IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDWARD A. BILISKI )
)
    Plaintiff, )
)
   v. )  C.A. No. 06-740-GMS
)
RED CLAY CONSOLIDATED SCHOOL )
DISTRICT BOARD OF EDUCATION, )
IRWIN J. BECNEL, JR., CHARLES )
CAVANAUGH, GARY LINARDUCCI, )
JAMES J. BUCKLEY, MARGUERITE )
VAVALA, YVONNE JOHNSON, )
MARTIN A. WILSON, SR, individually )
and in their official capacities as members )
of the Red Clay Consolidated School )
District Board of Education, ROBERT )
J. ANDRZEJEWSKI, individually and in )
his official capacity as Superintendent of )
Red Clay Consolidated School District; and )
RED CLAY CONSOLIDATED SCHOOL )
DISTRICT, )
)
    Defendants. )

## DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Barry M. Willoughby, Esquire (I.D. No. 1016)
Seth J. Reidenberg, Esquire (I.D. No. 3657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666; 571-6706
Facsimile: (302) 576-3345; 576-3442
Email: bwilloughby@ycst.com; sreidenberg@ycst.com
Attorneys for Defendants

Dated:  October 29, 2007

# TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................................ iii

NATURE AND STAGE OF THE PROCEEDINGS .................................... 1

SUMMARY OF ARGUMENT ...................................................................... 2

STATEMENT OF FACTS ............................................................................ 3

    A.    Plaintiff's Employment at Red Clay. ............................................ 3

    B.    Biliski's Performance Problems at Red Clay. ............................... 3

        1.    The March 30, 2006 Meeting Regarding
                Biliski's Performance Problems. ............................... 4

        2.    The July 31, 2006 Meeting Regarding Missed Deadline. ........... 6

    C.    The August 8, 2006 Meeting with Ammann and Davenport. ................ 7

        1.    The August 7, 2006 Memo – Unaccounted for Time. ............... 8

        2.    The August 7, 2006 Memo – Disregard for Instructions. ........... 9

        3.    The August 7, 2006 Memo – Refusal to Carry Out Assignments ............. 9

    D.    The August 8, 2006  Notice of Termination. ......................... 10

    E.    The Termination Process. .................................................... 11

        1.    Biliski Contacted Board Members. ............................. 11

        2.    Biliski Submitted Written Rebuttal to Board. ................. 11

        3.    The Board Approves Recommendation for Termination. ........ 12

        4.    Biliski's Employment Status. ................................... 12

ARGUMENT .............................................................................................. 14

    I.    PLAINTIFF DID NOT HAVE A PROPERTY
        INTEREST IN HIS EMPLOYMENT AS A COMPUTER
        TECHNICIAN AND THEREFORE WAS NOT
        ENTITLED TO PROCEDURAL DUE PROCESS. ......................... 14

II.     EVEN IF PLAINTIFF HAD A CONSTITUTIONALLY
        PROTECTED PROPERTY INTEREST, PLAINTIFF
        WAS PROVIDED WITH PROCEDURAL DUE
        PROCESS AS REQUIRED BY THE FOURTEENTH
        AMENDMENT.....................................................................................................17

III.    PLAINTIFF HAS NOT SUFFERED ANY HARM AND
        IS NOT ENTITLED TO DAMAGES ..................................................................20

IV.     THE INDIVIDUAL DEFENDANTS ARE ENTITLED
        TO QUALIFIED IMMUNITY. ............................................................................23

CONCLUSION............................................................................................................... 26

DB02:6277391.1                                                             061778.1006

# TABLE OF CITATIONS

Page

**Cases**

*Acierno v. Cloutier,*
   40 F.3d 597 (3d Cir. 1994)..................................................................................24

*Alexander v. Polk,*
   750 F. 2d 250 (3d. Cir. 1984)..............................................................................21

*Anderson v. Creighton,*
   483 U.S. 635 (1987)..........................................................................23, 24, 25

*Assaf v. Fields,*
   178 F.3d 170 (3d Cir. 1999)................................................................................24

*Atencio v. Bd. of Educ.,*
   658 F.2d 774 (10th Cir. 1981) .............................................................................20

*Barkauskie v. Indian River School Dist.,*
   951 F. Supp. 519 (D. Del. 1996)..........................................................................18

*Bishop v. Wood,*
   426 U.S. 341 (1976)................................................................................14, 21

*Blizzard v. Watson,*
   892 F. Supp. 587 (D. Del. 1995)..........................................................................14

*Brandywine Affiliate, NCCEA/DSEA v. Bd. of*
*Educ. of the Brandywine Sch. Dist.,*
   555 F. Supp. 852 (D. Del. 1983)..........................................................................20

*Butz v. Economou,*
   438 U.S. 478 (1978)............................................................................................23

*Carey v. Piphus,*
   435 U.S. 247 (1978)..........................................................................2, 20, 21

*Cleveland Bd. of Educ. v. Loudermill,*
   470 U.S. 532 (1985)................................................................................17, 18

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1997)............................................................................................23

DB02:6277391.1                                                                                                    061778.1006

*Gaines v. Wilm. Trust Co.,*
   C.A. No. 90C-MR-135, 1991 Del. Super.
   LEXIS 207 (Del. Super. June 3, 1997) ................................................................ 16

*Goodrich v. Newport News Sch. Bd.,*
   743 F.2d 225 (4th Cir. 1984) ............................................................................ 20

*Hameli v. Nazario,*
   1994 U.S. Dist. LEXIS 20523 (D. Del. Sept. 2, 1994) ....................................... 24

*Haney v. Laub,*
   312 A. 2d 330 (Del. Super. 1973) ...................................................................... 16

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) .......................................................................................... 23

*Hitchens v. Yonkers,*
   943 F. Supp. 408 (D. Del. 1996) ........................................................................ 15

*Hunt v. Chicago Housing Auth.,*
   1988 U.S. Dist. LEXIS 3295 (N.D. Ill. 1988),
   *rev'd on other grounds,* 1992 U.S. App. LEXIS 21810 (7th Cir. 1992) ............ 17

*In re City of Philadelphia Litig.,*
   49 F.3d 945 (3d Cir. 1995) ................................................................................ 24

*Knotts v. Bewick,*
   467 F. Supp. 931 (D. Del. 1979) ........................................................................ 21

*Larsen v. Senate of the Commonwealth of Pennsylvania,*
   154 F.3d 82 (3d Cir. 1998) ................................................................................ 24

*Lee v. Mahalich,*
   847 F.2d 66 (3d Cir. 1988) ................................................................................ 24

*Lloyd v. Jefferson,*
   53 F. Supp. 2d 643 (D. Del. 1999) ..................................................................... 24

*MacNamara v. County Council of Sussex County,*
   738 F. Supp. 134 (D. Del. 1990), aff'd, 922 F.2d 832 (3d Cir. 1990) ............... 14

*Malley v. Briggs,*
   475 U.S. 335 (1986) .......................................................................................... 23

*Mann v. Cargill Poultry,*
   C.A. No. 88C-AU37, 1999 Del. Super.
   LEXIS 225 (Del. Super. June 13, 1990) .............................................................. 17

iv

*Mathews v. Eldridge*
  424 U.S. 319 (1976)...............................................................................................21

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985)...............................................................................................23

*Morris v. Bd. of Educ. of the Laurel Sch. Dist.,*
  401 F. Supp. 188 (D. Del. 1975)......................................................................14, 15

*Nicholas v. Penna. State Univ.,*
  227 F.2d 133 (3rd Cir. 2000) .........................................................................21, 22

*Osteen v. Henley,*
  13 F.3d 221 (7th Cir. 1993) ...................................................................................20
*Rappa v. Hollins,*
  991 F. Supp. 367 (D. Del. 1997)............................................................................25

*Regents of State Colleges v. Roth,*
  408 U.S. 564 (1972)...............................................................................................14

*Rouse v. Plantier,*
  182 F.3d 192 (3d Cir. 1999)...................................................................................24

*Sharrar v. Felsing,*
  128 F.3d 810 (3d Cir. 1997)...................................................................................24

*Siegert v. Gilley,*
  500 U.S. 226 (1991)...............................................................................................24

*Stiner v. Univ. of Del.,*
  Civ. No. 02-312, 2004 U.S. Dist. LEXIS 17221 (D. Del. Aug. 27, 2004) ...............14

*Walls v. City of Milford,*
  938 F. Supp. 1218 (D. Del. 1996)...............................................................14, 17, 18

*We, Inc. v. Philadelphia,*
  174 F.3d 322 (3d Cir. 1999)...................................................................................23

**Other Authorities**

42 U.S.C. § 1983.......................................................................................................1

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed a complaint against Red Clay Consolidated School District Board of Education (the "Board"), the members of the Red Clay Consolidated School District Board of Education, the Superintendent of Red Clay Consolidated School District, as well as Red Clay Consolidated School District ("Red Clay" or "the District") itself, asserting a claim pursuant to 42 U.S.C. § 1983. Plaintiff claims that his procedural due process was violated when he was terminated from his computer technician position with Red Clay. In his complaint, Plaintiff seeks reinstatement with Red Clay, compensatory damages, including back pay, front pay, fringe benefits, and costs and attorneys' fees.

The parties have conducted discovery, including the exchange of documents and the taking of several depositions.

This is Defendants' Opening Brief in Support of Their Motion for Summary Judgment.

1

## SUMMARY OF ARGUMENT

Plaintiff raises a single claim in his complaint. He alleges that his procedural due process rights pursuant to the Fourteenth Amendment were violated when he was terminated. The Court should award Defendants summary judgment because (1) Plaintiff did not have a constitutional property interest in his employment with Red Clay; (2) even if he had a constitutionally-protected property interest, Plaintiff was afforded the procedural due process required by the U.S. Constitution – that is, notice of the job misconduct and an opportunity to be heard by the board prior to the decision to terminate him; and (3) regardless of any alleged procedural due process violation, Plaintiff is not entitled to a remedy under *Carey v. Piphus*, 435 U.S. 247 (1978) and its progeny since the District had a reasonable basis for terminating his employment and he would have been terminated in any event. In addition, the individual Defendants are entitled to an award of qualified immunity.

DB02:6277391.1                                                    061778.1006

## STATEMENT OF FACTS

**A.    Plaintiff's Employment at Red Clay.**

In January, 2001, Plaintiff, Edward A. Biliski ("Biliski"), applied for a Computer Technician position at Red Clay. (Biliski 49 (A33)). Biliski was interviewed by Charles Edward "Ted" Ammann ("Ammann"), Red Clay's current Manager of Technology, and Keith Cox, a Network Engineer for Red Clay. (Biliski 49-50 (A33-34)). In March, 2001, Biliski was hired as a Computer Technician in Red Clay's Technology Department. (Biliski 49 (A33)).

In 2002, Biliski was promoted to Help Desk Coordinator. Later that same year, Biliski voluntarily returned to his Computer Technician position, because he did not enjoy the Help Desk assignment and disliked two other Help Desk Coordinators. (Biliski 52-54; 78; 164-65 (A35-37; A38; A85-86)). Biliski remained a Computer Technician until his termination in August 2006. (Biliski 124 (A52)).

**B.    Biliski's Performance Problems at Red Clay.**

Initially, Biliski's work was satisfactory. His deposition, however, revealed that during this time he harbored resentments and misconceptions against his supervisors. He testified that he believed that his supervisors were involved in a "conspiracy" to get rid of him. (Biliski 92-94 (A44-46)). Biliski testified, for example, that he believed that his supervisors had placed a "tracking device" in his car, so he parked it on a public roadway where he could watch it. (Biliski 106-08; Henry-Carter Verification ¶4 (A47-49; A123)). He thought a returned shipment to a computer supplier was an effort to set him up for a "theft" claim, even though there was never any indication that anyone from the District thought he had stolen anything, let alone contacted the police. (Biliski 81-85 (A39-43)). When a vandal threw a rock through the window in the office where his desk was located, he believed one of his co-workers had done it. Biliski had complained about his co-workers to Ammann and believed that Ammann relayed

3

Biliski's comments to his co-workers. (Biliski 117-18 (A50-51)). He saved the rock as "evidence," but admitted that he did not have any facts to support his allegation that someone in the Technology Department had thrown it. (Biliski 117-18 (A50-51)).

Whether as a result of these unrealistic beliefs or otherwise, in 2006, Biliski's attitude and performance declined markedly. Beginning in March of 2006, he had several performance issues and workplace confrontations that led to his dismissal.

### 1. The March 30, 2006 Meeting Regarding Biliski's Performance Problems.

On March 30, 2006, Biliski had a meeting with Cara Gaudino ("Gaudino"), the Service Coordinator for the Technology Department and Biliski's direct supervisor, and Ammann. (Biliski 130; Biliski 3/30/06 Disciplinary Memo (A54; A3)). Biliski's managers reviewed the following performance problems with him. (Biliski 130-141 (A54-65)).

First, Biliski was criticized for not performing his assignment of cleaning up the Rapid Install Package ("RIP") computer installation files. (Biliski 3/30/06 Disciplinary Memo (A3)). Red Clay students were taking the Delaware Student Testing Program ("DSTP") tests from March 16, 2006 to March 24, 2006. (Gaudino 3/14-16/06 Emails to Computer Technicians (A1)). During this time, the Computer Technicians were instructed to stay out of the classrooms during regular school hours. (Gaudino 3/14-16/06 Emails to Computer Technicians (A1)). Since there would be some down time while the students were testing, Gaudino directed the Computer Technicians to complete some clean up work on their school's servers. On March 14, 2006, Gaudino emailed the Computer Technicians and instructed them to go through their assigned schools' servers and test the RIP files to see if they worked properly. (Gaudino 3/14-16/06 Emails to Computer Technicians (A1)). Gaudino sent a second email to the Computer Technicians on March 16, 2006 and instructed them to test the RIPs at their schools and delete any RIP files that were outdated or did not work. (Gaudino 3/14-16/06 Emails to Computer

4

Technicians (A1)). Gaudino again instructed the Computer Technicians to clean up the RIP files during a group meeting. (Biliski 128 (A53)). On March 17, 2006, Gaudino sent a final email reminder to the Computer Technicians and instructed them to clean up their RIPs and remove any Renaissance RIPs no later than March 24, 2006. (Biliski 131; Gaudino 3/14-17/06 Emails to Computer Technicians (A55; A2)). As of March 27, 2006, Biliski had still not completed this assignment. (Biliski 132; Biliski 3/30/06 Disciplinary Memo (A56; A3)). Gaudino and Ammann therefore counseled him about his failure to complete assigned duties.

Second, at the March 30, 2006 meeting, Biliski was counseled about his failure to complete another assignment, his responsibilities with respect to the Northwest Evaluation Association ("NWEA") testing preparation. In March, 2006, the students at Red Clay were scheduled to undergo NWEA on-line testing. (Biliski 3/30/06 Disciplinary Memo (A3)). When Gaudino asked Biliski if he had completed the NWEA preparation in his assigned schools, he admitted that he had not done so. (Biliski 132 (A56)). The March 30, 2006 Disciplinary Memo recounts that Biliski told Gaudino it was someone else's job. (Biliski 3/30/06 Disciplinary Memo (A3)). Later, Biliski testified that he may have jokingly said it was someone else's job. (Biliski 132 (A56)).

Third, at the March 30, 2006 performance counseling, Biliski was criticized for his behavior during a Customer Service Training Seminar. Members of the Technology Department were required to attend Customer Service Training at the Christiana Hilton in March of 2006. (Biliski 135-37; Biliski 3/30/06 Disciplinary Memo (A59-61; A3)). Biliski felt that the training was "totally ridiculous," "stupid," and a "waste of money." (Biliski 135-137 (A59-61)). When the instructor began the training, Biliski started "kidding around" with the presenter and she, in turn, commented that he was going to be the "rude one." (Biliski 137 (A61)). Biliski continued to talk loudly during the presentation and impacted the ability of others around him to

5

pay full attention. (Biliski 137; Biliski 3/30/06 Disciplinary Memo (A61; A3)). Gaudino and Ammann found his conduct to be embarrassing and inappropriate.

After reviewing the performance problems above, Ammann and Gaudino told Biliski that in a small department, every member of the team was expected to contribute 100 percent. (Biliski 138 (A62)). They both stated that they were disappointed in Biliski's behavior and that they expected to see an improvement in his performance. (Biliski 139; Biliski 3/30/06 Disciplinary Memo (A63; A3)). Biliski conceded that his supervisors discussed these performance problems with him, although he could not recall receiving their Disciplinary Memo memorializing their concerns. (Biliski 141 (A65)).

### 2.    The July 31, 2006 Meeting Regarding Missed Deadline.

On July 24, 2006, Biliski was given a Work Order to complete a wiring job in the Intermediate Distribution Facility ("IDF") at Conrad Middle School that was required for a construction project. The deadline for this assignment was July 28, 2006. (Biliski 7/31/06 Disciplinary Memo re: Missed Deadline (A4)). The work needed to be completed on time because if it were not, the outside contractors could not begin their work and it would prohibit after-hours access to the building. (Biliski 7/31/06 Disciplinary Memo re: Missed Deadline (A4)). Biliski did not start the assignment and never informed his supervisors that the work would not be completed by the deadline. (Biliski 145; Biliski 7/31/06 Disciplinary Memo re: Missed Deadline (A69; A4). On July 28, Ammann discovered that Biliski had not completed his assignment, and, as a result, he had to assign another Computer Technician at the last minute to complete the work. (Biliski 7/31/06 Disciplinary Memo re: Missed Deadline (A4)).

On July 31, 2006, Ammann met with Biliski to discuss the missed deadline. Biliski told Ammann that he overlooked the Work Order and gave a litany of excuses why he had not performed the work. (Biliski 142-144 (A66-68)). Ammann told Biliski that failure to

perform his work by the assigned deadline, without mutually agreed upon revisions to the deadline, would not be tolerated. Ammann warned Biliski that any future missed deadlines would result in disciplinary action up to and including termination. (Biliski 7/31/06 Disciplinary Memo re: Missed Deadline (A4)).

Ammann wrote a disciplinary memo outlining the missed assignment and memorializing the discussions he had with Biliski. (Biliski 7/31/06 Disciplinary Memo re: Missed Deadline (A4)). Biliski was instructed to return to the office to sign the disciplinary memo and Biliski was told that if Ammann was not in the office, he should ask his secretary, Rhonda Henry-Carter ("Henry-Carter"), for the memo. (Biliski 141-42, 145 (A65-66, A69)). When Biliski returned to the office, Ammann was not there. Henry-Carter gave the disciplinary memo to Biliski and asked him to sign it as Ammann had directed. (Biliski 145-46 (A69-70)). Instead of signing the document, Biliski became belligerent and told Henry-Carter that he would not sign the "f--king memo." (Henry-Carter Verification ¶6 (A123)). He left the building without telling Henry-Carter, or his supervisors, where he was going in violation of the policy. (Henry-Carter Verification ¶6 (A123)). During his deposition, Biliski denied that he cursed, but admitted to making disparaging remarks about Ammann. (Biliski 173 (A87)).

**C.    The August 8, 2006 Meeting with Ammann and Davenport.**

Biliski's performance and attitude continued to deteriorate after his meeting with Ammann on July 31, 2006. Ammann discussed the situation with Debra Davenport ("Davenport"), Manager of Human Resources, and was instructed to document the performance problems. (Ammann Verification ¶12 (A121)). On August 8, 2006, Davenport and Ammann met with Biliski and reviewed the following Disciplinary Memoranda with him.

7

1.      **The August 7, 2006 Memo – Unaccounted for Time.**

Biliski received a disciplinary memo for his inappropriate conduct and leaving the

office without notifying his supervisor, twice, once on July 31, 2006, and once on August 1,

2006. (Biliski 8/7/06 Disciplinary Memo re: Unaccounted for Time (A6)). After Biliski

received Ammann's July 31, 2006 memo from Henry-Carter, he left the building. Biliski

testified that he told Henry-Carter that he was going to see "Ammann's boss," Mary Norris, but

admitted he did not notify his supervisors that he was leaving. (Biliski 147-151, 154 (A71-75,

A78)). When he left the office at approximately 1:30 p.m., he did not send an email to Gaudino

as required of all Computer Technicians. (Biliski 151, 159-60; Ammann 8/1/06 Email to

Gaudino (A75, A83-84; A5)). Biliski testified that he drove to Brandywine Springs to talk to

Mary Norris and was told that she moved her office to Pike Creek. (Biliski 148 (A72)). Instead

of returning to his office or driving to Pike Creek to meet with Norris, Biliski decided it was too

late in the day and drove home. (Biliski 149-51 (A73-75)). Biliski testified that he never met

with Mary Norris. (Biliski 154 (A78)).

The next morning, Biliski decided to meet with Davenport. (Biliski 154 (A78)).

He testified that when he left the office, he told a co-worker, Troy Yeager, that he was going to

"see Mary Norris or somebody." (Biliski 154 (A78)).  Again, Biliski did not inform either of his

supervisors that he was leaving and did not send an email to Gaudino informing her of his

whereabouts. (Biliski 154-55 (A78-79)).

Biliski testified that he went to Davenport's office, but she seemed to be busy, so

he waited in the offices and talked with a secretary. (Biliski 153, 155-56 (A77, A79-80)).

Biliski stated that he went back to meet with Davenport and she was on the phone, so he left and

never met with her. (Biliski 156-57 (A80-81)). Davenport testified that Biliski never met with

her and she received no reports that he was in the building. (Davenport 21 (A101)). Biliski

returned to the Technology Department office at approximately 9:00 a.m. (Biliski 8/7/06

Disciplinary Memo re: Unaccounted for Time; Ammann 8/1/06 Email to Gaudino (A6; A5)).

Biliski confirmed that on both occasions, he left the Technology Department

without notifying his supervisors and never met with either Norris or Davenport. (Biliski 148-60

(A72-84)).

### 2.    The August 7, 2006 Memo – Disregard for Instructions.

Biliski also received a disciplinary memo, because he ignored his supervisor's

instructions to park in the front of the building during an extensive construction project. (Biliski

8/7/06 Disciplinary Memo re: Disregard for Instructions (A7)). Henry-Carter instructed all of

the Technology Department employees to park in front of the building, because there was

construction scheduled to be performed in the back parking lot. (Biliski 8/7/06 Disciplinary

Memo re: Disregard for Instructions (A7)). On August 1, 2006, Ammann sent a reminder email

to all Technology employees. (Biliski 176; Biliski 8/7/06 Disciplinary Memo re: Disregard for

Instructions (A88; A7)). On August 2, 2006, Biliski parked in the fire lane in the back of the

building directly in front of the closed back parking lot.

Biliski testified that he received Ammann's email, but claimed that he closed it

before he "finished" reading it. (Biliski 176 (A88)). Biliski attempted to rationalize his behavior

by stating that there were only fire lane signs on the left side of the road and he parked his car on

the right side. (Biliski 176-77 (A88-89)). When parking in the prohibited area, however, Biliski

also drove past the "Parking Lot Closed" sign that was placed at the entrance to the back lot.

(Biliski 208-10 (A94-96)).

### 3.    The August 7, 2006 Memo – Refusal to Carry Out Assignments

The third disciplinary memorandum Biliski received at the August 8th meeting

was for his refusal to carry out an assignment from Technician Assistant, Barbara Moore

9

("Moore"). (Biliski 8/7/06 Disciplinary Memo re: Refusal of Duties (A8)). On August 1, 2006, a van arrived at the Technology Office loaded with computer equipment. Moore went to the Technician Department and asked everyone to help unload the van. (Moore Verification ¶4 (A117)). They had two flatbed dollies and Moore wanted the Technicians to form a chain. The employees were to take the boxes out of the van, place them on a dolly, and push the dolly down the hall to another employee for unloading. (Moore Verification ¶4 (A117)). After Moore asked the Technicians to help unload the van, Biliski became belligerent and told Moore he had been working in the schools all day, it was hot, and he was not going to do it. (Moore Verfication ¶5; Biliski 189 (A117; A90)). Because of Biliski's insubordination and his use of profanity, Moore reported the incident to Ammann. (Moore Verification ¶6 (A117)).

### D.    The August 8, 2006  Notice of Termination.

During the August 8th meeting with Davenport and Ammann, Biliski attempted to talk over Davenport and Ammann several times and was asked to wait until they were finished. (Biliski 193; Ammann Verification ¶13 (A91; A121)). After Ammann and Davenport reviewed the three disciplinary memoranda with Biliski, he was given an opportunity to respond to the charges. However, rather than address the issues raised in the disciplinary memos, Biliski talked about issues that were unrelated to his performance problems. (Ammann Verification ¶13 (A121)).

Since Biliski offered no defense for his actions, Davenport handed him a letter informing him that due to his poor work performance, his name would be submitted to the Board for termination. (Davenport 8/8/06 Letter to Biliski (A9)). When Biliski saw the letter, he became extremely angry. He stood up, took off his I.D. badge, threw the badge at Ammann, and called him a "no good motherf--ker." (Biliski 194; Ammann Verfication ¶14 (A92; A121)). Biliski, still in a rage, threw a pencil at Ammann, hitting him in the chest. (Biliski 194-95;

10

Ammann Verfication ¶14 (A92-93; A121)). Davenport was shaken, told Biliski it was time for

him to leave, and he left the building. (Biliski 194-95; Ammann Verfication ¶14 (A92-93;

A121)).

### E.    The Termination Process.

#### 1.    Biliski Contacted Board Members.

After Biliski received his termination notice from Davenport, he attempted to

contact the individual Board members by telephone. (Biliski 7-8 (A27-28)). He called the

Board members at home and left messages with some on their answering machines. (Biliski 7-8

(A27-28)). Biliski also had conversations with some of the Board members, but he could not

identify who they were. (Biliski 8-9 (A28-29)). He asked the Board members to listen to his

side of the story and read his rebuttal letter before they voted to terminate his employment.

(Biliski 8-10 (A28-30)).

Irwin J. Becnel, Jr., President of the Board, recalled speaking with Biliski.

(Becnel 11 (A110)). When Biliski told Becnel that he wanted the Board to review his rebuttal

letter and attachments prior to making a decision, Becnel advised him to take the rebuttal letter

and attachments to Robbie Miller, the Board secretary, and she would distribute it to the Board.

(Becnel 11 (A110)).

#### 2.    Biliski Submitted Written Rebuttal to Board.

Biliski took his rebuttal letter (Biliski 8/16/06 Rebuttal Letter to Board (A10-24))

to the District Office for copying and submission to the Board. (Biliski 37 (A32)). The District

office received Biliski's rebuttal documents and put them in the Board packet for the meeting on

August 16. The Board discussed Biliski's termination during the August 16, 2006 Executive

Session. (Becnel 13-14 (A111-12)). Board President Becnel testified that during the Executive

Session, Biliski's rebuttal letter was discussed. The Board agreed that the documents Biliski

11

submitted did not refute the charges supporting the recommendation for termination. (Becnel 14-15 (A112-13)). In fact, some Board members felt the rebuttal was peculiar and that some of the information Biliski included was not related to the events of the termination. (Dunmon 20 (A108)).

### 3.    The Board Approves Recommendation for Termination.

After reviewing Biliski's rebuttal letter, the Board approved Biliski's termination. (Becnel 14-15; Davenport 8/17/06 Letter to Biliski (A112-13; A25)). Davenport sent Biliski a letter on August 17, 2006, notifying him of the Board action to terminate his employment and outlining his pension and benefit information. (Davenport 8/17/06 Letter to Biliski (A25)).

### 4.    Biliski's Employment Status.

Biliski was not a member of a collective bargaining unit nor subject to an employment contract. District officials all testified that he was an "employee at will" subject to discretionary dismissal. (Dunmon 19-20; Davenport 13, 18-19; Becnel 21 (A107-08; A98, A99-100; A114)). Biliski himself noted that he did not believe that he had any job protection in his position. (Biliski 8/16/06 Rebuttal Letter to Board (A17)). He testified that the only basis for his allegation in his complaint that he had an expectation of ongoing employment was the length of his service at Red Clay. (Complaint ¶15) (Biliski 10-11 (A30-31)).

During the discovery conducted in the case, Red Clay produced a personnel policy adopted over twenty years ago in 1985. It is anticipated that Plaintiff will argue that this policy, requiring "cause" for dismissal, applies to him and created a property interest in his employment. District representatives made clear that the policy has never been applied to at-will, non-union employees such as Biliski. (Becnel 21-22; Dunmon 18-19; Davenport 29-31 (A114-15; A106-07; A102-04)). Becnel testified that when the policy was adopted in 1985, there were no non-union employees employed by Red Clay. (Becnel 21-22 (A114-15)). The policy was

12

established to conform with the union contracts in effect at that time and, in fact, the policy itself references those union contracts. (Becnel 21 (A114)). Of course, as noted above, Biliski testified that he had no basis to believe that he had job protection and there is no testimony that he was even aware of it. He therefore could not have relied on the policy in any way.

13

## ARGUMENT

I.   **PLAINTIFF DID NOT HAVE A PROPERTY INTEREST IN HIS EMPLOYMENT AS A COMPUTER TECHNICIAN AND THEREFORE WAS NOT ENTITLED TO PROCEDURAL DUE PROCESS.**

Biliski did not have a protected property interest in his employment with Red Clay as a Computer Technician because the position was at-will, and as such, was not entitled to any procedural due process prior to his termination. The first step in analyzing a procedural due process claim is to determine whether a constitutionally protected property interest is at issue. *Regents of State Colleges v. Roth*, 408 U.S. 564 (1972); *MacNamara v. County Council of Sussex County*, 738 F. Supp. 134, 141 (D. Del. 1990), *aff'd*, 922 F.2d 832 (3d Cir. 1990); *Walls v. City of Milford*, 938 F. Supp. 1218, 1221 (D. Del. 1996) (to support a claim of a procedural due process in connection with termination from employment, a plaintiff must "establish that he has a constitutionally protected property interest in his continued employment.") "[W]hen the interest deprived is not of a constitutional magnitude, the Due Process Clause does not apply." *Blizzard v. Watson*, 892 F. Supp. 587, 592 (D. Del. 1995).

It is fundamental that ". . . the employee's property interest must amount to more than a mere unilateral expectation of continued employment." *Morris v. Bd. of Educ. of the Laurel Sch. Dist.*, 401 F. Supp. 188, 208 (D. Del. 1975) (quoting *Roth*, 408 U.S. at 577). The employee must have a "legitimate claim of entitlement to continued employment." *Id.*

The sufficiency of a claim of a legitimate entitlement to continued employment is a question of state, not federal law. *Bishop v. Wood*, 426 U.S. 341, 344 (1976); see also *Stiner v. Univ. of Del.*, Civ. No. 02-312, 2004 U.S. Dist. LEXIS 17221 (D. Del. Aug. 27, 2004). In other words, a federal court must consider the applicable state law to determine whether an employee has a right to continued employment.

An employee's mere subjective expectation is insufficient to raise the interest to a constitutionally protected level. *Hitchens v. Yonkers*, 943 F. Supp. 408, 411 (D. Del. 1996). In *Morris*, for example, the court stated that for a school teacher, an expectation of continued employment need not be secured by a formal contract, however, it must be secured by a binding understanding fostered by the school administration. *Morris* at 208-209. An employeee must be able to point to some objective criteria, however established and defined, by which the school administration has indicated a willingness to limit its discretion. *Id.* at 209 (emphasis added)

These principles are no less applicable in the case of an employee of a school district. Because Biliski cannot point to any objective criteria that indicated Red Clay's willingness to limit its ability to terminate Biliski, he did not have a property right of such constitutional magnitude that it demanded the protections afforded by the Due Process Clause of the Fourteenth Amendment.

Biliski has no legitimate claim of entitlement to continued employment with Red Clay. The President of the Red Clay School Board (Becnel), the Deputy Superintendent of Red Clay (Dunmon), and the Human Resources Manager for Red Clay (Davenport) all testified that Biliski's position was considered to be at-will. (Dunmon 19-20; Davenport 13, 18-19; Becnel 21 (A107-08; A98, A99-100; A114)). Furthermore, unlike a public school professional employee, there is no statute that governs Biliski's position or guarantees that he will continue to be employed with Red Clay.

In addition, Biliski was not part of a union, was not governed by a collective bargaining agreement, and had no employment contract with Red Clay. There has been no testimony that anyone in the Red Clay administration made any representations or promises to Biliski that he was guaranteed employment with Red Clay. Biliski's Complaint shows that his claim to continued employment with Red Clay was based solely on his length of service as an

15

employee of Red Clay. (Complaint ¶11). This subjective belief, in consideration of all of the objective evidence, does not support a finding that Biliski had a constitutionally protected property right.

It is anticipated that Biliski will argue that the policy adopted in 1985 by Red Clay entitled "Suspension and Dismissal of Classified Staff Members" ("1985 policy") applied to him and thus created a constitutionally protected property interest. The argument, however, is without merit for several reasons. First, there is no testimony that Biliski was aware of it, so it had no impact on his expectations regarding his employment. Second, Becnel, Dunmon, and Davenport all testified that the 1985 policy did not apply to Biliski. Becnel testified that the policy was adopted to conform with the union contracts in effect in 1985, when there were no non-union employees. Biliski was later hired into a non-union position and considered an at-will employee. Because the 1985 policy does not apply to Biliski, it does not offer him any constitutionally protected property right.

Third, as a matter of Delaware state law, the 1985 policy also does not give Biliski a legitimate claim of entitlement in continued employment. It is well-established that Delaware is an employment at will state. *Haney v. Laub*, 312 A. 2d 330, 332 (Del. Super. 1973). It is also well-established that employer policies such as those contained in an employee handbook concerning grounds for termination of employment or other discipline do not rise to the level of an employment contract and do not alter an employee's at-will status. *Gaines v. Wilm. Trust Co.*, C.A. No. 90C-MR-135, 1991 Del. Super. LEXIS 207 (Del. Super. June 3, 1997); see also *Haney at* 332. A unilateral expression of a policy by an employer such as that provided in a handbook does not modify an employee's at-will status. *Gaines* at *5.

Furthermore, courts have applied traditional contract principles in determining whether employee handbooks or policies alter the at-will status of an employee. *Mann v. Cargill*

16

*Poultry*, C.A. No. 88C-AU37, 1999 Del. Super. LEXIS 225, *19 (Del. Super. June 13, 1990).

Because the 1985 policy was not known to Biliski until after he filed his complaint, he could not

rely upon it to form the basis of his terms of employment. In *Hunt v. Chicago Housing Auth.*,

1988 U.S. Dist. LEXIS 3295 (N.D. Ill. 1988), *rev'd on other grounds,* 1992 U.S. App. LEXIS

21810 (7th Cir. 1992), for example, the District Court considered whether a policy adopted after

the plaintiff's hiring that prohibited termination without cause altered his at-will status under

Illinois law. In *Hunt*, the plaintiff was hired as an at-will employee of Chicago Housing

Authority ("CHA"). After he was hired, the defendant adopted a personnel policy that provided

that state employees could not be terminated without cause. The plaintiff was not made aware of

the policy until after he was suspended. The District Court found that the policy did not alter his

at-will status, because there was no knowledge or "acceptance" of the policy as required by the

traditional characteristics of contracts. *Id.* at *8.

The same principle holds true in this case. Biliski was hired as an at-will

employee. His employer did not consider the policy in question to apply to him. He was not

aware of the existence of the 1985 policy nor was it offered as a term of his employment. His

claim that the policy created a property interest is therefore without merit.

## II.   EVEN IF PLAINTIFF HAD A CONSTITUTIONALLY PROTECTED PROPERTY INTEREST, PLAINTIFF WAS PROVIDED WITH PROCEDURAL DUE PROCESS AS REQUIRED BY THE FOURTEENTH AMENDMENT.

Even if this Court were to conclude that Biliski had a constitutionally protected

property interest, Biliski was provided with procedural due process that met constitutional

standards. He received adequate notice of the reasons for his termination and an opportunity to

refute those reasons prior to the decision to terminate him. The essential requirements of due

process are notice of the charges and an opportunity to be heard. *Walls* at 1222 *quoting*

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). "Where a discharged public

17

employee is given notice of the charges, an adequate explanation of the evidence, and an adequate opportunity to present his side of the story, his due process rights are not violated." *Barkauskie v. Indian River School Dist.*, 951 F. Supp. 519, 533 (D. Del. 1996).

Notice of the charges need not be formal and need not be in great detail. *Id.* Notice need only provide the employee a meaningful opportunity to respond in the sense that he must know the substance of the case the employer has against him. *Id.*

Procedural due process also requires some kind of a hearing prior to discharge. *Id.* The purpose of having a hearing is "to provide an initial check against whether there are reasonable grounds to believe the charges against the employee are true and support the proposed action." *Walls* at 1222 *citing Loudermill*, 470 U.S. at 545-546. The opportunity to be heard need not be elaborate, and it can vary depending on the importance of the interests involved and the nature of the subsequent proceedings. *Id.* The opportunity to present reasons, either in person or in writing, as to why a proposed action should not be taken, can satisfy the due process requirement. *Id.*

In this case, Biliski was provided notice and an opportunity to be heard sufficient to satisfy the procedural due process requirement. Biliski had a meeting on March 30, 2006 with Gaudino and Ammann to discuss various performance issues Biliski was having in performing his job. He was also presented with these reasons in writing.

On July 31, 2006, Biliski had another meeting, this time with Ammann only, to discuss Biliski's failure to perform necessary work, by the deadline given to Biliski by Ammann. Biliski was also given a disciplinary memo outlining the missed assignment deadline and memorializing the discussion Biliski and Ammann had about the missed assignment. Biliski was asked but refused to sign the disciplinary memorandum.

18

On August 8, 2006, Ammann and Davenport met with Biliski to specifically discuss three incidents that occurred August 1 and August 2. At the August 8 meeting, Biliski was presented with three disciplinary memoranda, one for missing work without notifying his supervisor, one for disregarding the instructions of his supervisor, and one for refusing to carry out assignments. During the August 8 meeting, Biliski admitted to committing some of the acts identified in the disciplinary memos and denied some of the acts.

At the conclusion of the August 8 meeting, Biliski was provided a letter informing him that as a result of his disciplinary issues and poor work performance, his name would be submitted to the Board recommending that he be terminated. In response, Biliski stood up, took off his I.D. badge, threw the badge at Ammann, and called him a "no good motherf--ker." Biliski also threw a pencil at Ammann which struck him in the chest.

Following the August 8 meeting, Biliski contacted the Board members at home and had conversations with several of them, including Becnel. Biliski asked Becnel for permission to submit to the Board members a rebuttal letter in response to the allegations before the Board decided whether he should be terminated. Biliski was informed by Becnel that he should deliver the rebuttal letter to Robbie Miller, the Board's secretary, and she would make copies for the Board members. Biliski submitted a fifteen-page rebuttal letter in which he addressed the disciplinary memoranda that formed the basis for the recommendation for termination. The rebuttal letter was reviewed by the Board members prior to the August 16 Board meeting and questions were asked by the Board members regarding the allegations in the rebuttal letter. After considering the rebuttal letter and the recommendation to terminate, the Board voted unanimously to terminate Biliski.

Biliski may argue that the Board's actions were not in accordance with the 1985 policy. As discussed above, the 1985 policy did not apply to Biliski. However, even if this

19

Court concludes the 1985 policy applied to Biliski, the failure to follow the specific procedures set forth in the 1985 policy is not dispositive to the issue of whether Biliski was denied adequate due process. The fact that a valid school policy or state law is not followed is not by itself significant in determining whether procedural due process has been violated. *See Goodrich v. Newport News Sch. Bd.*, 743 F.2d 225, 226-27 (4th Cir. 1984) (*citing Atencio v. Bd. of Educ.*, 658 F.2d 774 (10th Cir. 1981)). A state's failure to follow its own procedures does not necessarily violate due process. *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993)("a violation of state law . . . is not a denial of due process, even if the state law confers a procedural right"). "The procedural protections that attach to a constitutionally protected interest are defined by federal constitutional standards of due process and not state procedural rules or statutes whether or not those state procedures fall short of, satisfy, or exceed the constitutional minimum. " *Brandywine Affiliate, NCCEA/DSEA v. Bd. of Educ. of the Brandywine Sch. Dist.*, 555 F. Supp. 852 (D. Del. 1983).

In short, constitutional procedural due process requirements are satisfied when an employee is given "notice" and an "opportunity to respond." *Loudermill*, at 546 (1985). Biliski has no "constitutional" right to the procedure set forth in the policy even if it applied to him. Since he was given notice and an opportunity to be heard, minimum procedural due process requirements were satisfied.

## III. PLAINTIFF HAS NOT SUFFERED ANY HARM AND IS NOT ENTITLED TO DAMAGES

If the Court concludes that Biliski: a) had a constitutionally protected property right and b) his procedural due process rights were violated, Biliski still cannot prevail because he has not suffered any harm and is not entitled to any award for damages. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

In deciding what process is constitutionally required in various contexts, the Supreme Court has repeatedly emphasized that procedural due process rules are shaped by the risk of error inherent in the truth finding process." (quoting *Mathews v. Eldridge,* 424 U.S. 319, 344 (1976)) The purpose of such rules is to minimize the substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis for which a government seeks to deprive individuals of these rights. *Id.* at 260. Thus, where a technical violation of procedural due process is found, a plaintiff is not automatically entitled to an award of damages. *Id.*

The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. *Nicholas v. Penna. State Univ.,* 227 F.2d 133 (3rd Cir. 2000) (quoting *Bishop v. Wood,* 426 U.S. 341, 349-50 (1976)). In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that the official action was regular. *Bishop,* 426 U.S. at 350. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions. *Id.*

Accordingly, if a defendant can prove that the decision to terminate would have been the same even if the correct process were followed, then the plaintiff has suffered no harm and, therefore, is entitled to no award of damages. *Alexander v. Polk,* 750 F. 2d 250, 263 (3d. Cir. 1984); see also *Knotts v. Bewick,* 467 F. Supp. 931, 936 (D. Del. 1979). Assuming Biliski establishes a prima facie violation of his procedural due process rights, it is Defendants' burden to show by a preponderance of the evidence that Biliski would have been discharged anyway. See *Alexander* at 264. The purpose of this test is to avoid the plaintiff from receiving a windfall, rather than compensation, when the results would have been the same if the correct process was followed. *Carey* at 260. First, as noted above, Biliski has no constitutional right to the process in the 1985 policy itself. If he had a property interest, his only federal right would arguably be to

21

substantive due process protection. It is clear, however, that Biliski's employment as a

Computer Technician does not rise to a fundamental right for constitutional purposes. In

*Nicholas,* the Third Circuit held that even a tenured university professor did not have a

fundamental right to public employment. 227 F.2d at 142. He therefore had no substantive due

process claim. The Court noted:

> Nicholas's tenured public employment is a wholly state-created contract
> right; it bears little resemblance to other rights and property interests that
> have been deemed fundamental under the Constitution. We agree with the
> analysis of the District Court in *Homar v. Gilbert* that "it cannot be
> reasonably maintained that public employment is a property interest that is
> deeply rooted in the Nation's history and traditions. Nor does public
> employment approach the interests" 'implicit in the concept of ordered
> liberty' like personal choice in matters of marriage and family.'" 63 F.
> Supp. 2d at 576 (citation omitted); see also *Collins, 503 U.S. at 128* ("state
> law, rather than the Federal Constitution, governs the substance of the
> employment relationship"). Accordingly, we view public employment as
> more closely analogous to those state-created property interests that this
> Court has previous deemed unworthy of substantive due process . . ."

*Id.* at 143.

Further, the standard the Courts apply to determining whether a substantive due

process violation has occurred is whether the public employer's actions were "arbitrary or

irrational." *Id.* at 142. Measured against this standard, the facts supporting Biliski's termination

clearly show that the decision was not arbitrary or irrational.

Second, even if the Court were to find that the 1985 policy applied to Biliski

despite the testimony to the contrary and the law establishing that he does not have constitutional

right to application of the policy itself, the undisputed record shows that there was just cause for

his dismissal. Biliski's own testimony establishes that he had performance problems. He had

multiple performance issues that were documented on four separate occasions within a five-

month period. Biliski was abusive to his co-workers and insubordinate. Biliski's performance

issues and attitude were considered by the Board along with the fifteen-page rebuttal letter

22

prepared by Biliski before the Board members voted unanimously to terminate Biliski's

employment. It is clear that if the Board followed any other procedures, the outcome would be

the same – the Board would still have terminated Biliski. Therefore, Biliski has suffered no

harm and is not entitled to an award in his favor for damages.

## IV.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Board Members, Irwin J. Becnel, Jr., Charles Cavanaugh, Gary Linarducci, James

J. Buckley, Marguerite Vavala, Yvonne Johnson, and Martin A. Wilson, Sr., and Superintendent

of Red Clay, Robert J. Andrzejewski, ("Individual Defendants"), as governmental officials, are

entitled to qualified immunity. Qualified immunity gives the Individual Defendants "immunity

from suit rather than a mere defense to liability . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985) (emphasis in original); *We, Inc. v. Philadelphia*, 174 F.3d 322, 325 (3d Cir. 1999). This

entitlement "is effectively lost if a case is erroneously permitted to go to trial." *We, Inc.*, 174

F.3d at 325 (*quoting Mitchell*, 472 U.S. at 526). The Individual Defendants' entitlement to

qualified immunity is a question of law, and the burden is on the Plaintiff to defeat their claim of

qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987).

Under the qualified immunity doctrine, the Individual Defendants are "shielded

from liability for civil damages insofar as [their] conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *County of

Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly

violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). *See also, Harlow*, 457 U.S. at 807

([O]ur cases make plain that "qualified immunity represents the norm."); *Butz v. Economou*, 438

U.S. 478, 508 (1978) ("qualified immunity from damages should be the general rule for

executive officials charged with constitutional violations . . . .").

23

The first step in dealing with a claim of qualified immunity is to determine "whether a plaintiff has alleged a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Larsen v. Senate of the Commonwealth of Pennsylvania*, 154 F.3d 82, 86 (3d Cir. 1998); *In re City of Philadelphia Litig.*, 49 F.3d 945, 961 (3d Cir. 1995) (*quoting Acierno v. Cloutier*, 40 F.3d 597, 606 n.7 (3d Cir. 1994)). "Deciding this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightfully claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." *Siegert*, 500 U.S. at 232; *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997). For the reasons set forth above, Biliski has not established a violation of his right to procedural due process.

Assuming, *arguendo*, that Biliski has established a procedural due process violation, the second step in the qualified immunity analysis is to determine whether the "unlawfulness of the action would have been apparent to a reasonable official." *Assaf v. Fields*, 178 F.3d 170, 174 (3d Cir. 1999). In other words, the Individual Defendants cannot be liable unless the constitutional right allegedly violated was "'clearly established' at the time [they] acted." *Acierno*, 40 F.3d at 606 (citing *Siegert*, 500 U.S. at 232; *Lloyd v. Jefferson*, 53 F. Supp. 2d 643, 678 (D. Del. 1999).

A constitutional right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Rouse v. Plantier*, 182 F.3d 192, 196 (3d Cir. 1999) (citing *Anderson*, 483 U.S. at 640 (1987)). Indeed, "the unlawfulness of [his] action must be <u>apparent</u> from previous court decisions." *Hameli v. Nazario*, 1994 U.S. Dist. LEXIS 20523, *27 (D. Del. Sept. 2, 1994); *Lee v. Mahalich*, 847 F.2d 66, 69 (3d Cir. 1988) (qualified immunity should be denied only if "a reasonable jury could find that the unlawfulness of the [defendants'] actions was so 'apparent'

that no reasonable [official] could have believed his [or her] actions were lawful."). There must also be at least some factual correspondence between the legal precedents and the issue at hand for the Individual Defendants to be liable. *Rappa v. Hollins*, 991 F. Supp. 367, 375 (D. Del. 1997) (citing *Anderson*, 483 U.S. at 640).

In this case, the testimony shows that the policy that Biliski now relies on was never considered to be applicable to him. It is also clear that Biliski was not aware of and never relied on the policy with respect to any expectation of continued employment. Further, there is no dispute that Delaware is an employment at will state. It can therefore hardly be said that contours of any claimed constitutional "property interest" in his position were clearly defined.

The Board acted in good faith by reviewing Biliski's termination in accordance with its usual practice. He was given notice and an opportunity to be heard. His letter to the Board was, in fact, considered before the Board voted.

Accordingly, a reasonable public official in the role of a school board member would not have known that Biliski's procedural due process rights may have been violated.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that summary judgment be granted and Plaintiff's Complaint be dismissed in its entirety.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby, Esquire (I.D. No. 1016)
Seth J. Reidenberg, Esquire (I.D. No. 3657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666; 571-6706
Facsimile: (302) 576-3345; 576-3442
Email: bwilloughby@ycst.com; sreidenberg@ycst.com
Attorneys for Defendants

Dated:  October 29, 2007

DB02:6277391.1                                                  061778.1006