IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDWARD A. BILISKI | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-740-GMS |
| | ) | |
| RED CLAY CONSOLIDATED SCHOOL | ) | |
| DISTRICT BOARD OF EDUCATION, | ) | |
| IRWIN J. BECNEL, JR., CHARLES | ) | |
| CAVANAUGH, GARY LINARDUCCI, | ) | |
| JAMES J. BUCKLEY, MARGUERITE | ) | |
| VAVALA, YVONNE JOHNSON, | ) | |
| MARTIN A. WILSON, SR, individually | ) | |
| and in their official capacities as members | ) | |
| of the Red Clay Consolidated School | ) | |
| District Board of Education, ROBERT | ) | |
| J. ANDRZEJEWSKI, individually and in | ) | |
| his official capacity as Superintendent of | ) | |
| Red Clay Consolidated School District; and | ) | |
| RED CLAY CONSOLIDATED SCHOOL | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO DEFENDANTS' OPENING BRIEF
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby, Esquire (I.D. No. 1016)
Seth J. Reidenberg, Esquire (I.D. No. 3657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666; 571-6706
Facsimile: (302) 576-3345; 576-3442
Email: bwilloughby@ycst.com; sreidenberg@ycst.com
Attorneys for Defendants

Dated:  October 29, 2007

# TABLE OF CONTENTS

Page

Gaudino Emails to Computer Technicians
dated March 14, 2006 and March 16, 2006 ...............................................................................A1

Gaudino Emails to Computer Technicians
dated March 14, 2006 through March 17, 2006...........................................................................A2

Ammann Disciplinary Memo to Biliski
dated March 30, 2006 ...................................................................................................................A3

Ammann Disciplinary Memo to Biliski re: Missed Deadline
dated July 31, 2006 ......................................................................................................................A4

Ammann Email to Gaudino dated August 1, 2006......................................................................A5

Ammann Disciplinary Memo to Biliski re: Unaccounted for Time
dated August 7, 2006 ...................................................................................................................A6

Ammann Disciplinary Memo to Biliski re: Disregard for Instructions
dated August 7, 2006 ...................................................................................................................A7

Ammann Disciplinary Memo to Biliski re: Refusal to Carry Out Assigned Duties
dated August 7, 2006 ...................................................................................................................A8

Davenport letter to Biliski dated August 8, 2006 ........................................................................A9

Biliski Rebuttal Letter and Documents to Red Clay Board Members
dated August 16, 2006 ...............................................................................................................A10

Davenport letter to Biliski dated August 17, 2006 ...................................................................A25

Excerpts from the Deposition Transcript of
Edward A. Biliski dated August 27, 2007 ................................................................................A26

Excerpts from the Deposition Transcript of
Debra Davenport dated August 29, 2007...................................................................................A97

Excerpts from the Deposition Transcript of
Diane Dunmon dated August 29, 2007....................................................................................A105

Excerpts from the Deposition Transcript of
Irwin J. Becnel, Jr. dated September 27, 2007.........................................................................A109

DB02:6328831.1                                                                                                                                    061778.1006

Verification of Barbara Moore dated October 11, 2007 ............................................................A116

Verification of Charles Edward "Ted" Ammann
dated October 12, 2007 ........................................................................................................A118

Verification of Rhonda Henry-Carter dated October 16, 2007................................................A122

DB02:6328831.1                                                                    061778.1006

| From: | Gaudino Cara <cara.roken@delaware> |
|---|---|
| Sent: | Thursday, March 16, 2006 9:52 AM |
| To: | Biliski Ed <eabiliski@redclay.k12.de.us>; Yeager Troy <tayeager@redclay.k12.de.us>; Martin Justin <justin.martin@delaware education.com>; Pritchard Rob <rob.pritchard@delaware education.com>; Amoroso Bryan J <bryan.amoroso@delaware education.com> |
| Subject: | FW: DSTP Dates- Reminder |

Please test the rips at your schools and delete any ones that are outdated or do not work.  (you can delete any Renaissance ones) <u>Leave everything that is in the Distributed Rips folder.</u>

**From:** Gaudino Cara
**Sent:** Tuesday, March 14, 2006 9:21 AM
**To:** Amoroso Bryan J; Berry Minta A; Biliski Ed; Brown Darryl; Clemmons Tony; Higgins David A; Kozulak Judy; Martin Justin; Pizzadili John; Pritchard Rob; Saienni Scot; Salem Kris; Schwartz Merrill; Yeager Troy
**Subject:** DSTP Dates
**Importance:** High

DSTP Testing is from  3/16 - 3/24. (Grades 2-10) Please make sure that you are not in the classrooms during school hours.

This would be a good time to test the rips at your schools to see which ones work and which ones don't or are outdated.

D128

A1

| | |
|---|---|
| **From:** | Gaudino Cara <cara.roken@delaware> |
| **Sent:** | Friday, March 17, 2006 4:04 PM |
| **To:** | Biliski Ed <eabiliski@redclay.k12.de.us>; Yeager Troy <tayeager@redclay.k12.de.us>; Martin Justin <justin.martin@delaware education.com>; Pritchard Rob <rob.pritchard@delaware education.com>; Amoroso Bryan J <bryan.amoroso@delaware education.com> |
| **Subject:** | DSTP Dates- Reminder to delete rips |

Last reminder to clean up your school's express/rips folder.   All Renaissance rips need to be removed (except anything in Distributed Rips.) All schools now have AR 6.32 and AM 2.32
This needs to be done by the end of DSTP testing, 3/24.

---

**From:** Gaudino Cara
**Sent:** Thursday, March 16, 2006 8:52 AM
**To:** Biliski Ed; Yeager Troy; Martin Justin; Pritchard Rob; Amoroso Bryan J
**Subject:** FW: DSTP Dates- Reminder
**Importance:** High

Please test the rips at your schools and delete any ones that are outdated or do not work.  (you can delete any Renaissance ones) Leave everything that is in the Distributed Rips folder.

---

**From:** Gaudino Cara
**Sent:** Tuesday, March 14, 2006 9:21 AM
**To:** Amoroso Bryan J; Berry Minta A; Biliski Ed; Brown Darryl; Clemmons Tony; Higgins David A; Kozulak Judy; Martin Justin; Pizzadili John; Pritchard Rob; Saienni Scot; Salem Kris; Schwartz Merrill; Yeager Troy
**Subject:** DSTP Dates
**Importance:** High

DSTP Testing is from  **3/16 - 3/24.** (Grades 2-10) Please make sure that you are not in the classrooms during school hours.
This would be a good time to test the rips at your schools to see which ones work and which ones don't or are outdated.

D127

A2

Aug. 23. 2007  1:55PM                                                    No. 6224   P. 2/2



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of
Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

**Help Desk**
(302) 636-HELP

**Technology Office**

# Memo

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | March 30, 2006 |
| **Re:** | Work Performance |

As we discussed, I have observed a number of problems with your performance as well as your attitude towards your responsibilities.

We requested that you go through your school's servers and clean up old RIPs – specifically those related to Renaissance Learning. You were asked a number of times including an email on March 17th. You were given a deadline of March 24th and as of March 27th this was still not finished.

Earlier this week, you were asked if you had completed the NWEA prep in your schools and you responded that it was someone else's job.

Additionally, your lack of respect and attention at the Customer Service training was not only rude to the presenter, but impacted the ability of others around you to pay full attention. As you have expressed in the past, training is extremely important to your ability to perform so it was especially troubling to see the lack of attention and respect for the time that was provided for you.

In a small department, it is important that every team member contribute 100%. I expect to see improvement in your performance over the next four weeks. Please let me know if there is anything I can do to assist you with this improvement. Failure to demonstrate an improved attitude as well as completion of assigned tasks will result in disciplinary action. There will be a follow-up by the end of April regarding the issues outlined above.

My signature below indicates that I have read the above statements and understand their content.  My signature does not necessarily indicate agreement.

Ed Biliski _____       Date: _____

Ted Ammann _____       Date: _____

1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 552-3662.

D169

A3



**Technology Office**

# Memo

**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

**Ted Ammann**
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | July 31, 2006 |
| **Re:** | Missed Deadline |

On July 24th, I assigned work order #44522 to you. This work order involved work that needed to be done in the IDF of Conrad Middle School as a result of a construction project. The deadline assigned to this work order was July 28th. This deadline was assigned due to the dependencies upon this work involving not only outside contractors but after hours access to the building.

As of the deadline, this work had not been completed, nor had you raised any concerns with having the work completed. Because you were not at work on the deadline, the work had to be assigned to someone else. The expectation of technicians is that work orders are completed by the date assigned. Failure to complete work by assigned deadlines without mutually agreed upon revisions to the deadlines can not be tolerated. Future missed deadlines will result in disciplinary action up to and including termination.

I have received the above memo.

_____

Ed Biliski

1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

D61

A4

| | |
|---|---|
| **From:** | Ammann Ted <tammann@redclay.k12.de.us> |
| **Sent:** | Tuesday, August 1, 2006 4:30 PM |
| **To:** | Gaudino Cara <cara.roken@delaware education.com> |
| **Subject:** | biliski |

just spoke with Debra and need to confirm before documenting and meeting with him tomorrow.

he left yesterday as far as you know about 1:30 (I'll confirm with RHonda)

this morning he left sometime between 7:30-8:00 and did not inform anyone that you are aware of as to his destination

he returned before 9AM NWEA mtg.

D98

A5



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

Help Desk
(302) 636-HELP

# Memo

**To:** Ed Bilinski

**From:** Ted Ammann

**CC:** Debra Davenport

**Date:** August 7, 2006

**Re:** Unaccounted for time

On August 1st, we met to discuss an issue regarding a deadline that you had missed. You were then asked to sign a memo that summarized our discussion. When you were given the memo, your behavior was inappropriate for a public office space. You were then unaccounted for during the rest of the day. The next morning, you again left and were unaccounted for until approximately 9AM.

You, as well as other full time techs, have been told to email Cara when you are going to be leaving the building. You have not been doing this.

It is even more important that you inform us if you are going to be leaving for non-tech. related issues so that we know you are not available. You are more than welcome to discuss any issues that you have with appropriate district personnel. However, it is incumbent upon you to notify Cara or myself when you are going to be away from your tech. responsibilities.

At this busy time of year, you were away from tech. responsibilities for over 2 hours with no evidence that you have met with any appropriate district personnel.

Cursing or disparaging remarks about supervisors in public places will not be tolerated and future instances will lead to discipline up to and including termination.

I have received, but do not necessarily agree with the content of this memo.

1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

D62

A6



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of
Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

**Ted Ammann**
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

---

*Help Desk*
(302) 636-HELP

# Memo

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | August 7, 2006 |
| **Re:** | Disregard for instructions |

---

As you know, there has been extensive construction going on in the back parking lot of Conrad. In preparation for this week's construction, we were asked to park in the front of the building. At my request, Rhonda shared this with the team last week. On August 1st, I sent a follow up reminder letting people know that parking needed to be in the front of the building. On August 2nd, you parked in the fire lane behind the building.

In addition to being a safety hazard, parking here showed a disregard for instructions you had been given. This will not be tolerated. Future disregard for instructions or any other similar behavior will lead to disciplinary action up to and including termination.

I have received, but do not necessarily agree with the content of this memo

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

D63

A7



**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of**
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

# Memo

**To:**  Ed Biliski

**From:**  Ted Ammann

**CC:**  Debra Davenport

**Date:**  August 7, 2006

**Re:**  Refusal to carryout assigned duties

On August 1st, some technicians brought back a van of equipment that needed to be unloaded to our offices. The van was backed up to the door as to quickly empty the van, Barb asked everyone in the building to assist with the unloading. As she came to you, your response was, "No, I'm not doing it. I've been in the schools and it's hot."

Moving technology equipment is a job responsibility of Red Clay technicians and as such you were refusing to complete your responsibilities. It also meant more work for colleagues who were willing to complete the task assigned.

Failure to complete assigned tasks can not be tolerated and continued refusal will lead to disciplinary action up to and including termination.

I have received, but do not necessarily agree with the content of this memo.

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

D64

A8



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

Human Resources

(302) 683-6656
FAX (302) 636-9778

Debra Davenport
*Manager*

Debra.Davenport@redclay.k12.de.us

August 8, 2006

Mr. Edward Biliski
106 Hunn Road
Manor Park
New Castle, DE  19730

Dear Mr. Biliski,

This letter is a follow-up to the meeting held today with me and Mr.
Ammann.  Due to poor work performance your name will be submitted
to the Board of Education for termination.  If approved your date of
termination will be effective August 11, 2006.

Sincerely,

*Debra Davenport*

Debra Davenport
Manager, Human Resources

cc:  Ted Ammann
     Mary Norris
     Diane Dunmon
     HR/Payroll

D65

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in
its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is:
Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A9

August 16, 2006

TO: The Board of Education for RCCSD
RE:  Edward Biliski wrongful termination

I would like to thank each member of the Board for reviewing my wrongful termination situation.

To begin, I have had an exemplary work record, as documented in my file, for over five dedicated years that I have worked with the Technology Department at RCCSD.

I Edward Biliski have worked for the Technology Department at RCCSD for over five dedicated years and during that time I have completed more work orders than anyone else in our office. Over 4000 closed Track-it work orders in 5 years and I have worked through many of my lunches (over 75 in 5 years) to get teachers and administrators back up and running, I also stayed late to get the work done and never asked for any compensation. My job was rewarding to know that I was able to help in some small way. I have also received many appreciation letters for a job well done, more that anyone else in our office most of them were left on my computer and never had the chance to retrieve them.

I know how important it is to have and maintain a job in today's market and I have always protected it by being on time every day when the rest of the office arrives around 15 minutes late every day and nothing is said to them. I try doing more work that the average employee. I have had no complaints about my work in 5 years and 4 months and in the matter of 10 days my manager over reacted to a problem that should have been nothing more that a verbal reprimand. I had apologized to him 3 times but that was not good enough, I have even email him and still he was unwilling to be compassionate.

The problem was not completing a track-it work order that Ted Ammann has called "Missed Deadline" that was assigned to me to be completed by a certain date. He called me on my cell phone and asked me to sign a document that was going to go on my permanent record and said lets put this all behind us. The reason I did not want to sign it was I knew that I was not treated in the same manner as the rest of the staff and that he could whip up more documents at will for the smallest infraction and that is just what he did.  I have put my response to the reason why it was not completed on time on the back of Ted Ammanns " Missed Deadline" document.

I did not want to sign the document because I believe that Ted Ammann was being unfair. Other employees had done things that were 10 times worse and were never written up for it. I will give you examples at the end of this letter of some of the other things that happened at our office and check and see if they were ever written up. It is Ted Ammann being paid extremely well for a Technology manager and failing to do his job time after time after time.

Right after I was written up for missing a deadline Ted Ammann had Cara Gaudino email other technicians to sit down and go over their over due work orders. I get fired for missing one Track-it work order and they get to sit down and discuss all theirs over due work orders with Cara Gaudino.

I received the document that Ted Ammann wanted me to sign and when I went to see his boss Mary Norris to complain about being treated unfair and he whipped up 3 more documents to

D67

A10

keep me from voicing my side of the story to anyone above him. He deliberately lied in the 3 of the documents and made statements that were just not true. And if terminated I will pursue legal action against Ted Ammann for all the damage that he may have caused by his actions. Where are the check offs to make sure Ted Ammann is acting in the best interest of Red Clay and not his own.

I was on light duty for 6 to 8 weeks because of going through minor heart surgery and had a defibulator implanted and Ted Ammann fires me due to poor work performance. I had told Ted Ammann I needed 6 to 8 weeks for light duty and I asked him if he needed a doctor's slip and he said no and take as much time as I needed. Then he turns around and documents me for not wanting to unload a small van. That was not true I am on light duty because I am not supposed to reach out or above my head with my left arm. I am not supposed to pick up any thing more that 15 pounds until everything heals. I was getting up to help and Barb Moore said with my condition I did not need to help so I sat back down. Jill who was sitting next to me heard Barb Moore make the comment.

I hope that you will look into the information that I have sent you and you will not elect to terminate me. Again I have done absolutely nothing wrong to be terminated from my job regardless of what Ted Ammann or Diane Dunmon say on and off the record. This is a deliberate act of harassment. I will add some of the other problems that other people in our office did and were not written up for and terminated.

Where did I have any chance to defend my self. There was never any training on how to handle these things. It was ok to leave my work to go sign his document but not ok to go see his boss to complain about being treated unfairly.

Ted Ammann has been to New York, San Diego and Rehoboth for conferences and then went on vacation to North Carolina and probably used comp time from the conferences instead of his vacation time. What a great life. Teachers are paying for supplies out of their own pocket while he is traveling all over the country. What would the tax payers think about that? I have been working in hot buildings with no air conditioning while recovering from a heart condition while he's traveling around the country and then comes back in a bad mood and I am fired.

I am available to return to work immediately and I am willing to put all of this behind me. If Ted cannot put it behind him perhaps you could arrange for my transfer.

It is my hope that we can settle this voluntarily as my health benefits and possibly my life are at stake.

I am willing to meet with anyone and request such a meeting in the event the Board votes against me.

Sincerely,


Edward Biliski
Attached: Ted's four write-ups and my rebuttals to the documents.


D68

A11



**Technology Office**

*MAIN COMPLIANT*

RED CLAY CONSOLIDATED
SCHOOL DISTRICT

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of
Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

# Memo

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | July 31, 2006 |
| **Re:** | Missed Deadline |

On July 24th, I assigned work order #44522 to you. This work order involved work that needed to be done in the IDF of Conrad Middle School as a result of a construction project. The deadline assigned to this work order was July 28th. This deadline was assigned due to the dependencies upon this work involving not only outside contractors but after hours access to the building.

As of the deadline, this work had not been completed, nor had you raised any concerns with having the work completed. Because you were not at work on the deadline, the work had to be assigned to someone else. The expectation of technicians is that work orders are completed by the date assigned. Failure to complete work by assigned deadlines without mutually agreed upon revisions to the deadlines can not be tolerated. Future missed deadlines will result in disciplinary action up to and including termination.

I have received the above memo.

_____

Ed Biliski

D69

1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A12

PROBLEM 1. Missed Deadline –
    Not completing a work order assigned to me on the 24th and that needed to be done by the 28th. The work order consisted of disconnecting wires in a network closet so the rack could be moved by contractors out of the closet area. It was completed on time by another technician in about ½ hr on the 28th with little interruption. This is why we have team meetings with team building games to be able to get things done in a minutes notice and in a fast pace environment.

    It turns out that the patch cable wires in the front did not need to be removed to get the rack out of the room. All they had to do is disconnect the 4 power cords and the one network cable supplying the t-1 connection. This could have been done in less than **"20 seconds"**. The network cables running to the back of rack were cut off by the contractors and they also removed the fiber optic connections at the same time. Ted Ammann did not know what he was talking about and had the technician create a bigger job because the wires were pulled out and thrown in a box and then someone had to untangle and separating each patch cable.

During the four days - Troy Yeager was off and I could not get it done first thing in the morning.
1. I covered for an admin staff meeting on Thursday and Wednesday I had to leave the Central school early to go back to the tech office and get a laptop and a projector for the meeting the next day.
2. I also have been working at Central School moving equipment around in many of the rooms per the principals request in very hot rooms again sweating from the heat.
3. Also had to install memory in all the newer computers per Cara Roken and upgrade to windows XP. Some of the equipment was not working properly and had to be setup and connected to the network.
4. Had to check on 2 problems in the community training lab per Cara Roken.
5. I had a hard drive taken off my desk in the past and I did not want to leave all the memory laying around the office so I went over to Central School and installed all the memory in as many computers as I could and by the end of the day my shirt that was soaking and I was feeling nauseated from the heat at the end of the shift.
6. All the computers had to be renamed at the Central \ Community school. I did this in rooms that had a reading near 100 with the heat index for 4 of the days around the 27th
7. I also had to go to mote to trouble shoot a network problem per Cara Roken because Cheryl Burns could not run an application - oms.
8. Also had to cover the help desk in the morning by my self from 7am to 8:15am because Troy Yeager was on vacation the 4 day's in question.
9. On the 27th I had to cover the Admin's meeting in the morning and I also had to leave to go to a doctor's appointment at 2 o'clock. This was the first follow up visit after 1- heart surgery and 2- having a defibulator installed in my chest to keep me alive. This was not only weighting on my mind on Thursday but for a couple of days leading up to it. I was going to get my results from all my tests.
10. On the 24th I had checked my track-it work orders first thing in the morning and their was no work order assigned to me at that time. I grabbed my work and left for the day not knowing it was even assigned to me.

D70

A13

PROBLEM 1. Missed Deadline –

Ted Ammann had called me in his office to discuss missing the deadline for the work order that was supposed to be done on the 28th. I told him that I did not intentionally avoid doing it and with everything going on I had over looked it. I apologized to him but that just was not good enough. I did everything to be as nice and non confrontational as I could to him and to get him to see my side but he was just really unreasonable. He seemed to be in a bad mood when I walked into his office and the feeling did not change when I left.

I left his office not feeling good about the whole situation so I email him to try and convey again how sorry I was but it did not seem to matter. Since I have started a RCCSD their probably have been over 5000 over due work orders and it looks like mine is the unacceptable one. Amazing that you can have an uncompleted work order one day and be out of a job the next day. I have over 4000 completed Track-it work orders and more than anyone else in our office but still once again this over-all performance is not good enough. I have in the past worked through my lunches to get the job done (over 75 lunches in 5 years) and also worked over time with out asking to be paid. I have had a lot of appreciation letters for the work that I have done. It just does not seem fair. Right after I had received the document that ted wanted me to sign Cara (Help Desk Manager) started emailing other techs about needing to talk to them about their over due work orders and none of them received letters that would go into their file. She would have never of done this if it wasn't for this current situation.

This is the main work order that started the whole problem.

There is no compassion with Ted Ammann. He knows I am on light duty for about 8 weeks after the surgery and he said he had no problem with that and take as long as I needed. He never stopped to ask if everything was ok and was having any problems with the lifting or if there was anything weighing on my mine that made me forget the work order. Did he ever stop to think I may have received bad news. He knows I have a heart condition and I just got out of surgery about a month ago. 1 -I had surgery on my heart and 2- I had a defibulator implanted in my chest to save my life if it gets out of rhythm. My heart rate was causing problems with my kidney and the side affects of that is feeling fatigued and nauseated he was aware of that. I have been working through this whole ordeal feeling fatigued and nauseated from my current problems and working in hot rooms has not made it any better. Through all this I was able to get all of my work orders done but this one and nobody else finisher all of theirs either.

I can not believe that in just 10 days I had nothing on my personal record and in a matter of 10 days there is a letter sent to the board of directors for approval to have me terminated with out any just cause. I was given no chance to defend my self against any allegations. There must be a code of conduct, ethics or a standard practice procedure to make sure a boss is not over stepping their boundary's and for dealing with these problems fairly.

To me this feels exactly like a hit and run accident or a drive by shooting with absolutely no reguards for me to be treaded honestly and fairly. This to me is just unethical.

D71

A14

An Example of favoritism

Ed Biliski

There was 4 days of tech training scheduled for the operation of apple computers.

The teacher from the company that was going to do the training emailed Keith Cox 2 times about what he needed before class and had received no reply. So on the last email he added "do not ignore this email" and Keith Cox never responded. Did Keith deliberately avoid this issue, I would say absolutely not. I would say he had a lot of work to do and missed it. And just like Richard Applegate jumped in and got my work done me so did cara jump in and help keith in the same manner.

The teacher who was not a regular teacher but a programmer agreed to fly out and train the 7 techs at red clay and about 5 techs from other schools.

He emailed Keith on how to setup the computers and have them ready so that he would be in very early to do a final setup of the programs that they were going to run for the 4 days.

He arrived and no computers were setup. Keith and Cara had to rush to get a network switch of 24 ports down to Conrad Library set it up, run all the network patch cables and then get all the laptops on the network. The teacher was very pissed off. He was hours behind and keep saying that he may not be able to get through everything in 4 days. He keep saying that this was it and he will never agree to do the training again. He also complained about the network being setup poorly and that he had never seen a network setup so bad. This teacher was one of the best teachers that we had ever seen.

Did Ted Ammann ever write up Keith Cox for his missed assignment and delay of a training class with 12 people and a programmer waiting around. Because Keith has a boat in the same marina as Ted should not be the deciding factor on weather you go beyond a verbal reprimand for one employee and a written document on some ones record with note of taking a disciplinary action up to and including termination.

I know there is a lot more instances of missed assignments where meetings were scheduled and know one was there to support the meeting or have software installed.

D72

A15



*1 of 3 That were added*

RED CLAY CONSOLIDATED
SCHOOL DISTRICT

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

# Memo

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | August 7, 2006 |
| **Re:** | Unaccounted for time |

On August 1st, we met to discuss an issue regarding a deadline that you had missed. You were then asked to sign a memo that summarized our discussion. When you were given the memo, your behavior was inappropriate for a public office space. You were then unaccounted for during the rest of the day. The next morning, you again left and were unaccounted for until approximately 9AM.

You, as well as other full time techs, have been told to email Cara when you are going to be leaving the building. You have not been doing this.

It is even more important that you inform us if you are going to be leaving for non-tech. related issues so that we know you are not available. You are more than welcome to discuss any issues that you have with appropriate district personnel. However, it is incumbent upon you to notify Cara or myself when you are going to be away from your tech. responsibilities.

At this busy time of year, you were away from tech. responsibilities for over 2 hours with no evidence that you have met with any appropriate district personnel.

Cursing or disparaging remarks about supervisors in public places will not be tolerated and future instances will lead to discipline up to and including termination.

I have received, but do not necessarily agree with the content of this memo.

D73

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A16

Unaccounted for time

This was not a memo it was a document of termination. I left the building to go to his boss to complain about him and being treated unfairly and if I was treated fairly this complaint would not exist. There was nothing ever mentioned in our team meetings about resolving issues like this. This is my first time that I have ever gone through this and when I went over to talk to someone about how to handle this situation they offered to help. What should I have done asked for his permission to go to his boss and complain about him and should I have also asked if he would mind giving me a ride over to. Every group that works at red clay has union representation the sectaries, teachers, maintenance, custodians to help them through these things and to keep the RCCSD administrator staff honest but not the technology department. And Red Clay has never put anything in place to offer us the same treatment. The only recourse was to go to Ted's boss and complain and of course I did not want him to know. I was there because I was discriminated against and treated unfairly.

There are many different procedures and for different people.

**The building techs** - do not show up at the office they go right to the schools. They are not emailing Cara everyday when they get to their schools. These are the people that should be emailing Cara because they are not reporting to the office or signing the board with their location.
**The techs** – that do come to the office first started with having to sign a book in the help desk room, and sign a board at the entrance of the office. Then it went to emailing Cara, signing the book in the help desk room, and signing the board at the entrance. More than one person said that this was f@&king ridiculous and went to have it changed. Then the final change was when you leave to email Cara and sign the board at the entrance.
**The network engineers** – don't email cara when they leave the building. They are not signing out of a book when leaving or returning they only sign out on the board at the entrance and they don't put down any time when they leave just the location where they are going to be.  Once they wipe the board clean at the entrance there is no way of ever knowing where they were. When they go out to the schools they do not sign in or out when they arrive, leave for lunch or when they are finished at that school. Why are they not emailing Cara before they leave the building. The question is why do we have to do both when the network engineers only have to sign the board at the entrance.
**Outside Visitors** – There is no book at our office to keep track of people that are coming and going that do not work in our department. When they are arriving or leaving they are not signing in and out of a book, they meet with people and then leave. After they leave there is no record of who they were, who they met with and how long they were in the building. **Example:** I have walked into the parts room and seen a dell technician sitting in the room fixing a computer on many occasions with no one else in the room. He is inches away from many laptops, switches, hard drives that could easily be put in his large tool bag that he brings with him. We just had 4 missing laptops and did anybody even consider the possibility dell technician may have taken them, the answer is no it was not even on the

D74

A17

radar screen. If you had everyone that comes in the office sign in and out of one book then when there is missing equipment you would know who to start asking questions and if the fire alarm sounds they could grab the book meet in one location and make sure everyone is accounted fore and not have to worry if someone may be trapped in the building.

If Cara needs to know where I am all she has to do is call my RCCSD cell phone. That is why I carry one.  I have answered it every single time she has called, what is the big deal. The first thing Cara does when she is looking for someone is to call out to Debbie and asked if that person has signed out on the board and left the building and if so where they went to. Emailing Cara does not make any sense or everybody would be asked to do so. There are more people in our office that don't email Cara then there are that do. And all the ones that she has asked to email her have all stopped and she has never made a big deal about it. It is only a big deal now because it is now a tool to terminate me and that is all. The reason we have stopped is it's an easy thing to forget. What is the big deal, it is an unnecessary step and as soon as she gets the email it is deleted. If she wants to use the email as a step to get the techs out of the office then why not come in to the help desk area every morning and ask when we are leaving. Why was she moved out of the help desk area any whey. That made no sense except for her taking long lunches and leaving to go pick up Coffee with Barb Moore and not have the rest of us see all the time she was wasting. Your treating the Tech's that report to the office different then everyone else. Every one should follow the exact same procedure period, and it should be based around something that makes sense.

What behavior I felt like I was just sucker punched. What pray tell was my inappropriate behavior. Was it cussing, every body in the office at one time or another has used inappropriate language including you Ted Ammann and Cara Gaudino people in a management position that are truly representatives of the Red Clay School District. I have heard both of them say the same things my self and right after that they made a short apologetic remark because I was standing there and I happened to hear it. This also took place in an office area. When I get in the morning there is a group of 4 people in the lobby that spend at least ½ hr every single morning from 7:30 to after 8 am and as soon as Ted drives up is when the morning party breaks up. This has gone on ever since we moved to Conrad over 2 years ago. And when I went up to ask a question about work related issues I felt like I was intruding in their party. This kind of conduct should not be tolerated in an office but I cannot report it to Ted because he will make sure it got back to the person that I was the one that told him causing more trouble with employees. They were always talking about sex toys and having a sex toy party show at one of there homes. When I walked up to Cara's cubicle there were 3 people standing around and Rob Feby was talking about the women getting a Brazilian bikini wax and how much that must hurt, who knows how long that conversation went on. There was a group of employees that even left work to go shopping for sex related toys and by the time they drove to and came back their lunch was over. So the time spent at the sex store was on RCCSD time. One morning I walked over to ask a question and one employee was talking about using a vibrator with elephants printed on it. She has made this comment and similar ones on numerous occasions.

Ted Ammann has loaded up the office with woman and there is a little click that easy spend

a third of their working hours talking about nothing and this goes on every day. Their gossip has lead to at least one person being terminated no I am sorry now two. Barb Moore a low level tech has on many occasions bad mouth employee. She went on and on about how much she hated him until he was finally terminated. The employee that was terminated knew he was going to be fired because when he went to pay 5 dollars to our office fund barb moore said that's ok you do not need to contribute otherwise she would of never refused his money. How does a low level technician know that someone is going to be fired if Ted Ammann is not leaking the information.

You want to talk about being away from your responsibilities the first year I was the help desk coordinator the 3 engineers and 2 technicians were going down to the driving range and were away from their duties and not informed anyone that they would not be available. They spent about an hour and a half all during the summer and three times a week. Ted purchased new golf clubs just to go down to the driving range with them. By the time you drive to and from the driving range your lunch is over. Ted knew this and not only did he choose to ignore it but he joined them. I went to the golf course one day and when I seen how much time it was taking up I never went back. By not going back made the other people paranoid and they were worried that I was going to go to upper management and tell them what they were doing. Me the responsible one that did not want to waist rccsd,s valuable time or put my job in jeopardy. Again no one was written up and placed in their permanent record or even terminated from their job. I don't here management telling ted to do his job or your out. You are talking about 5 people X 1 and1/2 hours a day X 3 days a week. That is over 22 lost work hours a week and well over 100 lost work hours in 21/2 months. Imagine what the tax payers would say about that. Teachers are buying supplies for the children with their own money while the tax payers money is being wasted at the driving range. This is clearly an act for termination he knew this was going on all summer long but he deliberately ignored the problem as such he failed to do his job and he should be fired for it. Ted has brought up on many occasions that we only get ½ hour for lunch and you lunch starts when you leave the building and not when you have your food and you sit down to eat it. There is a group of people that have totally ignored this direct request and as such failed to do their job and they were never written up for it. This group has taking over an hour for lunch every single day but they are friends of Ted Ammann so this is ok. When they were done at the driving range they would stop and order lunch and then go back to the office and eat it at there desk.

The second biggest time that was wasted and this would be by far was when Cara was planning her wedding and she stayed logged out of her phone and let the other colleagues pick up all the work. For about 3 months you could not walk by her cubicle with out seeing 2 or 3 people constantly standing around talking about her wedding and other things that were not related to her job. They were there morning, noon and night. Someone would make a comment every day about the time she keeps wasting and ted knew this and he deliberately choose to ignore it and never made one negative comment about her wasting so much time.

When ted ammann was off Cara and Barb would leave on company time and go down and Get a pedicure.

D76

A19

Unaccounted for time

Chris Jerger was away from his job and unaccounted for when he was over at a dentist office working on their computer system trying to get it back up and running. Two people seen him running back and forth trying to fix their issues. The date was 9\25 but not sure of the year. I checked the tech calendar and there was no personal time listed that he would be away from his duties. Chris Jerger fixes computers on the side but does any manager watch to make sure he is working for Red Clay and not Chris Jerger on RCCSD time. Nobody knows how many other times he has done this. When he leaves the office all he does is sign a board by the entrance as to where he is going and no time is included of when he left. Once he returns and wipes the board clean there is no way of going back to see where he ever was. There is a book at each of the schools for the technology dept. to sign in and out when they arrive or leave the schools but Chris Yerger and the other Network Engineers has stopped signing it and Ted Ammann has never done any thing to them. Why don't they have to email Cara when they leave the office especially Chris Jerger who is known to be out of the office on quite a bit on personal business.

It was brought up in a conversation about some of the employees always coming in late and Chris Jerger made the comment that he comes in late every day and nothing has ever been done to him.

On 2 occasions Chris Jerger told teachers and sectaries that they were stupid and one of them broke down in tears. How does Chris get away with not being written up?

People are late every single day but are they ever written up,  the answer is no.

There is a group of people that arrive in the morning that do nothing but hang out by the front desk talking and having a good old time at the expense of RCCSD. This has gone on for over a year it starts at 7:30 and ends after 8am if and when Ted Ammann drives up. Some one made a comment that no one works when Ted is not there and a co worker made the joke that no one works when he is here either.

D77



*2 of 3 That were Added*

**IED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of
Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

**Ted Ammann**
*Manager of Technology*
Ted.Ammann@redday.k12.de.us

───────────

*Help Desk*
(302) 636-HELP

# Memo

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | August 7, 2006 |
| **Re:** | Refusal to carryout assigned duties |

───────────────────────────────

On August 1st, some technicians brought back a van of equipment that needed to be unloaded to our offices. The van was backed up to the door as to quickly empty the van, Barb asked everyone in the building to assist with the unloading. As she came to you, your response was, "No, I'm not doing it. I've been in the schools and it's hot."

Moving technology equipment is a job responsibility of Red Clay technicians and as such you were refusing to complete your responsibilities. It also meant more work for colleagues who were willing to complete the task assigned.

Failure to complete assigned tasks can not be tolerated and continued refusal will lead to disciplinary action up to and including termination.


I have received, but do not necessarily agree with the content of this memo.

D78

1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A21

Refusal to carryout assigned duties

This is a joke am I on candid camera.

First of all this was not an assigned duty this was a person that just walked into the room asking for help without any previous notification to unload a small van of computer equipment that usually takes 2 people at the most. I have loaded and unloaded the van many times without any colleagues help. The one that was requesting the help are they also incapable of doing their job if so why are they still doing it. There was never any mention that they had to hurry up and get the job done asap. I don't believe there was any urgency to hurry up and unload the van, that part was completely fabricated. We have our own driveway off of the entrance road to the parking lot and the van is in nobodies way. Yes I did say I'm not doing that and I was out at the schools and it was hot and I was tired but I said it as a joke while I was starting to stand up to go help. Barb Moore then said that you better not help with your condition. Jill who was sitting next to me heard the last part of Barb Moore's comment "its ok you better not help" so I sat back down. Yes I was tired from moving equipment but I did it on my own without any help from my colleagues. I hope they appreciate me not asking them for help. When I pick up equipment I have to do it with most of the weight on my right side until this heals completely. If I knew that I would be needed to unload a truck I would have paced myself moving equipment out at the school. Jill then asked about what condition barb was talking about and I told her that I had a Heart Condition and had to have a deliberator put in my chest.

I was still supposed to be on light duty and Ted Ammann knew that. I had told him in his office when I came back from surgery that I would need 6 to 8 weeks of light duty and I was not supposed to pick up anything more then 15 pounds with my left hand and he replied take as much time as you need.

Right where we were supposed to unload a van is where I almost had a heart attack. I had to be rushed to the hospital. When the ambulance came they were having trouble finding a pulse and to insert an IV line so they had to call a paramedic to do it. I was in the hospital for six days.

This documented grievance is clearly an act of pure harassment and I don't need to go any further then that.

Once again this feels to me like a hit and run accident or a drive by shooting.

Either way I feel like I was just run over by a RCCSD bus and Ted Ammann was driving.

D79

A22



*3 of 3 that were Added*

RED CLAY CONSOLIDATED
SCHOOL DISTRICT

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

**Ted Ammann**
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

Help Desk
(302) 636-HELP

# Memo

**To:**    Ed Biliski

**From:**  Ted Ammann

**CC:**    Debra Davenport

**Date:**  August 7, 2006

**Re:**    Disregard for instructions

As you know, there has been extensive construction going on in the back parking lot of Conrad. In preparation for this week's construction, we were asked to park in the front of the building. At my request, Rhonda shared this with the team last week. On August 1st, I sent a follow up reminder letting people know that parking needed to be in the front of the building. On August 2nd, you parked in the fire lane behind the building.

In addition to being a safety hazard, parking here showed a disregard for instructions you had been given. This will not be tolerated. Future disregard for instructions or any other similar behavior will lead to disciplinary action up to and including termination.

I have received, but do not necessarily agree with the content of this memo

D80

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A23

Disregard for instruction

I had missed the email the day it was sent out. I had checked my email in the morning and left the building to go out to one of the schools and never rechecked it that day. I had off on Friday and was not at work to check email so when I came in Monday their was a sign at the entrance that the parking lot was closed. I pulled up to the side of the driveway that leads to the parking lot the side that did not have the fire lane signs and Troy Yeager pulled in behind me. We both parked there and went into the building. Why wasn't Troy Yeager fired also along with all the other people that parked there that day.

All in all this is a ridiculous thing to write someone up for and fire them. I was unaware of Ted Ammann asking us not to park there, the gate was closed and a yellow caution ribbon running across the driveway entrance so no traffic would be driving in or out of the parking lot. If they needed us to move our cars all they have to do is knock on our door that is 30 feet away and ask us to move our cars like they have done many times in the past. Once again I told Ted Ammann in a meeting that I was unaware of his request to park else ware and I had apologized 2 times and started parking where he wanted but again this just was not good enough.

D81

A24



August 17, 2006

**RED CLAY CONSOLIDATED**
**SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
Linden Park
4550 New Linden Hill Road
Wilmington, Delaware 19808

**Human Resources**

Office (302) 552-3783
FAX (302) 992-7822

Debra Davenport
*Manager*

Debra.Davenport@redclay.k12.de.us

**Benefits**

Office (302) 552-3782
FAX (302) 992-7822

Susan G. Carpenter
*Specialist*

Susan.Carpenter@redclay.k12.de.us

Edward Biliski – 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
106 Hunn Road
Manor Park
New Castle, DE. 19720

Dear Mr. Biliski,

RE:    Board Action
       *Termination*
       Effective -    08/11/2006

The Board of Education took action to terminate your employment.

If your salary was subject to deduction for pension and you are not continuing employment with another state agency, you have two options for funds accumulated as a result of that deduction:

   *Request to withdraw these funds (Refer to Form No. WB-1)

   *Elect to leave these funds on deposit (Refer to Form No. CRN-1)

Please complete the upper portion of the form which indicates your preference and return it to this office. We will complete and forward it to the Office of Pensions.

Enclosed is a copy of the "Notice to All Employees and Spouses concerning Continuation coverage Under Group Health Plans". Please contact the Employee Benefits Office, 552-3782, for additional information.

If you have any question concerning this matter, please contact me.

Sincerely,

Debra Davenport
Manager
Human Resources

D92

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Debra Davenport, Human Resources Development, RCCSD, Linden Park, 4550 New Linden Hill Road, Wilmington, DE  19808  (302) 552-3783.

A25



**WILCOX & FETZER LTD.**

In the Matter Of:

# Biliski

## v.

# Red Clay Consolidated School District Board of Education, et al.

## C.A. # 06-740-GMS

---

### Transcript of:

### Biliski, Edward A. (8/27/2007)

### August 27, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 7

1    Q.    You never, in fact, filed for --

2    A.    They told me there was a slim chance.  They

3    made a comment that if I wasn't missing an arm or

4    something along that line that it wasn't...

5    Q.    But the bottom line is you, in fact, did not

6    file a charge?

7    A.    No.  No.

8    Q.    Now, your complaint lists the Red Clay School

9    District.

10   A.    Right.

11   Q.    That's your former employer?

12   A.    Right.

13   Q.    And then it lists a number of individuals who

14   are all board members and then the superintendent?

15   A.    (The witness nodded.)

16   Q.    Correct?

17   A.    Correct.

18   Q.    Now, as far as the board members go, let's deal

19   with them first.

20          Did you ever have any dealings with any of

21   them individually in connection with your complaint?

22   A.    Yes.

23   Q.    Which ones?

24   A.    That fact I don't remember.  But I called I

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 8

1  think four people at home because I wasn't familiar

2  with the procedure on how to deal with this.  I tried

3  calling individuals up at home.  I got answering

4  machines on all.  Three called back.  I vaguely

5  remember who they were.

6          I requested that they don't vote to

7  terminate me until they hear my side of the story.

8  And one of them, and I'm not sure who it was, made the

9  comment that he would have to speak with Diane Dunmon

10  to find out what this thing was.

11          At that time as far as I know, I was not

12  terminated from Red Clay per the Board of Education.

13  Q.   So that was before the board meeting?

14  A.   Right.

15  Q.   You're looking at the front page that we call

16  the caption where you list the names there.

17          Can you go through those names and see if

18  you can identify who you called?

19  A.   I think I called everyone, but I got, like

20  three of them I got answering machines.

21  Q.   Which ones do you think you actually spoke to?

22  A.   I think Gary Linarducci.

23  Q.   Linarducci.

24  A.   I'm not sure if it was Charles Cavanaugh.  It

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 32 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 9

1    wasn't -- I don't believe it was Bucknell.

2                    I called --

3       Q.    You mean Becnel, B-e-c-n-e-l?

4       A.    Yeah, Becnel.  There was a woman that was on

5    the board.  I'm not sure if that's her.

6       Q.    Do you know which one?  There's a couple of

7    women listed here.

8       A.    There was one woman I called.  I got her

9    husband, but she was out of town attending to her

10   sister.  Her sister was sick out of state and she

11   was -- and I'm not 100 percent sure, but I think she

12   may have stepped down.

13      Q.    Do you know who it is though by looking at the

14   names here?

15      A.    Not really.  I think it was something like, it

16   might have been Vivian whatever, Vivian Johnson.

17      Q.    Yvonne Johnson?

18      A.    Yvonne Johnson, yeah.

19      Q.    Do you remember that or this is more or less --

20      A.    I'm not 100 percent sure, but 80, 90 percent I

21   believe it was her.

22      Q.    You didn't actually speak with her though?

23      A.    I didn't speak with her.  I spoke with her

24   husband.  He was going to relay the message to her.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 10

1    Like I said, she was out of town attending a sick

2    sister.

3        Q.    You made the same request that they not

4    terminate you until they received a letter you had

5    sent in?

6        A.    Right.  Right.

7        Q.    And then was that the same basic conversation

8    with all the board members you contacted?

9        A.    Yes.  Yes.

10       Q.    Did you have any direct contact with the

11   superintendent, Robert Andrzejewski?

12       A.    No.

13       Q.    Are you aware of any contact that he had with

14   your case or your termination?

15       A.    No.

16       Q.    Looking over at paragraph 15 of the complaint,

17   I just ask you to read paragraph 15 to yourself for a

18   second.

19       A.    (Reviewing document)  Okay.

20       Q.    Paragraph 15 you just read to yourself,

21   correct?

22       A.    Yes.

23       Q.    Now, am I correct that the only basis that you

24   have for alleging that you had an expectation of

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 11

1    ongoing employment was the length of your service at

2    Red Clay?

3        A.    Yes.

4        Q.    And as we said earlier, a couple of memos

5    aren't attached --

6        A.    That may not have been my only expectation, but

7    that was a big one.

8        Q.    Well, is there something else besides your

9    length of employment that gave you an expectation of

10   continued employment?

11       A.    The fact that it was under my understanding

12   that you had to have at least three memos in your file

13   to be terminated and that they would not fire you

14   without just cause.

15       Q.    Where did you get that expectation, that

16   understanding?

17       A.    From coworkers.

18       Q.    What coworkers?

19       A.    I can't remember at the time.  It was like, you

20   know, basic gossip thing.

21       Q.    Nothing from Red Clay management?

22       A.    No.

23       Q.    As we said before, the memos that you did

24   attach to your complaint I advertently left them out.

---

A31

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 37

1    Q.    You never got a letter saying that the board --

2    A.    Voted to terminate me?

3    Q.    Yes.

4    A.    No.

5    Q.    Did you attend the board meeting?

6    A.    No.

7    Q.    You just submitted the letter to the various

8  board members?

9    A.    Right.  Right.  I had submitted a letter to the

10  woman that's in charge of typing it up.  She ran off

11  copies.  I can't remember her name.

12    Q.    So did you take the letter to the district

13  office?

14    A.    Yes.

15    Q.    And it was copied there?

16    A.    Yes.

17    Q.    For the board meeting?

18    A.    Yes.

19    Q.    You didn't actually deliver it to each of the

20  board member's houses?

21    A.    No.

22    Q.    Are you presently under a doctor's care for any

23  reason?

24    A.    My heart condition.

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 36 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 49

1    Q.    Do you remember any of those?

2    A.    Not really.

3          MR. WILLOUGHBY:  Let's take about a

4    five-minute break.  I just want to take a real quick

5    break.

6          (A brief recess was taken.)

7    BY MR. WILLOUGHBY:

8    Q.    We're back on the record.

9          So you applied for employment with Red

10   Clay I think according to the exhibit on January 12,

11   2001?

12   A.    Yeah.  Now, that's when I was made permanent.

13   I applied March 20th.  I was hired March 20th.

14   Q.    Of what year?

15   A.    2001.

16   Q.    2001?

17   A.    Yes.

18   Q.    And were you interviewed by anybody?

19   A.    Yes.

20   Q.    Who were you interviewed by?

21   A.    Ted Ammann.

22   Q.    And where did your interview take place?

23   A.    Basically his old office.

24   Q.    Which was where?

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 37 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 50

1    A.    What was the address?  Something on Edwards

2    Avenue.  I'm not exactly sure what the old number was.

3    Q.    Edwards Avenue where?

4    A.    Out at Prices Corner.

5    Q.    Was anyone else present?

6    A.    I believe -- I can't really remember if -- Ted

7    was there and then I guess he had one of the engineers

8    who asked a few questions.  I'm not sure if we're in

9    the same room at the time or not.  He may have stepped

10   out and an engineer came in and asked a couple of

11   questions.

12   Q.    Do you know who it was?

13   A.    Keith Cox.

14   Q.    Was Mr. Cox still employed at Red Clay when you

15   left?

16   A.    Yes.

17   Q.    How did the interview go?

18   A.    The interview went fairly well as far as I

19   remember, you know.  They asked routine questions on,

20   you know, basic troubleshooting of equipment.

21   Q.    Did you get along with Mr. Ammann?

22   A.    During the beginning, yes.

23   Q.    When did you stop getting along with him?

24   A.    I think things changed right around the time

Edward A. Biliski

Page 52

1    the meetings for different like -- they're not

2    meetings for the whole group but smaller groups, stuff

3    like that.

4              First off, I was like help desk

5    coordinator.  When I first started seeing everything

6    going downhill was when I told him that I thought that

7    room created my heart condition.  It wasn't long after

8    that that he asked me if I would like to take my old

9    job back.

10             I was promoted to a help desk coordinator.

11   Then he asked me to take my job back as a technician.

12   And then --

13    Q.    Let me just stop you, not to break your train

14   of thought.

15             You said you were hired as a technician?

16    A.    Right.

17    Q.    Then you got the position of help desk

18   coordinator?

19    A.    Right.

20    Q.    You say that was a promotion?

21    A.    Yes.

22    Q.    It was a change in title?

23    A.    Yes.

24    Q.    Was there a change in pay?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 53

1    A.    Yes.

2    Q.    And was there a change in who you reported to?

3    A.    I still reported to him.

4    Q.    All right.  Go ahead.

5    A.    During that time, you know -- and I can't

6    really say for sure, but I told him at least once that

7    room created my heart condition.  And he said -- he

8    didn't say much.  He just kind of walked away.  He

9    never asked well, why do you think that or how could

10    that be, why do you feel that's the case, none of

11    that.  Any time I brought that up, he more or less

12    didn't want to hear any of it.

13            It went from that and I think a little

14    while later I told him again the second time then --

15    I'm not sure if I told him a second time then.  He

16    requested that, you know, would I accept going back to

17    being a coordinator -- not the coordinator.  Leave the

18    coordinator spot and go back to being a regular

19    technician.

20            So he said I could keep the pay scale that

21    I had and I agreed to because I didn't particularly

22    like two of the people that were actually working

23    there.  They didn't want to do anything and I didn't

24    have any control over telling them look, you have to

---

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 54

1  get out, other than look, you need to go here, but if

2  they didn't go I had no control in making them go.

3     Q.    So what did you do as a help desk coordinator?

4     A.    As a help desk coordinator I was responsible

5  for managing the work orders, keeping track of --

6  there's all type of work orders.  You had, you know,

7  level one, two and three, and then you had like

8  scheduled events.

9              What I had to do is make sure that the

10  scheduled events got done.  I had to make sure that

11  people were aware of them and were reminded.  They

12  were ones that had to be done, you know.  And my job

13  was to make sure that these people were well-aware of

14  it.  If it was the day before, I would call them and

15  say look, you know, this is due tomorrow; make sure

16  that this has to get done today or whatever.

17     Q.    That's for the scheduled events?

18     A.    Right.

19              And also kind of keep track of their work

20  orders.  They would linger in the office and Ted

21  Ammann told me that I needed to hurry up and get them

22  out of the office as soon as possible.  What he wanted

23  me to do is have them close the work orders as soon as

24  they're finished to try to keep track to see, you

A37

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 78

1    I'm not 100 percent sure that a portion of it wasn't

2    job related.  You know, they could be asking questions

3    to each other how do you do this or how do you do

4    that?  I don't know.

5        Q.    You wouldn't have any way of knowing that?

6        A.    No, not unless they told me.  And that's one of

7    the reasons why I didn't like pushing them out the

8    door per Ted Ammann and Patti Tilotson.

9        Q.    So Ted, this is back in 2002, so Ted asked you

10   if you wanted to stop being the help desk coordinator

11   and go back to being a regular technician?

12       A.    Correct.

13       Q.    And you accepted that?

14       A.    Correct.

15       Q.    There was no cut in pay?

16       A.    No.

17       Q.    Now, we started out with this we were talking

18   about the problems you had with Ted --

19       A.    Right.

20       Q.    -- during that period going forward, so that

21   was 2002.

22            What were the problems that you had --

23       A.    One of the big problems -- you asked how I was

24   getting along with Ted and that's where I may have got

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 81

1   there's no mistaking that the box accidentally doesn't

2   get sent back to the original place.

3           So the problem that I had on one occasion

4   was I worked on this one computer.  There was three

5   parts that were bad on this computer.  It looked like

6   there was lightning over the night before and it took

7   a strike.  The power supply was bad, the system board

8   was bad and the hard drive was bad.  I put in a work

9   order to Dell.  They sent the three parts.  I took the

10  good parts out, put the bad parts in, sealed the boxes

11  up, put the labels over the existing labels, put the

12  boxes in the area where they're supposed to be picked

13  up by the delivery service.

14          A couple of days went by.  I didn't think

15  nothing of it.  Dell e-mailed me that they never

16  received the boxes and I e-mailed them back.  I stated

17  that I put all the parts back in the day that they

18  were delivered; I sealed the box up, put the labels on

19  them and I put them in the area to be picked up by the

20  delivery person.

21          I told them that I would go through the

22  office, see if they're still laying around and

23  basically see if they're there and, if not, I'll ship

24  them on to them.

Edward A. Biliski

Page 82

1    So I went around the office checking

2    everybody.  Not everybody but in the areas where it

3    should have been.  I checked the office where I put

4    them.  They weren't around anywhere.  I talked to

5    three or four other people that were involved in the

6    office.  Nobody had seen these boxes anywhere.

7    So I went back, e-mailed Dell, stated that

8    I looked for these boxes.  I tore the office apart in

9    the areas where they should have been.  They're

10   nowhere around.  I'm just assuming that they were

11   picked up by the delivery person.

12   About a week went by.  They e-mailed me

13   back, said they still haven't received it.  I did a

14   second walk-through, asked the same people, looked

15   through the offices, same response:  They don't know

16   anything about the boxes.

17   I e-mailed them back, said I did a second

18   check, not here.  I'm assuming that the delivery

19   person picked them up.  A couple of days later they're

20   stating they never received them and they stated that

21   if they don't get the parts, they're going to have to

22   charge us for the parts.

23   I did a third search, went through the

24   office, checked again and the same thing.  No boxes,

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 83

1    no nothing.  I stated that, you know, if you feel that

2    you never got the parts back, I'm assuming that the

3    delivery person picked it up.  Maybe it's between the

4    delivery person and your office who's responsible.

5    And I left it at that.

6              And they e-mailed me back again and they

7    stated that "If we don't get the parts, we're going to

8    have to charge you."  And I was through with it.  I

9    said, by then I said, "Look, if you have to charge us

10   for the parts, so be it."  I said, "I did my job.  I

11   put them back in the box.  I know I put them in the

12   area where they get picked up by the delivery person.

13   They're not there."  And I said, "All's I know is I

14   have done my job.  If you feel they have to charge

15   this company, then so be it."

16             About a month went by, over a month, and

17   this is in a two-month period.  Shelly Radwoncuk --

18   and don't ask me to spell that name -- came up to me

19   with the three boxes.  The labels were ripped off.

20   She came up to me.  She didn't ask are these your

21   boxes?  She came up and said, "Here, these are your

22   boxes." And I said, "Well, where did they come from?"

23             She said, "The delivery person dropped

24   them off, said that they picked them up

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 84

1   inadvertently."  And I noticed the labels were ripped

2   off.  I said, "Who ripped the labels off?"  And she

3   said, "Well, the delivery person ripped the labels

4   off."  I said, "Well, why would they rip the labels

5   off?"  And she said she didn't know.

6          And my question was well, how do you know

7   these are even my boxes?  I didn't say that to her but

8   I said it to myself.

9   Q.    Right.

10  A.    But when I opened the boxes, these were the

11  parts that were never shipped back.

12         What I believe they did was they stuck

13  them in the back of the room and either they called

14  the police or they called Dell and told them I was

15  stealing parts.

16  Q.    Did anybody ever tell you that?

17  A.    Nobody actually told me that, but the reason is

18  when they brought the boxes back with the torn letters

19  off, there's nothing else that I could assume.

20  Q.    So when did that happen?

21  A.    That happened right around a month after I went

22  back to being a, back to my computer tech job.

23  Q.    So around 2002?

24  A.    Yeah, it was in 2002.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 85

1    Q.    So you believed because of that that Ted had

2    reported you for stealing?

3    A.    I'm guessing that.

4    Q.    That's what causes you --

5    A.    I don't know any other reason why somebody

6    would put boxes just in the back room and not send

7    them back.

8    Q.    But that's what you thought?

9    A.    That's what I thought.

10   Q.    And you continue to think that?

11   A.    I still think that today.

12   Q.    And that of course lowered Ted in your

13   estimation?

14   A.    Absolutely.  But that's not the only thing.  It

15   was a ballpark of things.  That's just the slip slide

16   that -- you know, other things went on exactly, you

17   know.

18   Q.    I want to go through --

19   A.    One of the reasons -- let me make this

20   statement.  One of the reasons I thought that these

21   boxes were put back there -- let me think -- and they

22   weren't picked up inadvertently because when a

23   delivery company comes, they scan each and every box

24   into a tracking system.  So how is somebody going to

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 92

1    don't even know if that --

2        Q.    This fellow's name was Rob Alfieri?

3        A.    Yes.

4        Q.    What was it that he did specifically that made

5    you think that he was accusing you of having stolen

6    the hard drives?

7        A.    It just happened to be the timing, that it just

8    seems like first it was the boxes.  You just don't

9    tear labels off a box and put them in the back of the

10    room for no reason whatsoever.

11            So in my opinion they were doing one of

12    two things, trying to make it look like I was

13    stealing, you know, and damaging me for Dell

14    coordinator or Dell certification that would follow me

15    from job to job.  And there was other things.  There

16    was a lot of other things along that line.  It just

17    wasn't one little thing.

18            I was in Ted's office -- that was just

19    one.

20        Q.    Hold up.  We'll go to those other things later.

21        A.    Okay.

22        Q.    Did Mr. Alfieri say that you had taken the hard

23    drives?

24        A.    He didn't say it to me.

A44

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 93

1    Q.    Did you ever hear him say that?

2    A.    No.

3    Q.    Did Ted ever come to you and say that

4    Mr. Alfieri said that?

5    A.    No.

6    Q.    Did anybody else come to you and ever say that?

7    A.    No.  Could it have been said without my

8    knowledge?  Sure, it could have been.  The fact that

9    nobody came to me and told me directly, you know...

10    Q.    I'm trying to pin down why in your mind you

11    think that Mr. Alfieri was accusing you as compared to

12    any other person in the technology group at Red Clay.

13    A.    Because I believed they had a personal vendetta

14    to try to get rid of me and that was the reason that I

15    told you for the, I told them that that room created

16    my heart condition and I don't doubt that Ted Ammann

17    went back to administration and they told, you know,

18    him to try to find anything that he could to get rid

19    of me.

20    Q.    Did you ever file a worker's compensation claim

21    arising out of your heart condition?

22    A.    I never, I never realized that that's what you

23    had to do.

24    Q.    So you never did that?

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

A45

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 49 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 94

1    A.    No.  I did it when I -- I didn't realize that I

2    needed to do that.  I don't know about the law.  I

3    don't know about workmen's compensation or anything

4    along that line.

5    Q.    But you never did that?

6    A.    No.

7    Q.    Now, are you saying that Ted and Mr. Alfieri

8    were in like a conspiracy to get rid of you or get a

9    reason to get rid of you?

10    A.    Yes.

11    Q.    So you're saying that Ted went to Mr. Alfieri

12    and put him up to --

13    A.    I don't know if Ted put him up to it.  I mean,

14    he did it, you know.  He may have conveyed to Rob

15    Alfieri that he would like to see me gone.  I mean,

16    I'm not saying that Ted said go do this or go do that.

17    Q.    What would be in it for Mr. Alfieri to accuse

18    you?  Why would he benefit from doing that?

19    A.    I don't know their personal status, you know,

20    in the office, you know.

21    Q.    What was his job in relationship to yours?

22    A.    He took my position.  He was the help desk

23    coordinator when I vacated it.

24    Q.    Now, you said he put his house up for sale and

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 50 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 106

1    machine, you know.

2        Q.   So would it be fair to say that during that

3    2002 to January 1, 2006 time period that your working

4    relationship with Ted deteriorated?

5        A.   Yes.

6        Q.   Now, during that time period was there ever an

7    allegation that somebody had installed any kind of

8    device on your vehicle to track your whereabouts?

9        A.   I kind of thought I found a device under my car

10   and I had told somebody who I thought would be

11   probably, kind of thought that they knew what they

12   were talking about.  But the thing is I bought a

13   secondhand car and I usually go over the car to make

14   sure there's not a gun or something, that if I was

15   ever stopped they would find a gun under the seat or

16   dope or anything like that.  And when I did a search

17   of under the driver's seat and the passenger seat, I

18   had seen nothing.  You know, there was nothing under

19   my seat, nothing in the car anywhere that I could get

20   to and look through or anything like that.

21            And I used to park my car in the lot and I

22   used to leave the windows rolled down.  And I was

23   concerned about, for instance, if Ted did do this, you

24   know, put the boxes in the back and they're looking to

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 51 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 107

1    do something, they could easily put something in my

2    car.

3                I found something that looked very

4    peculiar in my car.

5       Q.    What was that?

6       A.    It looked like a little cassette with a wire

7    coming out of it and something that you plugged into

8    the...

9       Q.    Lighter?

10      A.    Yeah.

11      Q.    The lighter socket?

12      A.    Right.  And I put it in a bag and I kind of hid

13   it in my house.

14               Like I said before, I went through the

15   car.  It was not there.  Now all of a sudden, you

16   know, during the period of not trusting that these

17   people were being honest, I found this part.  I didn't

18   put it there.  Could it have dropped down from maybe

19   underneath?  Sure, it might have done that.  But the

20   thing is I never lent anybody my car during that

21   period.  The only time was when the windows were

22   rolled down.

23               The fear of them actually putting

24   something in my car -- I have a sheet of paper that,

Case 1:06-cv-00740-GMS    Document 38    Filed 10/29/2007    Page 52 of 56
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 108

1    you know, that I got out of the back seat of the car.

2    It had like a drawing like you would think maybe

3    little kids might have done.  That was put in the back

4    pocket of the car.  I started then -- I didn't like

5    the idea of parking in the parking lot and I used to

6    park across the street where I could see my vehicle.

7        Q.    On Boxwood Road?

8        A.    Yes.

9        Q.    So you parked across the street so you could

10   see your vehicle from your office?

11       A.    Yes.

12       Q.    All right.  Let me go back.  We'll talk about

13   that.

14             Do you still have that bag with the item

15   you thought was a tracking device?

16       A.    Yes, I do.

17       Q.    Where is it?  In your house?

18       A.    As a matter of fact, I haven't looked for it

19   in -- I believe it's in there somewhere.

20       Q.    Where was the last time you saw it?

21       A.    Where was the last time I saw it?  Well, I have

22   it in a bag in my house and I assume it's still in the

23   same location.  I haven't even thought about it for

24   years obviously.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 117

1   Ted Ammann.

2              And I used that as an example as to why we

3   really should be having these discussions and I told

4   him about the three engineers and what they were

5   saying.  They were calling him a faggot and, you know,

6   nobody liked him and things along that line and he

7   always seemed like he wanted to do things his way.  He

8   doesn't ask the engineers any of their opinions.  He

9   goes to these trade shows and then he implements them

10  and when things blow up, they have to be the ones who

11  clean his mess up.

12  Q.    This is what they're saying?

13  A.    Right.

14  Q.    What else is in your stack of stuff?

15  A.    Well, in the stack of stuff leading up to that.

16  Then that Thursday I e-mailed him back and I said

17  let's have a -- I got that copy.  I don't know exactly

18  what I said, but honesty, respect and all that stuff.

19             We had the meeting Friday.  He never

20  brought anything up.  I came in the office Monday

21  morning.  There was a rock thrown through my window

22  and it was laying on my desk, broken glass.

23  Q.    Your office window?

24  A.    Right.

## Edward A. Biliski

Page 118

1    Q.    And what does that have to do with your

2    e-mails?

3    A.    I think, I think in my opinion I believe Ted

4    may have mentioned something to one of the engineers

5    and one of the engineers inadvertently threw the glass

6    through my particular window.

7    Q.    Inadvertently?

8    A.    Well, deliberately, not inadvertently.    I'm

9    sorry.

10   Q.    Threw a rock through your window?

11   A.    Right, as disgust for kind of tattletaling on

12   them.

13   Q.    How would they know that you had tattletaled?

14   A.    Because Ted confides in them and Cara.

15   Q.    Do you know that he told them anything about

16   you?

17   A.    I absolutely don't know anything.

18   Q.    So you believe though the fact that there was a

19   rock thrown through your window at work that was

20   retaliation for you having told Ted about things that

21   they did?

22   A.    Absolutely.

23   Q.    Tell me a little bit about your office.    Your

24   office is on the first floor?

Biliski v. Red Clay Consolidated School District Board of Education, et al.

## Edward A. Biliski

Page 124

1    Q.    Right.  But whether it's on record or not, if

2    you haven't told me about it I would like you to tell

3    me about it.

4    A.    I can't think.

5    Q.    Can you think of anything else?

6    A.    No.

7    Q.    Okay.  Did you remain in the position as a

8    computer technician after you accepted the offer to

9    stop being help desk coordinator?

10    A.    Yes.

11    Q.    From that point until your termination?

12    A.    Yes.

13            MR. WILLOUGHBY:  I'm going to have this

14    marked as the next exhibit.

15            (Biliski Deposition Exhibit No. 3 was

16    marked for identification.)

17    BY MR. WILLOUGHBY:

18    Q.    Do you recognize Exhibit 3?

19    A.    Yes, I do.

20    Q.    What is that?

21    A.    It was one of the memos Ted Ammann, sitting

22    right there (indicating), wanted me to come back to

23    the office and sign it and give it back to him.

24    Q.    Did you sign it?

Edward A. Biliski

Page 128

1    type thing, not an urgency as far as I knew.  And I

2    had other things I had to do.  I wasn't specifically

3    sure what exactly she wanted done.

4              And, like I said, I wasn't trying to not

5    listen to what she had to do.  I mean, if it had to be

6    done, then it had to be done.  But I vaguely remember

7    that, yeah, there was a thing.  We had a group meeting

8    and she specified we needed to clean these up.

9              And as far as me not cleaning mine up, I

10   had five schools to do and my first duty is to do the

11   work orders that need to be done in appropriate order.

12        Q.   Wasn't this during the testing of the students?

13        A.   I can't remember if it was or not.

14        Q.   So during the testing, you're not in the

15   schools doing work orders?

16        A.   Well, we have to be on site, you know, to cover

17   the exams.

18        Q.   But you're not responding otherwise to work

19   orders?

20        A.   Well, I mean, if they're having testing, our

21   first priority is to cover meetings and make sure none

22   of the computers go down, not attending to maintenance

23   issues.

24        Q.   And do you remember her telling you to deal

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 130

1          Did you have discussions concerning your
2    attitude toward your responsibilities?
3      A.    Well, the bottom line is I'm a self-managed
4    person.  I know what my responsibilities are.  If
5    somebody tells me that they need this done, I'm going
6    to try to do it.  I mean, I'm not going to say no, I
7    got to do this or do that, I mean within reasonable,
8    you know.
9      Q.    Do you recall having discussions with Cara or
10   Ted about your attitude towards your responsibilities?
11     A.    I vaguely -- I mean, it was just a discussion.
12   It wasn't like a, you know...
13     Q.    But you do remember that discussion?
14     A.    Yes.
15     Q.    All right.  And then the next paragraph says,
16   "We requested that you go through your school's
17   servers and clean up old RIP's."
18          What's an R-I-P?
19     A.    It's a RIP.  It's a program, installation
20   program.
21     Q.    "Specifically those related to Renaissance
22   Learning."
23          Do you remember having discussions with
24   Cara or Ted about that?

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 131

1    A.    Yes.  Because this Renaissance Learning was a

2    big mess that was going on and on and it was hard to

3    try to figure out how to fix this problem until

4    somebody sat down and went over it and redid all of

5    these RIP's.

6    Q.    So you were told --

7    A.    And there was -- I'm sorry.

8    Q.    So you were told to go through the servers and

9    clean up the old RIP's?

10   A.    Yes.  And, in fact, that's what I did.

11   Q.    When did you do that?

12   A.    Within a couple of days, you know.

13   Q.    It says you were asked a number of times

14   including an e-mail on March 17 to do this.

15              Do you remember that?

16   A.    Yeah.  I'm sure I got an e-mail on March 17th

17   or somewhere in that area.

18   Q.    And do you recall you're given a deadline of

19   March 24th?

20   A.    I didn't know about the deadline.  But as far

21   as I know if I seen that, and I'm going over -- if I

22   would have seen that and read it, I probably would

23   have had it complete because then I would have dropped

24   everything that needed to be done at that particular

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 132

1    moment and went and done it.

2        Q.   And do you remember as of March 27th it was not

3    completed?

4        A.   Well, I did it to the best of my -- you know,

5    some of these things, you know, they're -- and I

6    pointed out to them that there's Renaissance files in

7    like two or three different locations.

8        Q.   Do you recall --

9        A.   They're not in the same location on every

10   server.

11       Q.   Do you recall as of March 27 of 2006 you still

12   had not completed the work that Cara had assigned?

13       A.   Right.

14       Q.   Correct?

15       A.   I guess, if that's what it says.

16       Q.   It says, "Earlier this week, you were asked if

17   you had completed the NWEA prep in your schools and

18   you responded it was someone else's job."

19       A.   I don't remember that.

20       Q.   What is NWEA?

21       A.   It's a school training, testing.  I may have

22   said that as a joke that it was somebody else's job.

23   I kid all the time.

24       Q.   So you may have told your supervisor when she

A56

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 133

1    raised that with you that it was someone else's job?

2      A.   I could have said that as a joke.  I don't

3    know.  I don't know if it was pertaining to my schools

4    that I have been assigned to.  I don't know what went

5    on around that.  I don't know the questions asked

6    before or after that comment.

7      Q.   What is the NWEA prep?

8      A.   It's a basic, simple program that is actually

9    pushed, they push that program out through all the

10   schools.  I think Chris Jerger was the one that pushed

11   it and put it on the desktop of all of the computers.

12   And to my knowledge, you know, each year it changes a

13   little bit.  I mean, they had different passwords to

14   get it, to disable it each year.

15           As far as I remember, I did the best that

16   I could under the circumstances.

17     Q.   Was there a meeting where a presentation with

18   the users was taking place concerning the NWEA prep?

19     A.   A meeting with the users?

20     Q.   Yes.  Where the users were present?

21     A.   I have no idea.

22     Q.   Do you recall there being --

23     A.   There's been a lot of meetings.  I can't recall

24   that particular meeting.

---

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 134

1    Q.    Do you recall any training sessions where there

2    was a presenter concerning the NWEA prep and both

3    people from the technology department and the users

4    were present?

5    A.    The users being what?

6    Q.    The school.

7    A.    The students you mean?

8    Q.    The school personnel, the teachers.

9    A.    Yeah.  I assume there's been meetings like

10    that.

11    Q.    And do you remember attending customer service

12    training like that --

13    A.    Absolutely.

14    Q.    -- where there would be school personnel,

15    teachers, administrators, et cetera present?

16    A.    Teachers.

17    Q.    Or users of the computers services?

18    A.    No.  Just people in our office.

19    Q.    Do you ever remember having a meeting

20    concerning customer service training where the users

21    were present?

22    A.    No.

23    Q.    Isn't that what customer service training is?

24    A.    It depends on what you mean by "users."  You

A58

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 135

1    mean teachers, that type?

2      Q.    Yes.

3      A.    No, I don't remember.

4      Q.    The next paragraph of this memo says,

5    "Additionally, your lack of respect and attention at

6    the Customer Service training was not only rude to the

7    presenter, but impacted the ability of others around

8    you to pay full attention."

9              Do you remember having a discussion with

10   Cara about that?

11     A.    Yes.

12     Q.    Can you tell me about that?

13     A.    Well, the thing is I thought it was a big waste

14   of money.  It was a waste of time and waste of

15   technology effort.  We had a meeting on how to answer

16   a telephone.  I thought it was stupid, along with half

17   the people in that room were cracking jokes, but Cara

18   chose to listen and to zone in on what I was saying

19   and what I was doing, you know.  Other people were

20   acting out.

21              It was just a totally ridiculous thing to

22   go to to do and if they wanted to have a phone

23   training and they wanted us to be all on the same

24   page, they should just have told us what to say when

Biliski v. Red Clay Consolidated School District Board of Education, et al.

Edward A. Biliski

Page 136

1    we answered the phone.

2        Q.    Who was the presenter?

3        A.    I have no idea.  It was Phone Doctor.

4        Q.    An outside --

5        A.    Person, right.

6        Q.    Right.  And do you remember making paper

7    airplanes at that meeting?

8        A.    Nope.

9        Q.    You don't remember it?

10        A.    No.

11        Q.    Do you say you didn't do it?

12        A.    I don't believe I did it.

13        Q.    What were you doing that Cara talked to you

14    about concerning your behavior?

15        A.    Maybe I was a little loud.  Like they did stuff

16    that was totally ridiculous.  It was like I talked to

17    someone like it was like being in third grade and the

18    guy said no, it was second grade.  Everybody that I

19    talked to said it was so ridiculous, it was pathetic.

20        Q.    I'm asking you what was your behavior during

21    that meeting?

22        A.    Maybe loud and -- well, I'll tell you exactly

23    how that meeting started out.  There were no teachers,

24    there were no people, other than our staff.  It

Edward A. Biliski

Page 137

1    started out like I started kidding around with the

2    presenter and then she made a comment "Oh, you're

3    going to be, you're going to be the rude one" or

4    something along that line.

5        Q.    The presenter said that?

6        A.    Yes.

7                And I said, "Oh, no.  No, I'm not.  I'm

8    just, you know, just, you know, just having a good

9    time and all."

10       Q.    So you had this conversation with the

11   presenter?

12       A.    At the very beginning.

13       Q.    Even before the program started?

14       A.    Right.

15       Q.    And that was at the Christiana Hilton?

16       A.    Yes.

17       Q.    And that was in March of 2006?

18       A.    Yes.

19       Q.    So what else did you do during the course of

20   the meeting besides being loud?

21       A.    We were having discussions at our table and, as

22   you know, with inter-discussions people get loud and

23   may over talk the presenter.

24       Q.    So you were talking while the presenter was

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 138

1    presenting?

2       A.    Yes.   The same with other people.   I wasn't the

3    only one talking during that presentation.

4       Q.    And do you recall meeting with Cara afterwards

5    to discuss this?

6       A.    Yes.

7       Q.    And was Ted present?

8       A.    I believe he was.   But she also said that that

9    person made the comment that that was the worst

10   meeting she's ever been to, not just me, all the rude

11   people, all the people, not just me.

12             You know, singling me out because I was

13   the only one?   No, that's absolutely wrong.   There

14   were other people making just as much noise and

15   comments.

16      Q.    Do you remember in that meeting that you were

17   told that in a small department every team member had

18   to contribute 100 percent?

19      A.    Right.

20      Q.    And do you remember being told that it was

21   expected you would improve your performance over the

22   next four weeks?

23      A.    I don't remember that part.

24             Specifically over four weeks?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 139

1    Q.    Do you remember being told to improve your

2    performance by Cara and Ted?

3    A.    I don't recall that.

4    Q.    You're saying that Cara and/or Ted didn't tell

5    you that in that meeting?

6    A.    They were disappointed about, you know, you

7    know, I guess --

8    Q.    Your behavior?

9    A.    Yes.

10    Q.    Didn't they tell you that you needed to improve

11    your performance?

12    A.    I don't recall them saying anything like that.

13    Q.    Do you recall anything similar to that?

14    A.    Maybe.  I don't know.  They never presented

15    like I needed to clean up my act in the next four

16    weeks.  That was one little event, you know.

17    Q.    Regardless of the time frame, did they tell you

18    you needed to clean up your act?

19    A.    I don't remember them saying that.

20    Q.    Do you recall them saying anything like that?

21    A.    Possibly.

22    Q.    It says, "Failure to demonstrate an improved

23    attitude as well as completion of assigned tasks will

24    result in disciplinary action."

Biliski v. Red Clay Consolidated School District Board of Education, et al.

Edward A. Biliski

Page 140

1              Do you recall that discussion?

2      A.    No.

3      Q.    Are you saying --

4      A.    I don't remember them saying disciplinary

5   action.

6      Q.    Do you remember the other part?

7      A.    Something along that line.

8      Q.    Do you remember them saying that there will be

9   discussions at the end of April to follow up on these

10  issues?

11     A.    No.

12     Q.    Do you remember any discussions about

13  follow-up?

14     A.    No.  That's completely new to me.

15     Q.    And you're saying that you didn't actually

16  receive this document --

17     A.    No.

18     Q.    -- but you remember what we have discussed?

19     A.    Yes.

20              Could I ask a question?

21     Q.    Sure.

22              MR. ERHART:  No.

23     A.    Okay.

24     Q.    What were you going to ask me?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 141

1     A.     Nevermind.

2     Q.     If you had a question, then ask it.

3     A.     My question basically was if they had this

4   thing written up and they read from it, why didn't

5   they just have me sign it to make sure that I was

6   clear on what they were talking about?

7     Q.     You're saying you didn't receive the memo?

8     A.     No.

9     Q.     You do remember the events that we described

10  though?

11    A.     Yes.

12    Q.     All right.

13           MR. WILLOUGHBY:   Let's mark this as the

14  next exhibit.

15           (Biliski Deposition Exhibit No. 4 was

16  marked for identification.)

17  BY MR. WILLOUGHBY:

18    Q.     Do you recognize Exhibit 4?

19    A.     Yes, I do.

20    Q.     And what's that?

21    A.     It's the one memo that Ted called me up and

22  told me that he wanted me to come back to his office

23  and sign that and if he wasn't there that the

24  secretary would give me the memo.

Edward A. Biliski

Page 142

1    Q.    That was Rhonda?

2    A.    Yes.

3    Q.    Now, had you had a discussion with Ted and Cara

4    before that about the subject of this memo?

5    A.    I had a discussion with Ted the Monday after

6    that work order was due.

7    Q.    And what was that discussion?

8    A.    The discussion was he asked me why wasn't that

9    work order completed.

10   Q.    And what did you say?

11   A.    I told him that I kind of overlooked it; that I

12   was doing a lot of things; I was working on two

13   projects, one on the GX 1 to replace like 35 memory

14   things.  I wanted to get that done.

15              And, number two, I had a list that I

16   actually gave my lawyer of all the things that I was

17   doing that week, if...

18              There were other issues besides that one

19   job being done.  The thing is Ted told me that there

20   could be an issue to check to make sure, when I

21   disconnected that to make sure that nobody is without

22   network connection.  So what I chose to do, instead of

23   doing it at the beginning of the work, to do it at the

24   end of the week.  Hopefully people would be on

Biliski v. Red Clay Consolidated School District Board of Education, et al.

## Edward A. Biliski

Page 143

1    vacation and there wouldn't be an issue if I took it

2    apart and then they found out that they were off the

3    network.  So I was planning on doing that towards the

4    end of the week.

5       During that week I was operating the help

6    desk.  I usually had Troy Yeager.  We both worked the

7    help desk for about an hour, hour and twenty minutes

8    in the morning.  Troy wasn't there that week.  He was

9    on vacation that week, so I had the help desk calls by

10   myself that week.  Not only that, but I also had two

11   projects that I needed to do.  One was re-imaging the

12   community school, not only just re-imaging it but the

13   principal asked me to do stuff that was above and

14   beyond what I normally had to do and I tried to

15   accommodate him.

16      He wanted to put the white computers with

17   the white monitors, the black computers with the black

18   monitors in the room.  So I tried to accommodate him,

19   which took way more time.  I was trying to get the

20   school up for imaging.  I had to literally go into

21   rooms and literally set up the computers just to get

22   them on the network to image.  So that took a lot more

23   time.  And I was trying to get done before the

24   beginning of school and everything.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 144

1       The other project was memory.  We had GX

2   150's that needed upgraded memory because they were

3   going to be upgraded with Windows XP.  I think I had

4   33.  And I didn't want to leave the memory laying

5   around on my desk because at one time I had a hard

6   drive removed from my disk and I even told Ted Ammann

7   that someone went into my cubicle and took a hard

8   drive.

9       That hard drive turns out to be a hard

10  drive that an employee had at home, was using for home

11  use.  It was a GX 110.  He asked me to wipe the

12  computer, which means clean the image off of it.  When

13  I booted it up, I seen that it was being used for home

14  use and not in a classroom and I just took the hard

15  drive out.  It was at the end of the day.  I went home

16  and when I came back that particular hard drive was

17  gone from my desk.

18      Q.    Let's go back to this Exhibit 4 here.

19      A.    Right.

20      Q.    July 31, 2006 memorandum.

21      A.    Right.

22      Q.    Would you agree with me that this is an

23  accurate statement of what happened?

24      A.    (Reviewing document)  Somewhat.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 145

1    Q.    Well, what's not accurate about it?

2    A.    Well, the thing is I overlooked that work

3    order.

4    Q.    Well, I know you have a reason why you believe

5    you didn't complete the assignment.

6    A.    Right.

7    Q.    Putting that to one side, is this memo accurate

8    as to what happened?

9    A.    As far as to -- yes, it's accurate as far as I

10   didn't complete it and, no, I didn't tell anyone else.

11   Q.    Now, you said that Ted had asked you to come

12   back in to sign a copy of this memo?

13   A.    Yes.

14   Q.    And how did you get word of that?

15   A.    He called me on my cell phone.

16   Q.    And did you go back to the office as you were

17   told?

18   A.    Yes.

19   Q.    And did you meet with Ted?

20   A.    No.

21   Q.    Did you meet with Rhonda?

22   A.    Yes.

23   Q.    And did Rhonda give you the memo to sign?

24   A.    Yes.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 146

1    Q.    And did you sign it?

2    A.    Yes.

3          Well, no, I didn't sign it.

4    Q.    You didn't sign it?

5    A.    No.

6    Q.    What did you say to Rhonda about why you

7    wouldn't sign it?

8    A.    Well, I gave it to Rhonda to read and I told

9    her, I said, "I don't believe this."  You know, I told

10   her something like I got 4,000 closed work orders and

11   he's going to make a big deal out of this one little

12   thing.

13         And the thing is this work order could

14   have been a diversion.  Even the people coming in on

15   the weekend could have disconnected that rack and

16   moved it out of the way.

17   Q.    What are you talking about?  Disconnected what?

18   A.    The network connections to the rack.

19   Q.    Did you direct any kind of a profanity to

20   Rhonda?

21   A.    Absolutely not.

22   Q.    Did you use any profanity in saying that you

23   weren't going to sign it?

24   A.    No.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 147

1    Q.    So you never said anything to the effect of --

2    A.    Absolutely not.

3    Q.    Let me finish the question so you can hear what

4    I have to say first.

5    A.    Okay.  Sorry.

6    Q.    Did you ever say anything to Rhonda to the

7    effect of that you weren't going to sign the fucking

8    memo?

9    A.    No.

10    Q.    You never said anything like that?

11    A.    No.

12    Q.    Did you tell her anything about not signing the

13    memo?

14    A.    No.  I said something that I was going to go

15    see Ted's boss.  And I left to go see his boss and I

16    told her that I was leaving to go see her.

17    Q.    That day you left to go see Ted's boss?

18    A.    Right.

19    Q.    And who is that?

20    A.    That was Mary Norris.

21    Q.    And what time did you meet with Rhonda when she

22    gave you the memo?

23    A.    She was at lunch.  She takes a late lunch.  She

24    got back right around 2:00 o'clock.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 148

1    Q.    And she gave you the memo around 2:00?

2    A.    Right.

3    Q.    And you said you were going to see Mary Norris?

4    A.    Right.

5    Q.    And did you leave the building?

6    A.    Yes.

7    Q.    And where did you go?

8    A.    I went to see Mary Norris.

9    Q.    Did you see Mary Norris?

10   A.    No.

11   Q.    What happened?

12   A.    The problem happened that Mary Norris had been

13   moved to a new location and I didn't know that.

14   Q.    So where did you go?

15   A.    I went to Mary Norris's office and --

16   Q.    Where was that?

17   A.    Her old office.

18   Q.    Which was where?

19   A.    In Brandywine Springs.

20   Q.    Where had she been moved to?

21   A.    She was moved to the new office out in Pike

22   Creek.

23   Q.    The district offices?

24   A.    Yes.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 149

1    Q.    And how far is Brandywine Springs from Conrad?

2    A.    It depends.  Time-wise you mean?

3    Q.    Time-wise.

4    A.    Three, four miles.  It's about fifteen, twenty

5    minutes.

6    Q.    So you left at about --

7    A.    Ten after 2:00.

8    Q.    You got there by 2:30?

9    A.    About then.

10   Q.    You found out she wasn't there?

11   A.    Right.

12   Q.    Then what did you do?

13   A.    Had a discussion with one of the secretaries.

14   Q.    Who was that?

15   A.    That's a good question.  Who was that?  It was

16   somebody right next to her office.

17         Whatever it was, it was like a ten-minute

18   conversation.

19   Q.    So now we're at 2:40?

20   A.    Right.

21   Q.    What did you do next?

22   A.    By the time I drove back to work, it would have

23   been time to leave.

24   Q.    Did you go from there, from the Brandywine

Biliski v. Red Clay Consolidated School District Board of Education, et al.

## Edward A. Biliski

Page 150

1   Springs office to the new office in Pike Creek?

2       A.   No.  It was too late in the day to do that.

3       Q.   Did you attempt to have anybody at Brandywine

4   Springs call to see if Mary Norris was there?

5       A.   That's a good question.  I don't know if I did

6   or not.  It was one of those things where I don't know

7   if they knew the phone number of the new office.

8       Q.   But in any event, you didn't go to the district

9   office at Pike Creek?

10      A.   No.

11      Q.   And when you left Brandywine Springs where did

12  you go?

13      A.   When I left Brandywine Springs I was heading

14  back and it was about ten of and I figured -- right

15  about where I turn off to go to Conrad, it was about

16  seven of.  Instead of going back to work for seven

17  minutes, I just headed home.

18      Q.   So you went home?

19      A.   Right.

20      Q.   Did you tell anybody your whereabouts from the

21  time you left your office in Conrad until the next

22  day?

23      A.   I told Rhonda.  I told Rhonda where I was

24  going.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 151

1    Q.    Where you were going?

2    A.    Yes.

3    Q.    Did you tell anybody else?

4    A.    She knew exactly where I was going.  I signed

5    out on the board that I was going to Brandywine.

6    Q.    Did you tell Ted or --

7    A.    Neither Ted, nor Cara were around.

8    Q.    Did you send either of them an e-mail?

9    A.    No.

10    Q.    So when you found out that Mary wasn't there

11    you just went home?

12    A.    No.  Well, I was on my way back to work and I

13    seen it was like seven of 3:00 and then I just decided

14    do I want to pull in and pull right back out and I

15    said no because it could have been a few more minutes

16    just getting out of your car, parking, going in the

17    building, it's 3:00 o'clock.

18    Q.    You don't remember who you spoke with at

19    Brandywine Springs?

20    A.    Stevens, Maria Stevens.

21    Q.    Maria Stevens?

22    A.    Yeah.

23    Q.    So if I talk to Maria Stevens she will verify

24    that you were there?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 152

1    A.    Yes.

2    Q.    And do you know who she is, what her job is?

3    A.    She's some type of secretary.

4    Q.    Do you know for whom?

5    A.    No.

6    Q.    Did you have a discussion with Ted after this

7    concerning the fact that you got this memo?

8    A.    No, we never had a discussion after that.  I

9    wanted to talk directly to his boss.

10    Q.    So you never followed up with him?

11    A.    No.

12    Q.    Did you ever follow up with Cara?

13    A.    No.  I don't know if Cara was on vacation or

14    what, you know.

15    Q.    Did you ever talk to Mary Norris about it?

16    A.    I had a right to protect Ted.  You know, maybe

17    I didn't do it by talking to Rhonda but, you know,

18    sometimes you try to get people's opinion on what you

19    should do.  I've never been through this.  I don't

20    know what the procedures are.  I didn't know who to go

21    to.

22           I just assumed you went to Debra Davenport

23    and I was on my way over and somebody stopped me

24    because that was my school and I had a little

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 153

1    conversation.  I went to Debra Davenport's office.

2    She was on the phone or with somebody.  So I was kind

3    of waiting for that office to clear out and in the

4    meantime I talked to another person who read the

5    little clip that I wrote up, you know.  I was going to

6    complain about Ted Ammann in not being fair, you know,

7    which I firmly believe he wasn't fair.

8      Q.    Let me back you up a little bit.

9            So you went to Mary Norris's office that

10   day, which was July 31.  She wasn't there?

11     A.    Right.

12     Q.    You told me what happened the rest of the day?

13     A.    Right.  So I went home.

14     Q.    So you went home.  Did you go to attempt to see

15   somebody -- first of all, did you ever go to attempt

16   to see Mary Norris about this memo again?

17     A.    They were in between moving -- I didn't have

18   the number.  I tried calling somebody and she wasn't

19   available or something.

20     Q.    Did you ever go to actually see her, Mary

21   Norris, about this?

22     A.    No.  I never got to see her.  I never got to

23   discuss any of this.

24     Q.    Did you ever go to her office to discuss this

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 154

1    with her?

2    A.    The problem being is I didn't really know how

3    to handle this.  I thought Debra Davenport was in

4    charge of HR, so I didn't know to go to his boss or go

5    to HR.

6    Q.    Is the answer no, you never went to Mary

7    Norris?

8    A.    I never went to Mary Norris.

9    Q.    You started telling me about Debra Davenport

10   and attempting to go see her.  When was that?

11   A.    That was either a day or two later.

12   Q.    And did you tell anybody in the office that you

13   were going to see Debra Davenport?

14   A.    Yes.

15   Q.    Who did you tell?

16   A.    Troy Yeager.

17   Q.    Anybody else?

18   A.    Troy Yeager asked me "Where are you going?  To

19   see Mary Norris or somebody?"

20              And I said -- he said, "Are you going to

21   Brandywine?"  I said, "Yes" and I signed the board and

22   left.

23   Q.    This is a day or two later?

24   A.    No.  This is the same day.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 155

1    Q.   We already covered the same day.

2    A.   Okay.

3    Q.   Now, you said a day or two later you went to

4  see Debra Davenport.

5    A.   Right.

6    Q.   Now, did you tell anybody in the office that

7  you were going to see Debra Davenport?

8    A.   Directly Debra Davenport?  I don't remember.

9    Q.   Did you say that you were going to see human

10  resources or tell anybody your whereabouts?

11    A.   I told Troy that I was going and he said

12  something like "To complain about Ted?"  And I said,

13  "Yeah, to complain about Ted."  And I guess, you know,

14  I would -- you know, I assumed that he thought -- you

15  don't go to anybody but these people.  I wanted to get

16  Debra Davenport's opinion on how to handle this.  I

17  never was trained on what to do in these situations

18  and, you know, like I was saying, I went to go see

19  her.  She seemed to be busy.  I got in a conversation

20  while I was waiting to see her.  So someone asked to

21  read the little thing that I had and she said, "Well,

22  maybe you better soften it up a little bit."

23          And so I let her take it, look it over and

24  I left and went on to do other work orders.

Biliski v. Red Clay Consolidated School District Board of Education, et al.

## Edward A. Biliski

Page 156

1    Q.    Who was that?

2    A.    Susie Bonus.

3    Q.    What's the last name?  Bonus?

4    A.    Bonus, B-o-n-u-s

5    Q.    What's her job?

6    A.    She's some type of secretary in the HR

7    department.

8    Q.    You say you gave her a document?

9    A.    Yes.

10   Q.    Did she ever give it back to you?

11   A.    Eventually a couple of days later.

12   Q.    And have you produced a copy of the document to

13   us?

14   A.    I left it on the desk when I left being

15   terminated.

16   Q.    You left it on the desk at --

17   A.    At the HR.

18   Q.    So what did you do with it when Susie gave it

19   back to you?

20   A.    She had it yellowed out and tried to make, to

21   soften it.  I wanted to see Debra Davenport, but I

22   never got in to see her.

23          The thing is I was supposed to meet Bryan

24   Amoroso down at Pace.  He got tied up doing something

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 157

1    at work and on the way to Pace I decided to run over

2    to the HR department and grab that document and then

3    go on to meet Bryan when he was done doing whatever he

4    was doing at the main office over at Pace.

5        Q.    What is Pace?

6        A.    Pace is just another school or it's Central

7    School now.

8        Q.    Why were you going to see Bryan Amoroso?

9        A.    Well, Bryan Amoroso volunteered to help me with

10   the imaging of the school.

11       Q.    What do you mean "imaging of the school"?

12       A.    Re-imaging all of the computers, setting them

13   up, connecting them.

14       Q.    Were you discussing any of these issues with

15   Bryan, any of the discipline you got?

16       A.    Not at that time.

17       Q.    Did you discuss it later?

18       A.    No.

19       Q.    Now, you said you had a discussion with Troy

20   before you left to see, try to see Debra Davenport?

21       A.    Right.

22       Q.    What was that discussion about?

23       A.    Well, I was working the help desk.  He came in

24   and I told him that I was leaving to go up to the HR

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 158

1    department, something along that line.

2              And then he made the comment "Are you

3    going to complain about Ted or something?"  And I

4    said, "Yeah."

5        Q.    Was there anymore to the conversation?

6        A.    That was basically it.

7        Q.    Did you sign out on the board?

8        A.    Yes.

9        Q.    Tell me about the sign-out procedures.  What

10   are the procedures that you're supposed to follow?

11       A.    Well, they have a bunch of different

12   procedures.  Different people have different

13   procedures.

14       Q.    Well, just tell me about the ones that you know

15   about.

16       A.    The procedure we used to have was we used to

17   have to sign a book in our tech area.  That was my --

18   I did have people signing in and out of the tech area

19   when I was a help desk coordinator.

20              We would sign in and out of the book.  We

21   sign out when we leave and then we had a board we

22   signed on where we would sign again and then put the

23   school we're going to and then go out the door.

24              My question was why not eliminate that

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 159

1    board and just put a thing right at the main entrance

2    and just sign in and out from that thing?  But that

3    wasn't accepted.

4              They changed -- I liked having the book

5    there because I wrote my mileage down and my gas

6    mileage from each school.  Like each day when I'd get

7    in I would write where I went to and the mileage so at

8    the end of the month when it was time to do the, turn

9    in like a gas receipt, I would go back to that book

10   and I would check to see what my gas mileage and the

11   schools that I went to.

12   Q.    Was that a log for everybody?

13   A.    That was for the help desk.

14   Q.    But anybody who worked at the help desk --

15   A.    Inside that one room.

16   Q.    How many people is that?

17   A.    One -- at the time, let's see.  One, two,

18   three, four, five, six, seven, eight.

19   Q.    So you put your mileage down on that book?

20   A.    Right.

21   Q.    Even though it was a general book for like

22   eight people to --

23   A.    Right.  But they changed that to a new system.

24   I think Cara stated that she wanted us to e-mail her

# Edward A. Biliski

Page 160

1    when we left.  That was something that didn't seem

2    important and almost every tech stopped doing that.

3        Q.    So Cara did tell you she wanted you to e-mail

4    her before you left?

5        A.    Right.  Just to let us know that we left the

6    building.

7        Q.    And based on your statement you're saying you

8    didn't do that?

9        A.    There was times where we forgot to do it.

10   Everybody in that office did it at one point, didn't

11   do it at one point and just stopped doing it.

12       Q.    So did you stop doing it?

13       A.    When I remembered to do it, I did it and when I

14   didn't remember, I may stop by her desk and say I'm on

15   my way out instead of -- you know, I would get halfway

16   through the door and then remember okay, I forgot to

17   sign that book and then I would just go by her desk

18   anyway and I would tell her that I was on my way out.

19              And I even asked her one time "Do you want

20   me to go e-mail?"  And she said, "No.  That's okay."

21       Q.    So Cara wanted you to tell her if you were

22   leaving the building?

23       A.    Right.  Right.  Usually in the morning.  That

24   didn't seem to apply if you came back during the day

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 164

1    memo but we covered the items, were there other

2    difficulties you had with Cara?

3        A.    I'm sure there's little nitpicky things, but I

4    can't remember them.  You know, the bottom line is I

5    just wanted to do my job.  I never even wanted to work

6    the help desk in the morning.  I just wanted to come

7    in, get my work orders and go out and do them.

8              Ted was the one that wanted everybody to

9    work the help desk or he wanted me to work the help

10   desk.  When I gave up that position to go back to

11   being a computer technician, I wanted to get away from

12   being on the help desk and he kind of brought it back

13   in that I had to be on the help desk for an hour every

14   day.

15       Q.    And you didn't like that?

16       A.    Well, I didn't particularly like it.  Like I

17   said, I would rather have come in, get my work orders

18   and left.

19       Q.    What was it about being at the help desk that

20   you didn't like?

21       A.    There was a lot of things.  I didn't think that

22   the pay matched the problems that it created on the

23   help desk.  I'm sorry.  I was getting confused with

24   being a help desk coordinator.

Case 1:06-cv-00740-GMS   Document 38-2   Filed 10/29/2007   Page 33 of 71
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 165

1        The things were I just wanted to get in

2    and go do something.  The more you're in the office,

3    the more you get trapped into conversations and stupid

4    little things that are unprofessional.

5        Like I said earlier, you had technicians

6    that were always breaking something, either they were

7    jamming the shredder or, you know, you walked by the

8    copier and it's not printing.  And once you get tied

9    up with trying to fix something, it takes forever to

10   get out of the office, you know, that type of thing.

11       I wanted to get in, get my work orders, go

12   to my schools and work on the people that were

13   important to my...

14   Q.   Are you saying that you didn't think your pay

15   justified the additional duties?

16   A.   No.  No.  I was thinking that being a help desk

17   coordinator.  I got that confused.

18   Q.   You were confused with your earlier discussion

19   when you went back to the --

20   A.   Right.

21   Q.   But you kept your pay when you went back?

22   A.   Yes.

23   Q.   All right.

24       MR. WILLOUGHBY:  Mark this.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 173

1    remarks about supervisors in public places will not be

2    tolerated."

3                    Were you advised of that?

4    A.    No.  Not to my knowledge.  Like this was all

5    new to me when I went in that meeting.

6    Q.    Did you ever curse --

7    A.    That's a common sense thing.

8    Q.    Did you ever curse or use disparaging remarks

9    about any of your supervisors?

10   A.    In the five years?

11   Q.    No.  In this time period in August of 2006.

12   A.    No.  Not that I remember, no.

13   Q.    Or July 2006?

14   A.    No.  It depends on what you mean by

15   discouraging.

16   Q.    Disparaging?

17   A.    Disparaging.

18   Q.    Tell me what you think you said that might be

19   disparaging.

20   A.    Well, I don't know if I -- I mean, I may have

21   made a comment about Ted, that, you know, you can't

22   trust him or something like that.

23   Q.    Who did you make that comment to?

24   A.    It could be like a general conversation.  That

## Edward A. Biliski

Page 176

1          Rhonda was supposed to share with the team

2    that the parking lot was going to be closed.

3    Apparently, she e-mailed everybody and I think -- I'm

4    not quite exactly sure what happened.  I think I may

5    have started reading the e-mail and then I got

6    distracted with a phone call on the help desk and I

7    closed that and I never really went back and with

8    other things going on, I think I got a string of help

9    desk calls and I forgot to go back to that.

10      Q.    So Rhonda sent an e-mail out saying that you

11   shouldn't park in the fire lane in front of the

12   building?

13      A.    I never read that.

14      Q.    You said you started opening it up and you

15   never completed reading it?

16      A.    Yes.

17      Q.    Did you park in the fire lane?

18      A.    No.

19      Q.    You never parked in the fire lane?

20      A.    No.

21      Q.    Where was your car parked?

22      A.    My parked car was parked on the opposite side

23   of the fire lane.

24      Q.    When you say, "the opposite side of the fire

## Edward A. Biliski

Page 177

1    lane," what do you mean?

2    A.    There's no signs on the opposite side of the

3    road that states that that side is the fire lane.

4    Q.    Opposite side of the road?

5    A.    Right.  That road is 32 feet wide.

6    Q.    And you parked on the same road that was a fire

7    lane but on the other side?

8    A.    On one side of the road is marked that that

9    side is a fire lane.  On the other side there are no

10    signs stipulating do not park in this area.  There's

11    no painted signs on the asphalt stating that this

12    whole area is a fire lane.

13           And some of the pictures in my folders --

14    Q.    They depict that?

15    A.    Yes.

16    Q.    Well, we'll get to those in a little bit.

17           MR. WILLOUGHBY:  Let's mark this as

18    Exhibit 7.

19           (Discussion off the record.)

20    BY MR. WILLOUGHBY:

21    Q.    I just want to make sure I'm understanding what

22    you're saying.  There's a road --

23    A.    A road going into the parking lot.

24    Q.    Is this in Conrad?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 189

1    truck came in, you know, we all jumped in and helped

2    out.

3        Q.    What was the process that was followed?

4        A.    The problem in this situation is I was still on

5    light duty and I told, you know, Ted that I was

6    getting towards the end of my light duty.  She came in

7    saying we need to hurry up and unload, you know,

8    unload the van.

9              And what that means is there's a lot of

10   reaching in and that's exactly what I wasn't supposed

11   to do, do a lot of reaching, lifting anything more

12   than fifteen pounds or above my head.  And I made the

13   comment that yes, I was out at schools, it was hot and

14   I was tired.  But I made a joke that no, I'm not doing

15   it.

16       Q.    So you said --

17       A.    I said it as a joke.  And as I was getting up

18   to do it, Barbara Moore stated that "With your

19   condition maybe you're better off not doing it."  And

20   I said, "Okay" and I sat back down.

21             And Jill was sitting next to me on a call

22   and heard the very end, Barbara Moore saying, "That's

23   okay.  Maybe" -- it was a little van.  It wasn't like

24   a tractor-trailer.  It only takes minutes.  I've

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 193

1    A.    I might have.  I think I may have.  I'm not

2    sure.  This (indicating) is the one that they handed

3    me.

4    Q.    Right.  It shows, at the bottom it has a number

5    that's Biliski 5 written.  That's something your

6    lawyer put on it that shows it came from you.

7    A.    Right.

8    Q.    So you did receive this?

9    A.    Yes.  I received two copies.

10    Q.    So who gave you the letter?

11    A.    This was a letter he read off and then handed

12    to me.

13    Q.    Who is "he"?

14    A.    Ted Ammann.

15    Q.    And what did you say when he handed it to you?

16    A.    I was pissed off at the whole thing.  I thought

17    I was being ambushed.  When he told me that I was

18    terminated, I was pissed off because I needed my

19    medical benefits and everything.

20          During that meeting when I tried to rebut

21    what he was saying, Debra Davenport stopped me.  She

22    said, "Oh, no, you don't.  Oh, no, you don't.  You

23    have to listen to what he's saying."

24          Then when I looked over at her, she had a

Biliski v. Red Clay Consolidated School District Board of Education, et al.

## Edward A. Biliski

Page 194

1  big smile on her face.  And I kind of looked at her

2  and I'm wondering, you know, here I'm being terminated

3  and this woman is over there smiling away from cheek

4  to cheek.

5       Q.    So you thought she was smiling at the fact that

6  you were being terminated?

7       A.    Right.

8       Q.    And at any point did you discuss your viewpoint

9  of the three memos?

10      A.    No.

11      Q.    But you got Exhibit 9, the letter telling you

12  that your name would be submitted for termination?

13      A.    Correct.

14      Q.    When did you say to Ted at that point?

15      A.    At that point I stood up after hearing that I

16  was being terminated over the stupidest stuff, that I

17  was pissed off, I took my I.D. off and I flung it at

18  him and I called him a no good motherfucker and that

19  he finally got what he wanted.  And I was pissed and

20  then I kind of flipped my pencil at him or pen or

21  whatever, not at his face; at his stomach area.

22            And then Diane Dunmon said, "It's time" --

23      Q.    You mean Debra --

24      A.    Debra Davenport.  I'm sorry.  She said, "It's

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 195

1    time for you to go" and I left.

2        Q.   So you actually threw your pencil at him?

3        A.   Yes.

4        Q.   And it hit him, didn't it?

5        A.   Sure.  I'm sure it did.

6        Q.   Then after that meeting what did you do?

7        A.   I left.

8        Q.   Where did you go?

9        A.   What do you do after you just have been fired?

10   Let's see.  What do you do after you just lost your

11   medical benefits and you have a heart condition that I

12   believe was created by Red Clay?

13            But, nonetheless, I just left the

14   building.

15       Q.   Did you --

16       A.   I went home and called my sister and told her I

17   got terminated.

18       Q.   Did you then prepare the letter for the Board

19   of Education?

20       A.   I didn't think of that right away, until I read

21   the termination when I got home, and then --

22       Q.   Until you read Exhibit 9, this letter?

23       A.   Yes.  I just assumed I was terminated at that

24   spot.  Then when I read that upon approval of the

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Edward A. Biliski

Page 208

1    Q.    Yes.  And am I correct on the left-hand side is

2    where the grate is?

3    A.    On the right-hand side.

4    Q.    Can you mark for me where it is?

5    A.    The grate is down here (indicating) a little

6    further, right about there.  (Witness complies).

7    Q.    So had your vehicle been where it was parked on

8    that day would it be in this photograph?

9    A.    No.

10    Q.    So this doesn't show where your vehicle was?

11    A.    My vehicle was parked right near where the

12    grate was.  I think my front tires came right up to

13    the grate.

14         MR. WILLOUGHBY:  Let's mark this as

15    Exhibit 16.

16         (Biliski Deposition Exhibit No. 16 was

17    marked for identification.)

18    BY MR. WILLOUGHBY:

19    Q.    Let me hand you Exhibit 16.  Do you recognize

20    that?

21    A.    Yes.  I created that sign, just to show where

22    that sign was.

23    Q.    Whose vehicle is that?

24    A.    That is the car that Ted Ammann said I was

Biliski v. Red Clay Consolidated School District Board of Education, et al.

## Edward A. Biliski

Page 209

1    parked in a fire lane.

2        Q.    Is that your car?

3        A.    Yes.

4        Q.    So you parked your car where it was parked on

5    the day that you were written up for parking in the

6    fire lane?

7        A.    Yes.

8        Q.    So that's the spot?

9        A.    Somewhere around there.

10       Q.    When you say, "Somewhere around there," what do

11   you mean?

12       A.    I don't know exactly --

13       Q.    Didn't you say you could locate it by the

14   grate?

15       A.    Yes.

16       Q.    So were you trying to depict what was an

17   accurate reflection of where your vehicle was?

18       A.    Yes.

19       Q.    So did you park it by the grate?

20       A.    I parked right by the grate.

21       Q.    And did you park in the picture right by the

22   grate?

23       A.    No.   The picture -- what do you mean?   Yeah.

24   That's exactly where I parked, where the vehicle is.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

Page 210

1    Q.   That's what I was asking you.

2    A.   Right.

3    Q.   And the sign was still there --

4    A.   It said the parking lot was closed.  It did not

5  say do not park in the...

6    Q.   Was that sign still there a couple of Sundays

7  later?

8    A.   No.

9    Q.   How did that -- where did that sign come from?

10    A.   I made the sign just to indicate what it was

11  and what it looked like.

12    Q.   So this wasn't the sign that was there --

13    A.   No, this was not the sign.  But it was the same

14  exact thing, parking lot closed.

15    Q.   So you created that sign as a depiction?

16    A.   Yes.  Yes, I did.

17         MR. WILLOUGHBY:  Mark this, please.

18         (Biliski Deposition Exhibit No. 17 was

19  marked for identification.)

20         THE WITNESS:  Can I make a comment about

21  this.

22  BY MR. WILLOUGHBY:

23    Q.   Sure.  Go ahead.

24         MR. ERHART:  No.

A96



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Biliski

## v.

# Red Clay Consolidated School District Board of Education, et al.

## C.A. # 06-740-GMS

---

## Transcript of:

## Davenport, Debra (8/29/2007)

## August 29, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

Page 13

1    A.    Correct.

2    Q.    Teachers are not considered classified?

3    A.    Correct.

4    Q.    How about paraprofessionals?

5    A.    Classified.

6    Q.    They are classified?

7    A.    Yes.

8    Q.    How about cafeteria workers?

9    A.    Classified.

10   Q.    School bus drivers?

11   A.    Classified.

12   Q.    Persons like Mr. Biliski who is an IT tech?

13   A.    He would fall under -- we don't have a term for

14   it because he is not in the collective bargaining

15   unit, but classified.

16   Q.    Is he an at-will employee?

17   A.    Yes, he is.

18   Q.    Is he also a classified employee?

19   A.    For lack of a category to put him into, yes.

20   Q.    Now, Mr. Biliski in particular and the people

21   in his group are not under a collective bargaining

22   agreement as I understand it?

23   A.    That's correct.

24   Q.    Are there any other groups of employees other

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Debra Davenport

Page 18

1    BY MR. BERNSTEIN:

2       Q.   This is a document, dated October 18, 2001, and

3    it indicates a change in condition of employment, a

4    promotion to technician A and that's signed by you?

5       A.   Yes.

6       Q.   Now, at this point in time Mr. Biliski had been

7    working for looks like his contract had -- or his

8    employment continued past the end of the fiscal year,

9    past June 2001, correct?

10      A.   Yes.

11      Q.   Now, after June 2001 would he still have been a

12   probationary employee?

13      A.   No.

14      Q.   What would he have been?

15      A.   Just a regular employee.

16      Q.   Regular?  Classified employee?

17      A.   Just a regular employee.

18      Q.   Employee at-will?

19      A.   Yes.

20      Q.   But not a classified employee?

21      A.   Well, for lack -- I mean, that term was used to

22   identify individuals in the collective bargaining

23   unit.  For lack of a classification for him if you

24   want to call him classified you can, but he was an at-

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

Page 19

1    will employee.

2        Q.    And you considered him to be an at-will

3    employee?

4        A.    That's correct.

5        Q.    The next document I want you to look at is

6    document 61.

7                 MR. WILLOUGHBY:  Give me a second.

8                 MR. BERNSTEIN:  Okay.

9                 THE WITNESS:  Okay.

10   BY MR. BERNSTEIN:

11       Q.    Have you seen this document before?

12       A.    Yes.

13       Q.    And this is a document dated July 31, 2006 from

14   Ted Ammann?

15       A.    Yes.

16       Q.    Who is Mr. Ammann?

17       A.    He is the manager of the technology department.

18       Q.    And he would be Mr. Biliski's immediate

19   supervisor?

20       A.    That's correct.

21       Q.    And is it common practice when a supervisor has

22   a disciplinary performance-type issue with one of

23   their subordinates to copy you on memos like this?

24       A.    Yes.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

Page 21

1    Biliski concerning this July 31, 2006 memo?

2        A.    I did not.

3        Q.    Do you know whether Mr. Biliski ever tried to

4    contact you?

5        A.    I had heard he had, but I never got a formal

6    notification that he was trying to contact me.

7        Q.    Who did you hear that from?

8        A.    I had gotten a call from the technology

9    department asking if I had seen him because he had

10   left the building saying he was coming to see me.

11       Q.    Did you ever meet with him --

12       A.    No, I did not.

13       Q.    -- around that time?

14       A.    No.

15       Q.    How about around the time of March 30, 2006, do

16   you know whether Mr. Biliski ever tried to contact you

17   concerning that memo?

18       A.    Not that I'm aware.

19       Q.    Did you have any discussions with Mr. Ammann

20   around July 31, 2006 about this memo?

21       A.    I may have, but I can't remember the

22   particulars.

23       Q.    What about the March 30th memo?

24       A.    And I may have, but I don't remember the

Debra Davenport

Page 29

1          MR. BERNSTEIN:  Can you give me just a

2    minute?

3          MR. WILLOUGHBY:  Sure.

4          (Brief recess.)

5    BY MR. BERNSTEIN:

6    Q.    To your knowledge can an employee be terminated

7    without board approval?

8    A.    No.

9    Q.    Finally, I want you to look at document D243.

10          MR. WILLOUGHBY:  Okay, give me a second.

11          THE WITNESS:  I have it.

12    BY MR. BERNSTEIN:

13    Q.    Do you want to take a minute to read that over?

14    A.    Okay, (witness complies.)

15    Q.    Just let me know when you are done.

16    A.    Okay.

17    Q.    You have read that over?

18    A.    Yes.

19    Q.    In your opinion does page D243 apply to Mr.

20    Biliski?

21    A.    No, it does not.

22    Q.    Why in your opinion does it not?

23    A.    Because it refers to the collective bargaining

24    groups and you can see it has contract references and

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Debra Davenport

Page 30

1   it relates to teachers who really aren't classified

2   members and shouldn't be here, custodians, para-

3   professionals, food service workers and secretaries.

4       Q.    So, when you made the decision to terminate Mr.

5   Biliski's employment, Page D243 played no role

6   whatsoever in your decision?

7               MR. WILLOUGHBY:  She already testified the

8   board makes the decision.  She made a recommendation.

9   BY MR. BERNSTEIN:

10      Q.    Okay, your recommendation, when you made your

11  recommendation only.  I'll amend the question.  When

12  you made your recommendation, did Page D243 play any

13  role at all in your decision-making or recommending

14  process?

15      A.    It did not.

16      Q.    Finally, I want you to look at D-235.  Just

17  read that over to yourself.

18              MR. WILLOUGHBY:  Hold on one second,

19  (handed to the witness.)

20      A.    Okay.

21      Q.    In your opinion does Page 235 apply to Mr.

22  Biliski?

23      A.    It does not.

24      Q.    Why not?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

Page 31

1    A.    Because at first this one specifically refers

2    to collective bargaining agreements.

3    Q.    Now, after Mr. Biliski was terminated did you

4    have any contact with Mr. Biliski either in person or

5    any communication with Mr. Biliski concerning his

6    termination?

7    A.    I did not.

8    Q.    After Mr. Biliski's termination did you become

9    aware that Mr. Biliski had filed a claim for

10   unemployment compensation?

11   A.    Yes.

12   Q.    Did you receive notice that he had filed a

13   claim?

14   A.    Yes.

15   Q.    Did you receive notice that there was going to

16   be a hearing on his claim?

17   A.    I didn't receive it personally, no, but I know

18   that it came through.

19   Q.    You mean you saw it?

20   A.    I saw it.

21   Q.    Do you know whether or not any representatives

22   from Red Clay School District ever came to any

23   hearings before the unemployment compensation

24   department or employment referees or appeal board or



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Biliski

## v.

# Red Clay Consolidated School District Board of Education, et al.

## C.A. # 06-740-GMS

───────────────────────────────

## Transcript of:

## Dunmon, Diane (8/29/2007)

## August 29, 2007

───────────────────────────────

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Case 1:06-cv-00740-GMS    Document 38-2    Filed 10/29/2007    Page 53 of 71
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

Page 18

1    starting D170 through D243.

2                    MR. WILLOUGHBY:   Some of those are pulled

3    out.   I will give her the others and if you need

4    specific ones --

5    BY MR. BERNSTEIN:

6       Q.   My first question is generally are you familiar

7    with that section of the administrative manual?

8       A.   You mean D170 that starts Section G, Personnel?

9       Q.   Yes.

10      A.   Am I aware that it exists?   Yes.   Am I familiar

11   with all of its details?   No.

12      Q.   Is the section G, Personnel, is that something

13   that Ms. Davenport deals with specifically?

14      A.   Yes.

15      Q.   Do you have any occasion to deal with that?

16      A.   With this personnel section?   Certainly.

17      Q.   There are references and let's talk about

18   specifically Page D243, which is titled "Classified

19   Staff Members."   Do you see that?

20      A.   I do.

21      Q.   We can have this marked as an exhibit to your

22   deposition.   Does the term "classified staff members"

23   have any particular meaning in your opinion?

24      A.   In my opinion I have always referred to anyone

Biliski v. Red Clay Consolidated School District Board of Education, et al.

Diane Dunmon

Page 19

1   who does not hold a certificate, for example, a

2   teaching or administrative certificate, as classified

3   personnel.

4       Q.   Does it matter whether they're in a union or

5   not in a union?

6       A.   Typically classified personnel has been a

7   reference to people within a union, within bargaining

8   units.

9       Q.   Is that the way you interpret it?

10      A.   Yes.

11      Q.   What about people who are not in a bargaining,

12  what are they?

13      A.   They're typically at-will employees.

14      Q.   And that's your understanding?

15      A.   Yes.

16      Q.   And Mr. Biliski as I understand it is not a

17  teaching employee, correct?

18      A.   Correct.

19      Q.   And he is not in the union?

20      A.   That's also correct.

21      Q.   So, in your opinion he would be an at-will

22  employee?

23      A.   Yes.

24      Q.   And not a classified employee?

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

Page 20

1    A.    Correct.

2              MR. BERNSTEIN:   Okay, I think that's all I

3    have.

4              MR. WILLOUGHBY:   I only have one question.

5    BY MR. WILLOUGHBY:

6    Q.    Somewhere in the documents in front of you is

7    the letter that Mr. Biliski gave the board, D67.

8    A.    Yes.

9    Q.    You said that there was a comment that you

10   characterized as being suprised about the letter.  Can

11   you give us some more detail on that?  When you say

12   suprised, was it a reaction that the letter was in any

13   way peculiar, strange or did it relate to the events

14   of the termination?

15   A.    The board thought that it was a very odd,

16   peculiar letter.  They thought the person who wrote it

17   was definitely strange to have written a number of the

18   things that were here.

19             MR. WILLOUGHBY:   All right, that's all I

20   have.

21             MR. BERNSTEIN:   Okay.

22             MR. WILLOUGHBY:   We are going to read and

23   sign and I'll take care of getting the exhibits

24   straightened out with the court reporter.



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Biliski

## v.

# Red Clay Consolidated School District Board of Education, et al.

## C.A. # 06-740-GMS

---

## Transcript of:

## Becnel, Jr., Irwin J. (9/27/2007)

## September 27, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Irwin J. Becnel, Jr.

Page 11

1    meeting where Mr. Biliski's termination was taken up?

2        A.    General recollection, yes.

3        Q.    Tell me what your recollection is just sitting

4    here today.

5        A.    He had called me before the meeting and said

6    that he had a letter that he wanted to give the board

7    members regarding personnel action.

8        Q.    Let me interrupt you.  Prior to receiving the

9    phone call from Mr. Biliski, had you ever met

10   Mr. Biliski or did you know him?

11       A.    No.

12       Q.    So this phone call kind of came out of the blue?

13       A.    Yes.

14       Q.    And can you recall the substance of your

15   conversation?  You can pick it up where you left off.

16       A.    He told me that he had a letter regarding

17   personnel action about him.  He wanted the board members

18   to have it.  I told him he should take copies of the

19   letter to Robbie Miller, who is the board secretary for

20   Red Clay, and that she would see to it that it was

21   distributed to board members.

22       Q.    Do you know whether that was done?

23       A.    Yes, it was.

24       Q.    Did the letter that Mr. Biliski referred to show

Wilcox and Fetzer, Ltd.  Registered Professional Reporters         302-655-0477

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Irwin J. Becnel, Jr.

Page 13

1    note taker.

2        Q.    Are minutes prepared of the executive session?

3        A.    No.  There is a general -- that -- I'm

4    stammering a little bit on that.  There are minutes but

5    the minutes only say that personnel items were

6    discussed.  There is no detail written.

7        Q.    Do you know whether or not Mr. Biliski was

8    present at the August 16th meeting?

9        A.    No.

10       Q.    You don't know or he wasn't?

11       A.    I don't know.

12       Q.    Was Mr. Biliski ever asked to appear before the

13   board to get into the letter that he sent to the board?

14       A.    No.

15       Q.    Do you recall whether any questions were asked

16   of anyone in the administration concerning the letter

17   you got from Mr. Biliski?

18              MR. BOWSER:  Object to the form of the

19   question.  Will you say that one more time?

20   BY MR. BERNSTEIN:

21       Q.    You received a letter from Mr. Biliski sometime

22   before the August 16th board meeting, correct?

23       A.    Yes.

24       Q.    And I assume, at least from your standpoint, you

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Irwin J. Becnel, Jr.

Page 14

1    read the letter?

2        A.    Yes.

3        Q.    I'm not asking whether anybody else did or not.

4    But you read the letter.  Did the letter prompt any

5    questions on your part to anybody in the administration

6    about Mr. Biliski's termination?

7        A.    I'm sure it did.  In fact, I know it did.  I

8    asked what this was all about.  Can you give us some

9    details?

10       Q.    Do you recall who it was that you asked?

11       A.    I asked in the executive session.

12       Q.    Do you recall who it was?

13       A.    No, I don't.

14       Q.    Is there typically someone from personnel

15   present at the executive sessions?

16       A.    Generally, the deputy superintendent who has

17   overall responsibility would be there.  And she was.  I

18   remember Diane Dunmon was there.

19       Q.    How about Debra Davenport?

20       A.    I don't recall is she was there.

21       Q.    Do you have any recollection, sitting here

22   today, as to what kind of a response you got from either

23   Diane Dunmon or anyone else about Mr. Biliski?

24       A.    I don't recall a detailed response, no.

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Irwin J. Becnel, Jr.

Page 15

1    Q.    You don't recall what the details were?

2    A.    No.  No.

3    Q.    You got some response but, sitting here today,

4    you don't remember what it was?

5    A.    I can't remember the exact words of the

6    response.

7    Q.    Can you remember the substance?

8    A.    The administration was recommending termination.

9    They gave reasons for the termination which were pretty

10   much the same that Mr. Biliski had in his letter.

11   Q.    Okay.  So, in your view, there wasn't much of a

12   factual dispute between what you heard from the

13   administration and what you received from Mr. Biliski?

14   A.    The administration listed, as I recall now,

15   listed the reasons for the recommendation of

16   termination.  As I remember Mr. Biliski's letter, I

17   don't recall him refuting any of those reasons.  And

18   that's what I recall about out of the meeting.

19   Q.    The next document I want you to look at is

20   document D170 through D243.  And I will give you a few

21   minutes to kind of familiarize yourself with that

22   document.  We don't need to mark that document as an

23   exhibit.  I just want you to look through it.  Take your

24   time.  Tell me when you can answer a question whether

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Irwin J. Becnel, Jr.

Page 21

1          (Off the record.)

2          MR. BOWSER:   Joe, I have a couple questions.

3                    EXAMINATION

4     BY MR. BOWSER:

5     Q.    Do you have an understanding of whether

6     Mr. Biliski was in a union?

7     A.    To my knowledge, he was not in a union.

8     Q.    Do you have an understanding as to the nature of

9     Mr. Biliski's employment with the district?

10    A.    What do you mean the nature?

11    Q.    With respect to termination.

12    A.    He operated and was hired as an at-will

13    employee.  We hired him to do a job.  And that job could

14    end the next day for that matter.  So it's an at-will

15    employment opportunity.

16    Q.    Does the policy which has been marked as Exhibit

17    Number 2 to be applied to at-will employees?

18    A.    No, it doesn't.  This policy, you see the date

19    on it.  And the references in the policy refer to union

20    agreements.  And these were -- this policy was

21    established along with the discussions with the

22    appropriate unions for the procedures that are laid out

23    in there.  It wasn't established -- back then, there

24    were no nonunion employees back when this was set up.

A114

Biliski v. Red Clay Consolidated School District Board of Education, et al.
## Irwin J. Becnel, Jr.

Page 22

1    The use of at-will employees has been a fairly recent

2    occurrence, particularly in the technology area because

3    we have just now grown in technology in the last ten

4    years or less.  So we have begun using technology

5    experts or technology related people that don't belong

6    to a union.

7        Q.    To the best of your knowledge, this policy has

8    never been used in connection with the termination or

9    suspension or with respect to an at-will employee?

10       A.    That is correct.  To the best of my knowledge,

11   it has not.

12                 MR. BOWSER:  I don't have anything further.

13                 MR. BERNSTEIN:  I have a couple follow-up

14   questions.

15                        EXAMINATION

16   BY MR. BERNSTEIN:

17       Q.    First, Mr. Becnel, we took a short break just

18   before Mr. Bowser began asking you some questions,

19   correct?

20       A.    That's right.

21       Q.    Did you have any discussions with Mr. Bowser

22   during that break?

23       A.    No, sir.

24       Q.    Now --

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDWARD A. BILISKI | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 06-740-GMS |
| | ) |
| RED CLAY CONSOLIDATED SCHOOL | ) |
| DISTRICT BOARD OF EDUCATION, | ) |
| IRWIN J. BECNEL, JR., CHARLES | ) |
| CAVANAUGH, GARY LINARDUCCI, | ) |
| JAMES J. BUCKLEY, MARGUERITE | ) |
| VAVALA, YVONNE JOHNSON, | ) |
| MARTIN A. WILSON, SR, individually | ) |
| and in their official capacities as members | ) |
| of the Red Clay Consolidated School | ) |
| District Board of Education, ROBERT | ) |
| J. ANDRZEJEWSKI, individually and in | ) |
| his official capacity as Superintendent of | ) |
| Red Clay Consolidated School District; and | ) |
| RED CLAY CONSOLIDATED SCHOOL | ) |
| DISTRICT, | ) |
| | ) |
| Defendants. | ) |

**VERIFICATION OF BARBARA MOORE**

I, Barbara Moore, hereby submit the following verified statement:

1.    I am employed as a Technician Assistant in the Technology Department of

Red Clay Consolidated School District ("Red Clay").

2.    I worked with Ed Biliski while he was employed as a Computer

Technician for Red Clay.

3.    My responsibilities as Technician Assistant include making deliveries to

the schools, inventory, and receiving shipments in the Technology Department.

4.    On August 1, 2006, a van had arrived at the Technology Department loaded with equipment. I went into the Technician Office and asked everyone to come and help unload the van. We had two flatbed dollies and I asked the Computer Technicians to form a chain. The employees were to take the boxes out of the van, place them on a dolly, and push the dolly down the hall to another employee for unloading.

5.    Ed Biliski immediately became confrontational and told me that he had been working in the schools all day, it was hot, and he was not going to do it. His behavior was rude and he used some profanity. Ed Biliski never assisted in unloading the van. After the van was unloaded, I told Ed Biliski that he could have at least pushed the dolly down the hall.

6.    I reported the incident to my supervisor Ted Ammann, because I considered Ed Biliski's behavior rude and upsetting.

I hereby verify under penalty of perjury that the foregoing is true and accurate.

_Barbara Moore_
BARBARA MOORE

Signed this _11th_ day of October, 2007.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDWARD A. BILISKI | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 06-740-GMS |
| | ) |
| RED CLAY CONSOLIDATED SCHOOL | ) |
| DISTRICT BOARD OF EDUCATION, | ) |
| IRWIN J. BECNEL, JR., CHARLES | ) |
| CAVANAUGH, GARY LINARDUCCI, | ) |
| JAMES J. BUCKLEY, MARGUERITE | ) |
| VAVALA, YVONNE JOHNSON, | ) |
| MARTIN A. WILSON, SR, individually | ) |
| and in their official capacities as members | ) |
| of the Red Clay Consolidated School | ) |
| District Board of Education, ROBERT | ) |
| J. ANDRZEJEWSKI, individually and in | ) |
| his official capacity as Superintendent of | ) |
| Red Clay Consolidated School District; and | ) |
| RED CLAY CONSOLIDATED SCHOOL | ) |
| DISTRICT, | ) |
| | ) |
| Defendants. | ) |

## VERIFICATION OF CHARLES EDWARD "TED" AMMANN

I, Charles Edward Ammann, hereby submit the following verified statement:

1.    I am the Manager of Technology for the Red Clay Consolidated School

District ("Red Clay").

2.    I interviewed and recommended the employment of Edward Biliski when

he applied for a position as Computer Technician at Red Clay in 2001.

3.    When Ed Biliski began his employment, his technical knowledge was not

at an impressive level, but he had a good attitude and work ethic and I felt that his technical

knowledge would develop over time.

4.     In 2006, his performance and attitude towards his responsibilities significantly declined. During a training seminar in February, 2006, Ed Biliski acted in a childish manner and continued to talk during the presentation which distracted the other participants. When his direct supervisor, Cara Guadino, directed all Computer Technicians to search their schools' servers and delete any old Rapid Install Package ("RIF") computer installation files, Ed Biliski failed to complete the assignment. When Cara Guadino asked Ed Biliski if he had completed the NWEA prep in his schools, he responded that it was someone else's job. Cara Guadino and I met with Ed Biliski on March 30, 2006 to discuss these performance problems and warned him that failure to demonstrate an improved attitude and completion of assignments would result in disciplinary action. The meeting was memorialized in my March 30, 2006 memo attached hereto as Exhibit A.

5.     On July 24, 2006, I assigned Ed Biliski a Work Order to do a wiring job in the Intermediate Distribution Facility ("IDF") at Conrad Middle School which was required for a construction project. The deadline for this assignment was July 28, 2006. The work needed to be completed on time for the outside contractors and to allow for after-hours access to the building. On July 28, I discovered that the wiring was never performed by Ed Biliski and because he was out of the office, I had to reassign another Computer Technician to complete the assignment on time.

6.     I met with Ed Biliski on July 31, 2006, to discuss the missed deadline. I reiterated the importance of completing his assignments on time or, if necessary, requesting extensions to the deadlines. I told Ed Biliski that failure to complete his work by assigned deadlines without mutually agreed upon revisions to those deadlines would not be tolerated. I

2

A119

also warned him that future missed deadlines would result in disciplinary action up to and including termination.

7.    I informed Ed Biliski that I would prepare a Disciplinary Memo outlining the performance issues we discussed and instructed him to return to the office to review and sign it. I told him that if I was not available, he should ask my secretary, Rhonda Henry-Carter, to provide him with the memo so he could sign it. When I left the office, I gave the memo to Rhonda Henry-Carter and asked her to give it to Ed Biliski when he returned to the office for his review and signature.

8.    I was informed by Rhonda Henry-Carter that Ed Biliski came back to the office and reviewed the memo. She stated that he became very angry and said that he would not sign the "fucking memo." Ed Biliski left the office without signing the memo. He failed to inform anyone of his whereabouts and failed to send an email to Cara Guadino to notify her of his location, a practice which was required by all Computer Technicians. Ed Biliski did not return to the office on July 31, 2006.

9.    On August 1, 2006, I was informed that Ed Biliski left the office around 7:30 a.m. and did not return until 9:00 a.m. Again, he did not send Cara Guadino an email giving his location.

10.    During the afternoon of August 1, 2006, a van loaded with computer equipment arrived at the Technology Department and Barbara Moore, Technician Assistant, asked all of the employees to help unload the van. Barbara Moore reported to me that Ed Biliski refused to assist in unloading the van.

11.    On August 1, 2007, I sent an email to the Technology Department personnel reminding them to park in the front parking lot because there would be construction in

3

the back parking lot and it would be closed. On August 2, 2007, Ed Biliski parked in the fire lane in front of the gates to the back parking lot.

12.    I discussed Ed Biliski's performance problems, disciplinary issues, and poor attitude with Debra Davenport, Red Clay's Human Resource Manager. I felt that his behavior could no longer be tolerated. I was advised to document Ed Biliski's behavior and schedule a time for Debra Davenport and I to meet with Ed Biliski.

13.    On August 8, 2006, Debra Davenport and I met with Ed Biliski and reviewed the Disciplinary Memos. Ed Biliski interrupted me several times and Debra Davenport asked him to wait until I was finished. After we reviewed the Disciplinary Memos, Ed Biliski was given an opportunity to explain his actions. Rather than address the issues raised in the Disciplinary Memos, Ed Biliski talked about issues that were unrelated to the performance problems raised.

14.    When Ed Biliski was finished speaking, Debra Davenport handed him a letter informing him that due to his poor work performance, his name would be submitted to the Red Clay Consolidated School District Board of Education for termination. Ed Biliski became enraged, stood up, threw his I.D. badge at me and called me an obscene name. He then threw his pencil at me which hit me in the chest. Debra Davenport was shaken by his behavior and told him that he had to leave the building.

I hereby verify under penalty of perjury that the foregoing is true and accurate.

CHARLES EDWARD AMMANN

Signed this 12 day of October, 2007.

4

061778.1006

A121

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDWARD A. BILISKI | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 06-740-GMS |
| | ) |
| RED CLAY CONSOLIDATED SCHOOL | ) |
| DISTRICT BOARD OF EDUCATION, | ) |
| IRWIN J. BECNEL, JR., CHARLES | ) |
| CAVANAUGH, GARY LINARDUCCI, | ) |
| JAMES J. BUCKLEY, MARGUERITE | ) |
| VAVALA, YVONNE JOHNSON, | ) |
| MARTIN A. WILSON, SR, individually | ) |
| and in their official capacities as members | ) |
| of the Red Clay Consolidated School | ) |
| District Board of Education, ROBERT | ) |
| J. ANDRZEJEWSKI, individually and in | ) |
| his official capacity as Superintendent of | ) |
| Red Clay Consolidated School District; and | ) |
| RED CLAY CONSOLIDATED SCHOOL | ) |
| DISTRICT, | ) |
| | ) |
| Defendants. | ) |

## VERIFICATION OF RHONDA HENRY-CARTER

I, Rhonda Henry-Carter, hereby submit the following verified statement:

1.    I have been employed as a Secretary for Red Clay Consolidated School

District ("Red Clay") since 1999.

2.    I worked as a Secretary in Red Clay's Technology Department from 2002

until April of 2007.  My direct supervisor was Ted Ammann who was the Manager of

Technology.

3.    When I began working in the Technology Department, I became acquainted with Ed Biliski and we had a friendly working relationship throughout the entire time we worked together.

4.    When the Technology Department was located at Conrad Middle School, Ed Biliski would frequently park his car on Boxwood Road in front of the houses.  When I asked him why he parked there, he told me it was because he found a "tracking device" in his car and he believed that Ted Ammann had planted it there.

5.    On July 31, 2006, Ted Ammann had to leave the office and instructed me to have Ed Biliski sign the Disciplinary Memo attached hereto as Exhibit A.

6.    When Ed Biliski came to the office, I handed him the memo so that he could review and sign it.  When Ed Biliski saw the memo, he became very angry and said that he wasn't going to sign that "fucking memo."  He then left the office and did not tell me where he was going.

7.    When Ted Ammann returned to the office, I told him that Ed Biliski became angry when I gave him the memo and repeated Ed Biliski's comment to me.

I hereby verify under penalty of perjury that the foregoing is true and accurate.

RHONDA HENRY-CARTER

Signed this 1 ῾6 day of October, 2007.

DB02:6293627.1                                             061778.1006

A123



**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

**Technology Office**

# Memo

| | |
|---|---|
| **To:** | Ed Biliski |
| **From:** | Ted Ammann |
| **CC:** | Debra Davenport |
| **Date:** | July 31, 2006 |
| **Re:** | Missed Deadline |

On July 24th, I assigned work order #44522 to you. This work order involved work that needed to be done in the IDF of Conrad Middle School as a result of a construction project. The deadline assigned to this work order was July 28th. This deadline was assigned due to the dependencies upon this work involving not only outside contractors but after hours access to the building.

As of the deadline, this work had not been completed, nor had you raised any concerns with having the work completed. Because you were not at work on the deadline, the work had to be assigned to someone else. The expectation of technicians is that work orders are completed by the date assigned. Failure to complete work by assigned deadlines without mutually agreed upon revisions to the deadlines can not be tolerated. Future missed deadlines will result in disciplinary action up to and including termination.

I have received the above memo.

_____

Ed Biliski

## EXHIBIT A

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.