## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **EDWARD A. BILISKI,** | : |
| **Plaintiff,** | : |
| | : |
| **v.** | **: Civil Action No. 06-740-GMS** |
| | : |
| **RED CLAY CONSOLIDATED SCHOOL** | : |
| **DISTRICT BOARD OF EDUCATION,** *et al.,* | : |

### APPENDIX TO
### PLAINTIFF'S BRIEF IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein@embarqmail.com
Attorney for Plaintiff

Dated: October 29, 2007

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| COMPLAINT |  | A-1 |
| ANSWER OF DEFENDANTS |  | A-5 |
| EXCERPTS FROM DEPOSITION OF EDWARD A. BILISKI |  | A-9 |
| EXCERPTS FROM DEPOSITION OF DIANE DUNMON |  | A-16 |
| EXCERPTS FROM DEPOSITION OF IRWIN J. BECNEL, JR. |  | A-21 |
| EXCERPTS FROM DEPOSITION OF DEBRA DAVENPORT |  | A-27 |
| LETTER TO EDWARD BILISKI DATED AUGUST 8, 2006 | (D65) | A-33 |
| LETTER FROM BILISKI TO BOARD OF EDUCATION  (D67) |  | A-34 |
| AGENDA OF BOARD OF EDUCATION MEETING OF AUGUST 16, 2006 | (D82) | A-49 |
| LETTER TO EDWARD BILISKI DATED AUGUST 17, 2006 | (D92) | A-55 |
| MEMO TO DIANE DUNMON FROM ED BILISKI RECEIVED AUGUST 21, 2006 | (D93) | A-56 |
| MEMO TO ED BILISKI FROM TED AMMANN DATED AUGUST 7, 2006 | (Biliski-EX6) | A-57 |
| MEMO TO ED BILISKI FROM TED AMMANN DATED AUGUST 7, 2006 | (Biliski-EX8) | A-58 |
| MEMO TO ED BILISKI FROM TED AMMANN DATED AUGUST 7, 2006 | (Biliski-EX8) | A-59 |
| EXCERPTS FROM SCHOOL DISTRICT PERSONNEL POLICIES | (D170) | A-60 |
| RECORDS FROM ED BILISKI CLAIM FOR UNEMPLOYMENT COMPENSATION |  | A-65 |

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

EDWARD A. BILISKI,          :
    **Plaintiff,**           :
                          :
        **v.**              :
                          :
**RED CLAY CONSOLIDATED SCHOOL**  :
**DISTRICT BOARD OF EDUCATION; IRWIN**  :
**J. BECNEL, JR, CHARLES CAVANAUGH,**  **: Civil Action No. _____**
**GARY LINARDUCCI, JAMES J. BUCKLEY,**  :
**MARGUERITE VAVALA, YVONNE**  :
**JOHNSON, MARTIN A. WILSON, SR.,**  :
**individually and in their official**  :
**capacities as members of the Red Clay**  **: TRIAL BY JURY IS DEMANDED**
**Consolidated School District Board of**  :
**Education; ROBERT J. ANDRZEJEWSKI,**  :
**individually and in his official capacity as**  :
**Superintendent of the Red Clay Consolidated**  :
**School District; and RED CLAY**  :
**CONSOLIDATED SCHOOL DISTRICT,**  :
    **Defendants.**          :

### COMPLAINT

### JURISDICTION AND VENUE

1. The claims set forth herein arise and are instituted pursuant to 42 U.S.C. §1983 to redress the deprivation by the defendants, acting under color of state law, of a right, privilege and immunity secured to the plaintiff by the Fourteenth Amendment to the Constitution of the United States.

2. This Court has original jurisdiction pursuant to 28 U.S.C. §1331 and §1343(3) and 42 U.S.C. §1983. Declaratory relief is sought under 28 U.S.C. §2201 and 2202.

3. The acts alleged herein were committed within the State of Delaware.

### THE PARTIES

4. The Plaintiff, Edward A. Biliski ("Biliski"), is a male citizen of the United States and resides in New Castle County, State of Delaware. Biliski was formerly employed as a computer technician by the defendant Red Clay Consolidated School District Board of Education ("Board").

5. The defendant Board is a "school board" as defined in 14 *Del.C.* §1041(1) organized and existing under the laws of the State of Delaware, 14 *Del.C.* §1041, *et seq.*

6. Defendants Irwin J. Becnel, Jr., Charles Cavanaugh, Gary Linarducci, Martin A. Wilson,

Sr., Marguerite Vavalla, James J. Buckley, and Yvonne Johnson constitute the individual membership of the Defendant Board.

7. Defendant Robert J. Andrzejewski (hereinafter "Superintendent") is the duly appointed Superintendent of the defendant Red Clay Consolidated School District.

8. Defendant Red Clay Consolidated School District ("District") is a "reorganized school district" as defined in 14 *Del.C.* §1041(1) organized and existing under the laws of the State of Delaware, 14 *Del.C.* §1041, *et seq.*

9. At all times referred to herein, the defendants were acting within the scope of their employment and/or were exercising powers conferred on them under color of the laws of the State of Delaware.

## FACTS COMMON TO ALL COUNTS

10. On or about March 20, 2001, the plaintiff was hired by the defendants Board/District as a computer technician. Plaintiff's employment with the Board/District continued from March 20, 2001 through August 8, 2006. On August 8, 2006, plaintiff was called off his work assignment and directed to go to the District's human resources office. When plaintiff arrived at the office, he met with his immediate supervisor, Ted Ammann ("Ammann") and Debra Davenport ("Davenport"), the District's Manager of Human Resources.

11. At this meeting, plaintiff was given a series of three Memos. Each Memo was from Ammann and was dated August 7, 2006. Copies of these Memos are attached to this Complaint as Exhibit 1, Exhibit 2, and Exhibit 3, respectively. The Memos contained allegations relating to plaintiff's job performance. At the conclusion of the meeting, plaintiff was handed a letter from Davenport dated August 8, 2006. A copy of this letter is attached to this Complaint as Exhibit 4. The letter stated:

> This letter is a followup to the meeting held today with me and Mr. Ammann. Due to poor work performance, your name will be submitted to the Board of Education for termination. If approved your date of termination will be effective August 11, 2006.

12. Prior to his attending the meeting with Ammann and Davenport on August 8, 2006, plaintiff had no notice that the defendants District/Board intended to terminate his employment and

had no notice as to the reasons for his termination which might have enabled plaintiff to present his case to any decisionamker prior to his termination.

13. After August 8, 2006 and continuing up to the present time, the plaintiff was not provided with any notice or opportunity to contest the merits of the termination decision with anyone, including the defendants Superintendent, District, or members of the Board.

### Claims Arising Under 42 U.S.C. §1983

14. Plaintiff realleges Paragraphs 1 through 13 above as if here fully set forth.

15. By virtue of his employment by the Board/District from March 20, 2001 through August 8, 2006, the plaintiff had an expectation of continued employment with the Board/District.

16. The aforesaid expectation of continued employment amounts to a property interest which exists under the laws of the State of Delaware and is subject to the protections afforded by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

17. The actions of the defendants as set forth in Paragraphs 1 through 13 above amounted to a deprivation of the plaintiff's property right to continued employment in violation of the plaintiffs's right to procedural due process under the Fourteenth Amendment to the Constitution of the United States which is actionable under 42 U.S.C. §1983. Specifically:

(1) the defendants failed to provide the plaintiff with any notice or meaningful opportunity to be heard by any decisionmaker prior to his termination on August 8, 2006;

(2) the defendants failed to provide the plaintiff with any notice or meaningful opportunity to be heard by any decisionmaker after his termination on August 8, 2006.

18. The acts as described above by defendants Board and District, its agents and employees, were practiced either intentionally or with reckless indifference to the federally protected rights of the plaintiff.

19. As a direct and proximate result of the unlawful conduct of defendants, its agents and employees, plaintiff has been injured and has suffered a loss of income, including back pay and benefits and future earnings and fringe benefits.

WHEREFORE, the plaintiff requests that the Court grant relief as follows:

(a) enter a declaratory judgment that the acts and practices complained of herein were unlawful and violative of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. §1983;

(b) issue a preliminary and permanent injunction to restore the plaintiff to his former employment and to enjoin the defendants from terminating plaintiff's employment unless the termination procedures employed by the defendants comply with the minimum requirements of procedural due process under the Fourteenth Amendment.

(c) order the defendants, individually, and jointly and severally, to make whole the plaintiff, who has been adversely affected by the violation of constitutional rights described herein, by awarding appropriate monetary damages, including but not limited to backpay, future earnings and fringe benefits, and compensation for all other injuries and losses proximately caused by the unlawful acts of the defendants;

(d) award plaintiff the costs of the action and his reasonable attorney's fees.

(e) grant such other and further relief as the court deems necessary and proper.


                              /s/    Joseph M. Bernstein
                              JOSEPH M. BERNSTEIN (#780)
                              800 N. King Street - Suite 302
                              Wilmington, DE 19801
                              302-656-9850
                              302-656-9836 (Fax)
                              E-mail: jmbern001@comcast.net
                              Attorney for Plaintiff

Dated: November 30, 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDWARD A. BILISKI )
)
     Plaintiff, )
)
     v. ) C.A. No. 06-740-GMS
)
RED CLAY CONSOLIDATED SCHOOL )
DISTRICT BOARD OF EDUCATION, )
IRWIN J. BECNEL, JR., CHARLES )
CAVANAUGH, GARY LINARDUCCI, )
JAMES J. BUCKLEY, MARGUERITE )
VAVALA, YVONNE JOHNSON, )
MARTIN A. WILSON, SR, individually )
and in their official capacities as members )
of the Red Clay Consolidated School )
District Board of Education, ROBERT )
J. ANDRZEJEWSKI, individually and in )
his official capacity as Superintendent of )
Red Clay Consolidated School District; and )
RED CLAY CONSOLIDATED SCHOOL )
DISTRICT, )
)
     Defendants. )

## ANSWER AND AFFIRMATIVE DEFENSES

Defendants answer Plaintiff's Complaint as follows:

1.    This paragraph states a legal conclusion as to which no response is

required. By way of further answer, defendants deny that plaintiff's claims have legal or factual

merit.

2.    This paragraph states a legal conclusion as to which no response is

required. By way of further answer, defendants deny that plaintiff's claims have legal or factual

merit.

          061778.1006

A-5

3.    Admitted that plaintiff was employed by defendant Red Clay Consolidated School District Board of Education in the geographic area of the State of Delaware. It is denied that plaintiff's claims have factual or legal merit.

## THE PARTIES

4.    Admitted upon information and belief that plaintiff is a male citizen of the United States and a resident of New Castle County, State of Delaware. It is also admitted that plaintiff was formerly employed as a computer technician by defendant, Red Clay Consolidated School District Board of Education.

5.    Admitted.

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    This paragraph states a legal conclusion as to which no response is required. By way of further answer, defendants deny that plaintiff's claims have legal or factual merit.

## FACTS COMMON TO ALL COUNTS

10.    Admitted that plaintiff was hired by a Defendant of Red Clay Consolidated School District Board of Education, on or about March 21, 2001 and that his employment was terminated on August 8, 2006, effective 8/11/06. Admitted that on August 8, 2006, plaintiff met with Ted Ammann, Manager of Technology, and Debra Davenport, the District's Manager of Human Resources.

11.    Admitted that Plaintiff received copies of the documents attached as Exhibits 1 through 3 respectively to his complaint. Each memorandum speaks for itself. It is

further admitted that on August 8, 2006 Plaintiff received the letter attached to the Complaint as

Exhibit 4.

      12.    Denied.

      13.    Denied.

### CLAIMS ARISING UNDER 42 U.S.C. §1983

      14.    Defendants repeat and reallege their answers to Paragraphs 1 through 13

as if fully set forth herein.

      15.    Denied.

      16.    Denied.

      17.    Denied.

      18.    Denied.

      19.    Denied.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims fail to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims fail in whole or in part because at all times Defendant made a

good faith effort to comply with applicable law, acted lawfully and with legitimate non-

discriminatory business reasons.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by his failure to mitigate damages.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint may be denied in whole or in part with the doctrine of after-acquired evidence.

## FIFTH AFFIRMATIVE DEFENSE

The individual defendants are entitled to Qualified Immunity from the suit.

WHEREFORE, Defendants respectfully request that this action be dismissed with prejudice, with costs and attorneys' fees assessed against Plaintiff.


YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ Barry M. Willoughby
Barry M. Willoughby, Esquire (I.D. No. 1016)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Email: bwilloughby@ycst.com
Attorney for Defendants, Red Clay Consolidated
School District Board of Education, et al.

Dated: February 6, 2007

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 11 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

**6**

1    MR. WILLOUGHBY: So we evidently didn't
2    attach the other exhibits.
3        Off the record.
4        (Discussion off the record.)
5    BY MR. WILLOUGHBY:
6    Q. Have you had a chance to review the document,
7    Exhibit 1?
8    A. Yes.
9    Q. Do you recognize that as the complaint that you
10   have filed against Red Clay and various individuals?
11   A. Yes.
12   Q. Have you filed any other complaint in any other
13   court against Red Clay or anybody associated with Red
14   Clay?
15   A. No.
16   Q. Have you filed any kind of administrative
17   charge with the Department of Labor, anybody else?
18   A. Well, I started to file a charge for, you know,
19   unlawful -- I ended up with a heart condition and I
20   thought maybe I was protected under a minority thing
21   and I went into the unemployment office to see if I
22   could, you know, file.
23   Q. In fact, you never filed --
24   A. For disability.

**7**

1    Q. You never, in fact, filed for --
2    A. They told me there was a slim chance. They
3    made a comment that if I wasn't missing an arm or
4    something along that line that it wasn't...
5    Q. But the bottom line is you, in fact, did not
6    file a charge?
7    A. No. No.
8    Q. Now, your complaint lists the Red Clay School
9    District.
10   A. Right.
11   Q. That's your former employer?
12   A. Right.
13   Q. And then it lists a number of individuals who
14   are all board members and then the superintendent?
15   A. (The witness nodded.)
16   Q. Correct?
17   A. Correct.
18   Q. Now, as far as the board members go, let's deal
19   with them first.
20       Did you ever have any dealings with any of
21   them individually in connection with your complaint?
22   A. Yes.
23   Q. Which ones?
24   A. That fact I don't remember. But I called I

**8**

1    think four people at home because I wasn't familiar
2    with the procedure on how to deal with this. I tried
3    calling individuals up at home. I got answering
4    machines on all. Three called back. I vaguely
5    remember who they were.
6        I requested that they don't vote to
7    terminate me until they hear my side of the story.
8    And one of them, and I'm not sure who it was, made the
9    comment that he would have to speak with Diane Dunmon
10   to find out what this thing was.
11       At that time as far as I know, I was not
12   terminated from Red Clay per the Board of Education.
13   Q. So that was before the board meeting?
14   A. Right.
15   Q. You're looking at the front page that we call
16   the caption where you list the names there.
17       Can you go through those names and see if
18   you can identify who you called?
19   A. I think I called everyone, but I got, like
20   three of them I got answering machines.
21   Q. Which ones do you think you actually spoke to?
22   A. I think Gary Linarducci.
23   Q. Linarducci.
24   A. I'm not sure if it was Charles Cavanaugh. It

**9**

1    wasn't -- I don't believe it was Bucknell.
2        I called --
3    Q. You mean Becnel, B-e-c-n-e-l?
4    A. Yeah, Becnel. There was a woman that was on
5    the board. I'm not sure if that's her.
6    Q. Do you know which one? There's a couple of
7    women listed here.
8    A. There was one woman I called. I got her
9    husband, but she was out of town attending to her
10   sister. Her sister was sick out of state and she
11   was -- and I'm not 100 percent sure, but I think she
12   may have stepped down.
13   Q. Do you know who it is though by looking at the
14   names here?
15   A. Not really. I think it was something like, it
16   might have been Vivian whatever, Vivian Johnson.
17   Q. Yvonne Johnson?
18   A. Yvonne Johnson, yeah.
19   Q. Do you remember that or this is more or less --
20   A. I'm not 100 percent sure, but 80, 90 percent I
21   believe it was her.
22   Q. You didn't actually speak with her though?
23   A. I didn't speak with her. I spoke with her
24   husband. He was going to relay the message to her.

3  (Pages 6 to 9)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 12 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

10

1  Like I said, she was out of town attending a sick
2  sister.
3   Q.  You made the same request that they not
4  terminate you until they received a letter you had
5  sent in?
6   A.  Right. Right.
7   Q.  And then was that the same basic conversation
8  with all the board members you contacted?
9   A.  Yes. Yes.
10   Q.  Did you have any direct contact with the
11  superintendent, Robert Andrzejewski?
12   A.  No.
13   Q.  Are you aware of any contact that he had with
14  your case or your termination?
15   A.  No.
16   Q.  Looking over at paragraph 15 of the complaint,
17  I just ask you to read paragraph 15 to yourself for a
18  second.
19   A.  (Reviewing document) Okay.
20   Q.  Paragraph 15 you just read to yourself,
21  correct?
22   A.  Yes.
23   Q.  Now, am I correct that the only basis that you
24  have for alleging that you had an expectation of

11

1  ongoing employment was the length of your service at
2  Red Clay?
3   A.  Yes.
4   Q.  And as we said earlier, a couple of memos
5  aren't attached --
6   A.  That may not have been my only expectation, but
7  that was a big one.
8   Q.  Well, is there something else besides your
9  length of employment that gave you an expectation of
10  continued employment?
11   A.  The fact that it was under my understanding
12  that you had to have at least three memos in your file
13  to be terminated and that they would not fire you
14  without just cause.
15   Q.  Where did you get that expectation, that
16  understanding?
17   A.  From coworkers.
18   Q.  What coworkers?
19   A.  I can't remember at the time. It was like, you
20  know, basic gossip thing.
21   Q.  Nothing from Red Clay management?
22   A.  No.
23   Q.  As we said before, the memos that you did
24  attach to your complaint I advertently left them out.

12

1  I'm not going to talk about those now.  We'll talk
2  about them later on.
3        Prior to coming to Red Clay where did you
4  work?
5   A.  I worked for Rollins Leasing in Wilmington,
6  Delaware.
7   Q.  I'm sorry?
8   A.  Rollins Leasing, Wilmington, Delaware.
9   Q.  And --
10   A.  Up on 202.
11   Q.  What did you do there?
12   A.  Computer technician. I started my computer
13  field training there at Rollins Leasing.
14   Q.  So it was the first time you worked with
15  computers?
16   A.  Employed fixing computers, yes.  I went to
17  school for three months prior.
18   Q.  All right.
19        MR. WILLOUGHBY:  Let me ask the court
20  reporter to mark that as Exhibit No. 2.
21        (Biliski Deposition Exhibit No. 2 was
22  marked for identification.)
23  BY MR. WILLOUGHBY:
24   Q.  Let me ask you to take a look at Exhibit No. 2

13

1  and see if you recognize that.
2   A.  Yes, I do.
3   Q.  Do you recognize that as your application for
4  employment with Red Clay?
5   A.  Yes.
6   Q.  Did you look at that prior to coming in for the
7  deposition today?
8   A.  Yes.
9   Q.  And that indicates that your employment
10  immediately before coming to Red Clay was Rollins
11  Leasing?
12   A.  Yes.
13   Q.  Now, were you employed at Rollins Leasing at
14  the time you applied to Red Clay?
15   A.  Yes. Yes.
16   Q.  Going down to the second employer listed, it
17  says is it McClafferty?
18   A.  Yes.
19   Q.  Printing?
20   A.  Yes.
21   Q.  And it says you were a press helper.  What did
22  you do in that capacity?
23   A.  What I did was basically everything that the
24  press operator didn't do.  I had to load the ink in

4  (Pages 10 to 13)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 13 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

34

1  option.
2      She made a comment well, she was only
3  there two years. I said well, maybe you don't then
4  and left it at that, you know.
5      Q. All right. Now I'm going to ask you some
6  questions about when you contacted counsel. I want to
7  be clear. I'm not asking about what you said to
8  counsel who is with you or to Mr. Bernstein about the
9  case. I just want to know when you made the contacts.
10 Okay?
11     A. Okay.
12     Q. When was the first time that you contacted a
13 lawyer with respect to any potential claims involving
14 Red Clay?
15     A. I'm not sure of the exact date, but it was a
16 little period after -- I didn't hear nothing from
17 Diane Dunmon. I had dropped a letter off requesting
18 to have a meeting. I got no reply or nothing stating
19 that they would or wouldn't acknowledge my reasonable
20 thing.
21     I went online and I noticed that within
22 fifteen days if you submit a letter -- and this was a
23 state site. It wasn't the Red Clay site. So I
24 assumed they were guided by the same policies.

35

1      So what I did was I typed something up and
2  I took it in and hand delivered it to Diane Dunmon's
3  office.
4      Q. And that was after the board --
5      A. That was ten days after being allegedly
6  terminated.
7      Q. Ten days after the board action of your
8  termination?
9      A. No. That was after they suggested that I be
10 terminated upon the board's approval.
11     Q. So that was ten days after your meeting in
12 which you were advised that your termination would be
13 placed before the board?
14     A. Right.
15     Q. So was it before the actual board meeting?
16     A. When I gave that thing?
17     Q. Yes.
18     A. Yes.
19     Q. So it was before the board meeting?
20     A. Yes.
21     Q. As we talked about earlier, you also submitted
22 a letter to the board in advance of the meeting?
23     A. Yes.
24     Q. And so when was it in relation to that that you

36

1  contacted legal counsel?
2      A. I waited -- I'm not even sure. I think I
3  waited a couple of weeks after that. I heard nothing
4  back. I figured that they weren't going to do
5  nothing. Even after, even after they had their board
6  meeting, they had a general public meeting and after
7  the public meeting they had like an executive meeting
8  where they vote on things like this.
9      And I rushed. I was up probably until
10 4:00 in the morning trying to hurry up and type a
11 rebuttal, you know. There are some typos and all
12 that, but I was in a hurry and I was tired and trying
13 to get something to the board just so that they would
14 give me my chance in court, so to speak, before they
15 terminated me or voted to terminate me.
16     So the answer to your question was
17 probably three weeks to maybe a month or maybe a
18 little bit longer, maybe a little less.
19     Q. By that time had you received a letter from Red
20 Clay saying that the board had voted to dismiss you?
21     A. No. No.
22     Q. So you already had an attorney before you got
23 that letter?
24     A. I never got the letter.

37

1      Q. You never got a letter saying that the board --
2      A. Voted to terminate me?
3      Q. Yes.
4      A. No.
5      Q. Did you attend the board meeting?
6      A. No.
7      Q. You just submitted the letter to the various
8  board members?
9      A. Right. Right. I had submitted a letter to the
10 woman that's in charge of typing it up. She ran off
11 copies. I can't remember her name.
12     Q. So did you take the letter to the district
13 office?
14     A. Yes.
15     Q. And it was copied there?
16     A. Yes.
17     Q. For the board meeting?
18     A. Yes.
19     Q. You didn't actually deliver it to each of the
20 board member's houses?
21     A. No.
22     Q. Are you presently under a doctor's care for any
23 reason?
24     A. My heart condition.

10  (Pages 34 to 37)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 14 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

190

1  loaded and unloaded a van on my own.
2  Q. So this memo is accurate, but it's just that
3  your view is that you only said you're not doing it as
4  a joke?
5  A. Correct.
6  Q. Now, you got these three at a meeting with
7  Debra Davenport and Ted --
8  A. There was a total of four at that meeting.
9  Q. What was the other one you got?
10  A. Was it -- there were four memos presented.
11  One...
12  Q. Hold on a second, please.
13  A. Right.
14       (Biliski Deposition Exhibit No. 9 was
15  marked for identification.)
16  BY MR. WILLOUGHBY:
17  Q. Is Exhibit No. 9 what you're referring to as
18  the fourth memo?
19  A. No.
20  Q. There's something else?
21  A. Yes.
22  Q. Did you keep a copy of it?
23  A. I had a total of four memos. The one memo was
24  for missing the work order, disregard for

191

1  instructions, refusal to carry out assignment.
2  There's two of the same here. Let's see. Unaccounted
3  for time. Missed deadline.
4       These (indicating).
5  Q. Let me ask you to look back at your complaint
6  which is Exhibit 1. Do you have that? Right there
7  (indicating).
8       I'm going to ask you to look at paragraph
9  11. That paragraph of your complaint says that you
10  were given three memos at the meeting.
11  A. I had the memo that he had given me earlier,
12  plus three additional memos.
13  Q. So you were given three additional at the
14  meeting?
15  A. Right.
16  Q. So we have covered all four of the memos that
17  you referred to?
18  A. Right.
19  Q. Now, did you also get Exhibit 9, the letter
20  advising you that your name would be put into the
21  board for termination?
22  A. Yes.
23  Q. Did you have discussions with Ms. Davenport and
24  Ted about the circumstances that occurred with those

192

1  three memos? Did you discuss them?
2  A. He read them off and then at the end --
3  Q. Did you respond to them?
4  A. No. I tried to respond and they shut me up.
5  Q. What do you mean by that?
6  A. I tried to make a comment and Diane Dunmon
7  said, "Oh, no, you don't." Not Diane Dunom, but Debra
8  Davenport says, "Oh, no, you don't. Oh, no, you
9  don't. You have to listen to what he's reading."
10       And then at the end of his reading, I
11  wanted to rebuttal each one and I wasn't given that
12  opportunity.
13  Q. At the end of the reading did you rebut them?
14  A. No.
15  Q. Did you make any comments about them?
16  A. I tried to make them and he read off the thing
17  that, you know, they feel it's in the best interest to
18  terminate me.
19  Q. So you didn't tell them your position?
20  A. No.
21  Q. And you received Exhibit 9 at the end of the
22  meeting?
23  A. No, I didn't. Exhibit 8.
24  Q. Exhibit 9, the letter --

193

1  A. I might have. I think I may have. I'm not
2  sure. This (indicating) is the one that they handed
3  me.
4  Q. Right. It shows, at the bottom it has a number
5  that's Biliski 5 written. That's something your
6  lawyer put on it that shows it came from you.
7  A. Right.
8  Q. So you did receive this?
9  A. Yes. I received two copies.
10  Q. So who gave you the letter?
11  A. This was a letter he read off and then handed
12  to me.
13  Q. Who is "he"?
14  A. Ted Ammann.
15  Q. And what did you say when he handed it to you?
16  A. I was pissed off at the whole thing. I thought
17  I was being ambushed. When he told me that I was
18  terminated, I was pissed off because I needed my
19  medical benefits and everything.
20       During that meeting when I tried to rebut
21  what he was saying, Debra Davenport stopped me. She
22  said, "Oh, no, you don't. Oh, no, you don't. You
23  have to listen to what he's saying."
24       Then when I looked over at her, she had a

49  (Pages 190 to 193)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 15 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

194

1  big smile on her face. And I kind of looked at her
2  and I'm wondering, you know, here I'm being terminated
3  and this woman is over there smiling away from cheek
4  to cheek.
5    Q.  So you thought she was smiling at the fact that
6  you were being terminated?
7    A.  Right.
8    Q.  And at any point did you discuss your viewpoint
9  of the three memos?
10   A.  No.
11   Q.  But you got Exhibit 9, the letter telling you
12  that your name would be submitted for termination?
13   A.  Correct.
14   Q.  When did you say to Ted at that point?
15   A.  At that point I stood up after hearing that I
16  was being terminated over the stupidest stuff, that I
17  was pissed off, I took my I.D. off and I flung it at
18  him and I called him a no good motherfucker and that
19  he finally got what he wanted. And I was pissed and
20  then I kind of flipped my pencil at him or pen or
21  whatever, not at his face; at his stomach area.
22       And then Diane Dunmon said, "It's time" --
23   Q.  You mean Debra --
24   A.  Debra Davenport. I'm sorry. She said, "It's

195

1  time for you to go" and I left.
2    Q.  So you actually threw your pencil at him?
3    A.  Yes.
4    Q.  And it hit him, didn't it?
5    A.  Sure. I'm sure it did.
6    Q.  Then after that meeting what did you do?
7    A.  I left.
8    Q.  Where did you go?
9    A.  What do you do after you just have been fired?
10  Let's see. What do you do after you just lost your
11  medical benefits and you have a heart condition that I
12  believe was created by Red Clay?
13       But, nonetheless, I just left the
14  building.
15   Q.  Did you --
16   A.  I went home and called my sister and told her I
17  got terminated.
18   Q.  Did you then prepare the letter for the Board
19  of Education?
20   A.  I didn't think of that right away, until I read
21  the termination when I got home, and then --
22   Q.  Until you read Exhibit 9, this letter?
23   A.  Yes. I just assumed I was terminated at that
24  spot. Then when I read that upon approval of the

196

1  board.
2    Q.  So then you submitted the letter, made the
3  letter?
4    A.  Right.
5        MR. WILLOUGHBY: Make this Exhibit 10.
6        (Biliski Deposition Exhibit No. 10 was
7  marked for identification.)
8  BY MR. WILLOUGHBY:
9    Q.  Do you recognize Exhibit 10?
10   A.  Yes, I do.
11   Q.  Is that your rebuttal document?
12   A.  Yes.
13   Q.  And that was submitted to the Board of
14  Education?
15   A.  Yes.
16   Q.  Did you know what date the board was meeting?
17   A.  I really didn't know that the board, when the
18  board was meeting. What I tried to do is call the
19  Board of Education at home and then one of them
20  directed me on what I needed to do.
21   Q.  And those were the discussions we had way back
22  at the beginning of this deposition?
23   A.  Yes. Yes.
24   Q.  Then you took this over and somebody in the

197

1  district office copied it for you?
2    A.  Yes.
3    Q.  And gave it to the board members?
4    A.  Yes.
5    Q.  And you didn't actually go to the board
6  meeting?
7    A.  No. No.
8        MR. WILLOUGHBY: Mark that as 11.
9        (Biliski Deposition Exhibit No. 11 was
10  marked for identification.)
11  BY MR. WILLOUGHBY:
12   Q.  Let me hand you Exhibit 11 and ask you if you
13  recognize that.
14   A.  Nope.
15   Q.  You never saw that before?
16   A.  Never seen it.
17   Q.  Is it correctly addressed?
18   A.  Yes.
19   Q.  And you never saw that before today?
20   A.  Absolutely not.
21   Q.  All right.
22        MR. WILLOUGHBY: Let's take about a
23  five-minute break. We're coming down the homestretch,
24  I think.

50  (Pages 194 to 197)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 16 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

202

1   Q. Okay.
2   A. (Reviewing document). The bottom line is
3   wrong. It's 40,500.
4   Q. Well, let me ask you: Did you review the
5   response?
6   A. Yes.
7   Q. Am I correct that your response says that you
8   are now employed with Management Business Solutions?
9   A. Correct.
10  Q. And that's 540 First State Boulevard?
11  A. Yes.
12  Q. And you began working there on March 19, 2007?
13  A. Correct.
14  Q. And according to the interrogatory answers
15  which you just signed, that says your annual salary is
16  45,000 per year?
17  A. That's wrong.
18  Q. So that's incorrect?
19  A. Right.
20  Q. What do you say your annual salary is?
21  A. It's 40,500.
22  Q. 40,500?
23  A. Yes. Not 45,000.
24  Q. Who does payroll at your current employer?

203

1   A. It's done out at Colorado. I'm not exactly
2   sure. There's nobody you can go to at this site.
3   Q. You told me earlier who your supervisor is at
4   this site.
5       Is there somebody at your site who is
6   responsible for administrative responsibilities?
7   A. I believe the site that I work at -- I work for
8   MBS as a contractor. I'm contracted into Agilent
9   Technologies and the boss that runs that whole thing
10  down at Newport is Morris Bilson, III.
11  Q. Is he with Agilent?
12  A. Yes.
13  Q. And is their address the same as what you
14  listed in your interrogatory answer?
15  A. Yes.
16  Q. Now, do you like the job at Management Business
17  Solutions?
18  A. Yes, I do.
19  Q. What is it exactly that you're doing there?
20  A. The same basic thing I did at Red Clay.
21  Basically, troubleshooting networks, making sure
22  manufacturing equipment is up, re-imaging desktops,
23  that type of thing.
24  Q. Do you get along with your supervisor?

204

1   A. Yes.
2   Q. Do you get along with your coworkers?
3   A. Yes.
4   Q. Do you think your supervisor is out to get you
5   to try to fire you?
6   A. Absolutely not.
7   Q. But you're telling me that even though you like
8   the job and your supervisor is not out to get you like
9   you believe Ted was, you want to be reinstated to Red
10  Clay?
11  A. It depends. I was hoping to retire through Red
12  Clay. I do want my job back if I can get it back and
13  I can get it to where -- I can work with Ted. I don't
14  know if he can work with me on this.
15      It depends on the situation.
16  Q. What does it depend on?
17  A. That I go back and I'm not harassed in the job,
18  not by him or by any of the employees.
19  Q. What employees do you have in mind?
20  A. Any employees, either in upper management or
21  just coworkers.
22  Q. Am I correct you received unemployment
23  insurance benefits after you left Red Clay?
24  A. Yes.

205

1   Q. You got about $5,000?
2   A. Something like that.
3   Q. When you left Red Clay you looked for other
4   jobs?
5   A. Yes, I did.
6   Q. And do you have documents showing which jobs
7   you applied for?
8   A. I might have something on the computer, but I
9   haven't really kept track. Once I got my position, I
10  pretty much dumped everything.
11  Q. Dumped everything off of your computer?
12  A. Everything that I needed. I may have -- you
13  know, I just got a new computer so I may have dumped a
14  lot of stuff.
15  Q. You got this request --
16  A. I gave you some of the, a list that I did
17  remember. One was Yellow Freight. I applied for them
18  twice. I mean, I put a list, you know, to each and
19  everyone.
20  Q. Did you save the letters or documents?
21  A. Not really. I mean, once you didn't get the
22  job there's really no need to save anything.
23  Q. They were on your computer before you changed
24  it?

52   (Pages 202 to 205)

Case 1:06-cv-00740-GMS   Document 41   Filed 10/29/2007   Page 17 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Edward A. Biliski

226

1   Q. When you say, "in the office," what office?
2   A. The main office, right next to Doctor A, the
3   superintendent.
4   Q. You still have to tell me what the main office
5   is.
6   A. The main office of Red Clay School District.
7   Q. Did anybody tell you to take it there?
8   A. Yes.
9   Q. Who was that?
10  A. The woman that -- what the hell was her name?
11      The woman that's a secretary for Doctor A.
12  Q. Let me ask you. From August the 8th -- let me
13  back up.
14      From August the 7th or the August the 8th
15  when you had a meeting with Ted Ammann and he gave you
16  the three or four memorandums, from that time or any
17  time thereafter did anyone ever inform you that there
18  was going to be a hearing before the Board of
19  Education regarding your termination?
20  A. No, they didn't.
21  Q. On August the 7th or 8th or any time
22  thereafter, were you ever informed when the Board of
23  Education was going to act on your termination?
24  A. No, I wasn't.

227

1   Q. Were you ever informed that you had a right to
2   a hearing?
3   A. No.
4   Q. Did you ever get notice of a termination
5   hearing by the Board of Education?
6   A. No, I didn't.
7   Q. Did you ever get notice that you were
8   terminated by the Board of Education?
9   A. No, I didn't.
10  Q. Were you ever informed that you had a right to
11  a hearing after the Board of Education terminated you?
12  A. No.
13  Q. As a result of your August 16th, 2006 letter
14  which is Biliski No. 10, did you ever get a response?
15  A. No response whatsoever.
16  Q. You never got a response from the Board of
17  Education?
18  A. No.
19  Q. Did you ever get a response from the school
20  district?
21  A. No.
22  Q. From no one?
23  A. Nothing.
24      MR. ERHART: Nothing further.

228

BY MR. WILLOUGHBY:
2   Q. All right. With respect to the date that the
3   board was going to act on your recommended
4   termination, you did call a board member and find out
5   when it was going to be?
6   A. I called three board members. I didn't know
7   they were even having a board meeting. I called three
8   board members and asked them not to terminate me.
9   Q. Didn't you know that there was going to be a
10  meeting, that's why you were preparing Exhibit 10 so
11  quickly?
12  A. I think, yes, I found out rather late. I
13  called the board and then I think maybe one of them
14  told me that there's going to be a meeting and he told
15  me to go to Robbi Miller -- that was the name I
16  couldn't remember -- the secretary of Doctor A. And
17  she told me that I needed to print up like I think it
18  was seven or eight copies for each board member and I
19  told her I didn't think I had time. So she instructed
20  me to bring it in and she would do it and she would
21  put it in each of their folders.
22  Q. To your knowledge, did she do that?
23  A. Yes, she did.
24  Q. I'm sorry. I'm pulling all of these documents

229

1   away from you. Give me one second.
2       All right. We went over Biliski Exhibit
3   11 a while back and you testified you never, in fact,
4   received that.
5   A. No, I didn't.
6   Q. Even though it was addressed to you?
7   A. I've never seen it.
8   Q. But it's properly addressed?
9   A. I've never seen anything with the board saying
10  termination.
11  Q. And am I correct that the address is proper?
12  A. The address is correct.
13  Q. Did you ever follow up with anybody to find out
14  what happened?
15  A. I followed up with my attorney. I asked him if
16  he had heard anything, if I was terminated, and he
17  said he didn't know. He wanted to check.
18  Q. And what did he tell you?
19  A. He told me that they were avoiding him. They
20  weren't returning his calls. They weren't returning
21  letters. So he had no idea and there was only one
22  thing to do, was take them to court.
23  Q. So did he ever tell you that he thought you
24  were, that he told you that you were terminated?

Case 1:06-cv-00740-GMS   Document 41   Filed 10/29/2007   Page 18 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

**2**

1    DIANE DUNMON, the deponent herein, having
2  first been duly sworn on oath, was examined and
3  testified as follows:
4  BY MR. BERNSTEIN:
5    Q. Ms. Dunmon, as you know, my name is Joe
6  Bernstein and I'm representing Ed Biliski who has
7  filed a lawsuit against Red Clay School District
8  concerning his termination. I understand you were
9  present throughout the deposition of Ms. Davenport, is
10 that correct?
11   A. Yes.
12   Q. The same thing I told Ms. Davenport applies to
13 you. If you don't understand a question that I'm
14 asking you, please interrupt me and I'll try and
15 clarify it. I just want to find out what you know
16 about Mr. Biliski's situation. Okay?
17   A. Yes.
18   Q. Now, for the record could you state what your
19 position with Red Clay School District is.
20   A. I'm deputy superintendent.
21   Q. And is there more than one deputy
22 superintendent?
23   A. There is not.
24   Q. And I take it you report to the superintendent?

**3**

1    A. I do.
2    Q. And can you describe generally what your duties
3  are.
4    A. I'm responsible for school transportation, food
5  service, human resources, facilities and grounds and
6  general legal.
7    Q. So, would it be fair to say that you are kind
8  of a liaison to the superintendent from the kind of
9  highest level frontline supervisors?
10   A. Yes.
11   Q. And one of the people who reports to you is Ms.
12 Davenport?
13   A. Yes.
14   Q. And she reports to you concerning personnel
15 matters?
16   A. Correct.
17   Q. Now, first can you explain the relationship
18 between the administration -- I'm going to call that
19 the superintendent, assistant superintendent,
20 personnel director -- and the board of education
21 concerning personnel matters, how does that work as a
22 practical matter?
23       MR. WILLOUGHBY: What are the roles of the
24 various people?

**4**

1        MR. BERNSTEIN: Yes, what are the roles.
2  What role does the administration play versus what the
3  board plays?
4        MR. WILLOUGHBY: Are you identifying a
5  particular group of employees?
6        MR. BERNSTEIN: Well, let's talk about
7  non-teachers.
8    A. If I understand your question correctly, the
9  human resources department, Ms. Davenport, as the
10 manager is responsible to work with principals and
11 other managers and supervisors with regard to hiring
12 and recommendations for employment, recommendations
13 for termination of employees. Those recommendations
14 are then brought forward to my office. My office
15 prepares a report to the board of education for all of
16 those items and they're given to the superintendent
17 and board for a vote.
18   Q. Now, when recommendations come to your office,
19 let's talk about Mr. Biliski.
20   A. All right.
21   Q. In Mr. Biliski's case can you tell me what you
22 received from Ms. Davenport?
23   A. With regard to a recommendation?
24   Q. Yes.

**5**

1    A. We are talking about recommendation for
2  termination?
3    Q. Yes.
4    A. Okay. What I received from her office was I
5  believe the usual form. We get a form out of that
6  department on all personnel actions. So, it's an
7  individual form on individual employees. So, I would
8  have I believe received a form that simply had his
9  name, his position in the district, and it would have
10 indicated on the line for action would have said
11 termination and an effective date.
12   Q. Would you have received any kind of back-up
13 documentation as to why Mr. Biliski was being
14 recommended for termination?
15   A. Typically I would receive -- there are
16 typically conversations between the HR manager and
17 myself regarding an employee who is pending
18 termination. So, we would have had conversations
19 about Mr. Biliski. I would have also received some
20 copies -- I believe I received copies of at least one
21 letter to him.
22   Q. Do you have any specific recollection as to the
23 substance of any conversation?
24   A. I really don't have detailed recollections

2  (Pages 2 to 5)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 19 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

6

1    other than there were performance issues as I recall.
2    Q.  Did you ever meet with or speak to Mr. Biliski
3    directly concerning the alleged performance issues?
4    A.  I don't recall doing that.
5    Q.  Do you know whether Ms. Davenport met with Mr.
6    Biliski?
7    A.  I am aware that she and Mr. Ammann met with Mr.
8    Biliski on at least one occasion.
9    Q.  Do you know whether they met with him on more
10   than one occasion?
11   A.  I really don't recall, although I believe they
12   may have.
13   Q.  Now, when you get this recommendation in Mr.
14   Biliski's case what is the next thing that happens?
15   A.  My assistant prepares a report for the board
16   every month that identifies board action on any number
17   of employees and she would have prepared a sheet that
18   said something -- I'm going to paraphrase now -- like
19   it is recommended to the board of education that Mr.
20   Edward Biliski be terminated effective X date.
21   Q.  Let me have you look at some documents.
22   A.  Okay.
23   Q.  The first document I want you to look at is
24   Bates stamped D82.

7

1         MR. WILLOUGHBY:  First page of that
2    document is D82?
3         MR. BERNSTEIN:  Actually it's a bunch of
4    pages stapled together.
5         MR. WILLOUGHBY:  I have D82 to D87.
6         MR. BERNSTEIN:  Look at that whole document
7    and we can mark that as an exhibit.
8    A.  (Witness complies.)  Okay.
9    Q.  That appears to be the public agenda for the
10   meeting of the board on August 16, 2006 --
11   A.  Yes.
12   Q.  -- correct?  Is there a reference in that
13   public agenda to personnel matters?
14   A.  Yes.
15   Q.  And where does that appear?
16   A.  To personnel matters?
17   Q.  Yes.
18   A.  It appears -- do you mean the page number?
19   Q.  Yes.
20   A.  Personnel matters appear on Page 34 in this
21   document through page 37.
22   Q.  Let's refer to the Bates stamp numbers to make
23   it easier.
24   A.  Oh, I apologize, D84 through D87.

8

1    Q.  There is also a stamp on those pages for board
2    information only?
3    A.  Yes.
4    Q.  Do you see that?
5    A.  Yes.
6    Q.  Do you mean that those pages would not be
7    included in the posted public agenda?
8    A.  It means that they would not appear in this
9    manner in the public agenda.
10   Q.  And beginning on page D84 there are categories,
11   appointments, changes in assignment?
12   A.  Yes.
13   Q.  Leaves of absence?
14   A.  Yes.
15   Q.  This covers any kind of short-term disability,
16   disability, pensions, resignations, extensions of
17   employment, expirations, termination, recisions of
18   termination, this report covers any number of
19   situations --
20   A.  Yes.
21   Q.  -- correct?  And this is a document that is
22   presented to the board?
23   A.  Yes.
24   Q.  Now, on page D87 under "Termination" Mr.

9

1    Biliski's name appears?
2    A.  Yes.
3    Q.  Do you know whether or not anything other than
4    these pages in Mr. Biliski's case, D87, is given to
5    the board?  Is any back-up material given to the
6    board?
7    A.  I don't believe there was any back-up.  I do
8    not typically give them any other documents.
9    Q.  Is there any communication or memo given to the
10   board about why this person is being terminated?
11   A.  In the executive session if the board asks for
12   information on any individual or any topic in this
13   personnel report, I will respond to them verbally.
14   Q.  When the board goes into executive session,
15   that occurs before the regular meeting?
16   A.  Yes.
17   Q.  Before the public meeting?
18   A.  Yes.
19   Q.  Are those executive sessions recorded in any
20   way?
21   A.  They're not.  There are brief minutes taken
22   which are then printed and voted on at the following
23   meeting.
24   Q.  So, I would need to look at the minutes for the

3  (Pages 6 to 9)

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

10

1  next meeting that occurred after August 16th to review
2  the minutes of the executive session?
3      A.  Correct.
4          MR. BERNSTEIN:  Barry, I don't know if
5  those minutes were produced or not.
6          MR. WILLOUGHBY:  I'm not positive, but I
7  think these are the D88 through D91, I believe.
8          MR. BERNSTEIN:  Okay, I'm sorry, I
9  apologize.
10         MR. WILLOUGHBY:  I'll give it to the
11 witness and let her verify that.
12         THE WITNESS:  These are the minutes of the
13 regular session.  I don't believe these include the
14 minutes from the executive session.
15         MR. BERNSTEIN:  In looking at it I think
16 you are correct.
17         MR. WILLOUGHBY:  Well, if there are other
18 minutes we'll locate those.
19         MR. BERNSTEIN:  Okay.
20 BY MR. BERNSTEIN:
21     Q.  Other than the minutes of the executive session
22 prepared there is no other record of what occurred in
23 any given executive session?
24     A.  No, there is not.

11

1      Q.  Now, when a termination of an employee is
2  recommended to the board, does the employee who is
3  affected, in this case, Mr. Biliski, receive any kind
4  of notice that the board is going to consider his
5  termination?
6      A.  I am not sure if the letter that is produced
7  from the HR office -- you mean prior to the meeting?
8      Q.  Yes.
9      A.  I'm not sure if the letter from the HR office
10 identifies the date that it will go forward to the
11 board or not.
12     Q.  Why don't you look at D65.
13     A.  I see that.
14     Q.  Is that the letter that was sent to Mr. Biliski
15 informing him of his termination?
16     A.  I believe it was.
17     Q.  If there was someplace where Mr. Biliski was
18 going to be told that this is going to be taken up by
19 the board, would that have been the letter that you
20 just referred to --
21     A.  Yes.
22     Q.  -- or is there something else?
23     A.  No, I believe this is the letter.
24     Q.  And do you want to take a minute to read that

12

1  over?
2      A.  (Witness complies.)  Yes, I'm finished.
3      Q.  Does that letter indicate when the board is
4  going to meet to consider Mr. Biliski's termination?
5      A.  It does not.
6      Q.  Now, that letter -- we can have D-65 marked as
7  the next exhibit.
8          MR. WILLOUGHBY:  Okay, do you want to do
9  that now?
10         MR. BERNSTEIN:  Yes.
11         MR. WILLOUGHBY:  We didn't do the others.
12         MR. BERNSTEIN:  Or just make a list.
13         MR. WILLOUGHBY:  Right, we'll make a list
14 and we can do it afterwards.
15         MR. BERNSTEIN:  D65 is dated August 8,
16 2006.
17 BY MR. BERNSTEIN:
18     Q.  Did you receive any correspondence or
19 communication from Mr. Biliski after August 8th
20 concerning his termination?
21     A.  I believe Mr. Biliski drafted a letter to the
22 board of education.
23     Q.  Why don't you take a look at D67 through D81.
24     A.  Yes, I have it here.

13

1      Q.  Is that the letter you just referred to a
2  moment ago?
3      A.  It appears to be, yes.
4      Q.  And you have seen this before?
5      A.  I have.
6      Q.  It's dated August 16th to the board of
7  education, Red Clay School District, and it was
8  authored by Mr. Biliski.  And do you know when it was
9  that it was the first time that you saw that?
10     A.  I believe he brought it to the district office
11 that day, August 16th, and, as I recall, he gave it to
12 -- it's my understanding that he gave it to I believe
13 the superintendent's secretary, but I'm not certain.
14     Q.  Did this letter come into your hands that day
15 at some point?
16     A.  It did.  The secretary -- again, as I recall,
17 the secretary asked -- said she had this letter for
18 the board and I said, yes, it's to be placed in the
19 board's packet for this evening.
20     Q.  Do you know whether that was done?
21     A.  It was.
22     Q.  Did you attend the board's executive session on
23 August 16th?
24     A.  I did.

4  (Pages 10 to 13)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 21 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

14

1    Q.  Do you know whether any board members asked you
2    or any other member of the administration's staff any
3    questions about Mr. Biliski's termination?
4    A.  I recall a board member and I believe it was
5    the board president, Mr. Becnel, asking about this
6    letter.
7    Q.  Do you remember what he said?
8    A.  I simply remember him saying did you read this
9    letter and he was kind of suprised at its contents.
10   Q.  What was your response?
11   A.  I said, Yeah, I had looked at the letter and
12   that Mr. Biliski was being terminated for poor
13   performance or recommended for termination for poor
14   performance.
15   Q.  Other than Mr. Becnel did any other board
16   members have any questions or refer to this letter in
17   any way?
18   A.  They may have, but I really don't recall.  They
19   -- someone may have said, yes, I was reading through
20   this, but do I recall a specific question, I do not.
21   Q.  Do you know whether or not Mr. Biliski was
22   present either at the public meeting or the executive
23   session?
24   A.  He was not present in the executive session.  I

15

1    do not know if he was present at the public session.
2    Q.  After the executive session and after the
3    public session on August 16th do you know whether or
4    not the school district afforded Mr. Biliski any
5    opportunity to present his side of the story to anyone
6    either on the board or the district?
7    A.  Not to my knowledge.
8    Q.  He wasn't sent a letter saying you have been
9    terminated, if you want to appeal this termination
10   here is what you need to do?
11         MR. WILLOUGHBY:  That's a compound
12   question.
13         MR. BERNSTEIN:  All right, I'll break it
14   up.
15   BY MR. BERNSTEIN:
16   Q.  Do you know whether or not Mr. Biliski received
17   any correspondence concerning his termination after
18   August 16th other than saying you're terminated?
19   A.  He should have received a letter indicating to
20   him the board action that was taken on August 16th and
21   he should have been informed about his benefits
22   rights.
23   Q.  Let's look at document 92.
24   A.  Yes.

16

1    Q.  That's a letter dated August 17th from Debra
2    Davenport, is that something you would be copied on
3    normally or not?
4    A.  No.  It's a standard form letter.  I do not
5    receive copies of these.  They go out automatically
6    subsequent to a board meeting for any action the board
7    takes.
8    Q.  And this basically tells Mr. Biliski that his
9    employment was terminated by the board and he has
10   certain rights with respect to looks like pension
11   funds?
12   A.  Correct.
13   Q.  And looks like it refers to his options or
14   rights concerning funds of a 401K and his options with
15   respect to health insurance?
16   A.  That's correct.
17         MR. BERNSTEIN:  If we could add D92 to be
18   marked as an exhibit.
19         MR. WILLOUGHBY:  Sure.
20   BY MR. BERNSTEIN:
21   Q.  The next document I would like you to look at
22   is D93 and we could have that checked off as an
23   exhibit too.  Do you want to take a minute to look
24   that over?

17

1    A.  Yes, please.  Okay.
2    Q.  Do you recall receiving that document from Mr.
3    Biliski?
4    A.  Yes.
5    Q.  Looks like it's Bates stamped August 21st --
6    A.  Yes.
7    Q.  -- received in your office.  Did you make any
8    response to that correspondence?
9    A.  I do not believe I did.
10   Q.  Do you have any knowledge or did you receive
11   any notice or did it come to your attention that Mr.
12   Biliski had filed a claim for unemployment benefits?
13   A.  I don't recall that.
14   Q.  You heard Debra Davenport's testimony about
15   that matter?
16   A.  I did.
17   Q.  Did you have any knowledge of those events at
18   the time they were occurring?  Were you informed about
19   that Mr. Biliski filed a claim?
20   A.  I have to tell you I do not remember.  If I was
21   informed, I don't recall it at all.
22   Q.  I just want to change gears a little bit here
23   and I would like you to first let me ask you some
24   questions about the personnel manual, the documents

5  (Pages 14 to 17)

Case 1:06-cv-00740-GMS   Document 41   Filed 10/29/2007   Page 22 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Diane Dunmon

18

1  starting D170 through D243.
2      MR. WILLOUGHBY: Some of those are pulled
3  out. I will give her the others and if you need
4  specific ones --
5  BY MR. BERNSTEIN:
6      Q. My first question is generally are you familiar
7  with that section of the administrative manual?
8      A. You mean D170 that starts Section G, Personnel?
9      Q. Yes.
10     A. Am I aware that it exists? Yes. Am I familiar
11 with all of its details? No.
12     Q. Is the section G, Personnel, is that something
13 that Ms. Davenport deals with specifically?
14     A. Yes.
15     Q. Do you have any occasion to deal with that?
16     A. With this personnel section? Certainly.
17     Q. There are references and let's talk about
18 specifically Page D243, which is titled "Classified
19 Staff Members." Do you see that?
20     A. I do.
21     Q. We can have this marked as an exhibit to your
22 deposition. Does the term "classified staff members"
23 have any particular meaning in your opinion?
24     A. In my opinion I have always referred to anyone

19

1  who does not hold a certificate, for example, a
2  teaching or administrative certificate, as classified
3  personnel.
4      Q. Does it matter whether they're in a union or
5  not in a union?
6      A. Typically classified personnel has been a
7  reference to people within a union, within bargaining
8  units.
9      Q. Is that the way you interpret it?
10     A. Yes.
11     Q. What about people who are not in a bargaining,
12 what are they?
13     A. They're typically at-will employees.
14     Q. And that's your understanding?
15     A. Yes.
16     Q. And Mr. Biliski as I understand it is not a
17 teaching employee, correct?
18     A. Correct.
19     Q. And he is not in the union?
20     A. That's also correct.
21     Q. So, in your opinion he would be an at-will
22 employee?
23     A. Yes.
24     Q. And not a classified employee?

20

1      A. Correct.
2      MR. BERNSTEIN: Okay, I think that's all I
3  have.
4      MR. WILLOUGHBY: I only have one question.
5  BY MR. WILLOUGHBY:
6      Q. Somewhere in the documents in front of you is
7  the letter that Mr. Biliski gave the board, D67.
8      A. Yes.
9      Q. You said that there was a comment that you
10 characterized as being suprised about the letter. Can
11 you give us some more detail on that? When you say
12 suprised, was it a reaction that the letter was in any
13 way peculiar, strange or did it relate to the events
14 of the termination?
15     A. The board thought that it was a very odd,
16 peculiar letter. They thought the person who wrote it
17 was definitely strange to have written a number of the
18 things that were here.
19     MR. WILLOUGHBY: All right, that's all I
20 have.
21     MR. BERNSTEIN: Okay.
22     MR. WILLOUGHBY: We are going to read and
23 sign and I'll take care of getting the exhibits
24 straightened out with the court reporter.

21

1      MR. BERNSTEIN: Okay, and see if you can
2  locate that one --
3      MR. WILLOUGHBY: The minutes of the
4  executive session following August 16th, minutes of
5  August 16th, which would have appeared in the next
6  meeting.
7      (Dunmon Deposition Exhibit Numbers 1
8  through 6 are marked for identification.)
9      (The deposition was concluded at 11:28
10 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

6 (Pages 18 to 21)

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Irwin J. Becnel, Jr.

2

1          IRWIN J. BECNEL, JR.,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5              EXAMINATION
6   BY MR. BERNSTEIN:
7      Q. Mr. Becnel, can you hear me okay?
8      A. Sure can.
9      Q. Am I pronouncing your name correctly?
10     A. Yes.
11     Q. My name is Joe Bernstein. I'm an attorney. I'm
12  on the telephone. I'm calling you. I'm in Bonita
13  Springs, Florida. I'm kind of semi retired.
14         In any event, you are here today because of
15  a lawsuit that's been filed by Edward Biliski who is a
16  former employee of Red Clay School District. And I'm
17  going to be asking you some questions about the
18  involvement of Board of Education in that case. And if
19  you don't understand any question, please, feel free to
20  interrupt. I will try and rephrase it. Okay?
21     A. Okay.
22     Q. I'm just go trying to find out what you might
23  know.
24     A. All right.

3

1      Q. First, you are a member of the Red Clay Board of
2   Education; is that correct?
3      A. Yes.
4      Q. How long have you been a member of the board?
5      A. A little over 17 years.
6      Q. Is that an elected position?
7      A. Yes, it is.
8      Q. How often do you stand for re-election?
9      A. Every five years.
10     Q. When does your current term expire?
11     A. 2010.
12     Q. Do you hold any position on the board or are you
13  just a member or is there a president, vice-president?
14     A. I'm the president.
15     Q. You are the president. How long have you been
16  the president?
17     A. Since 2003.
18     Q. And does your term as president end in any
19  particular time?
20     A. It's a yearly term as dictated by statute.
21     Q. Okay. And how is the president chosen?
22     A. By all board members.
23     Q. Now, if you can, can you describe for me the
24  relationship between the board and the Red Clay

4

1   administration concerning personnel matters? For
2   example, if the administration wants to hire a school
3   bus driver, what is the process?
4          MR. BOWSER: Object to the form. Go ahead
5   and answer it.
6          THE WITNESS: The administration has a
7   responsibility for hiring employees. They come to the
8   board with their recommendation to hire. And the board
9   approves or disapproves, but generally approves the
10  hiring. And that approval is done at a regular public
11  board meeting.
12  BY MR. BERNSTEIN:
13     Q. Now, does the procedure you just described cover
14  all employees?
15     A. Yes.
16     Q. Whether it's a teacher or an assistant principal
17  or a cafeteria worker or a school bus driver or an
18  administrative staff, that's the procedure for
19  everybody?
20     A. To my knowledge, yes.
21     Q. When you get a recommendation from the
22  administration, other than the recommendation itself we
23  recommend the board approve this, is there any kind of
24  back-up material that you get? And I'm now talking

5

1   about hiring.
2      A. Not generally.
3      Q. Okay. You just get a list of names?
4      A. That's right.
5      Q. And positions?
6      A. And positions.
7      Q. And a recommendation?
8      A. Right.
9      Q. What happens if a member of the board, there is
10  a question about somebody?
11     A. There is an opportunity during our executive
12  sessions for personnel related questions to be raised.
13  And that's the time when a question or an objection or
14  anything like that would generally be raised.
15     Q. Now, with respect to firing district employees,
16  what is the procedure?
17     A. I'm not sure what you mean by what the procedure
18  is.
19     Q. Let's say, would a firing typically originate
20  with the board or with the administration?
21     A. It's the administration.
22     Q. Has the board ever initiated a firing in your
23  tenure?
24     A. Not of administrative staff beneath the level of

2  (Pages 2 to 5)

A-21

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 24 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Irwin J. Becnel, Jr.

6

1    superintendent.
2      Q.  So other than superintendents, if there is a
3    recommendation that somebody be fired, it always comes
4    from the administration?
5      A.  Yes.
6      Q.  Now, when the administration recommends that
7    somebody be fired, does that have to be approved by the
8    board?
9      A.  Yeah.  All personnel actions are ultimately
10   approved by the board at the regular public meeting.
11     Q.  Now, when the administration recommends that
12   someone be fired, what kind of documentation is given to
13   the board members?
14     A.  Generally, none.  It's a verbal recommendation
15   from the administration.  If board members have
16   questions, they can ask the questions.  But, generally,
17   we don't get documentation.  We get reasons.
18     Q.  Do you get reasons?
19     A.  Yes.
20     Q.  How is that communicated?
21     A.  In the course of the executive session, when a
22   termination or any kind of ceasing involvement of
23   employment, the administration would generally tell the
24   board the reason for the dismissal.

7

1      Q.  Is that done verbally?
2      A.  Yeah, generally verbally.
3      Q.  So generally that's a verbal report?
4      A.  Yeah.
5      Q.  I would like you to take a look at Document D82.
6    It's actually D82 through D87.  Do you have that if
7    front of you?
8           MR. BOWSER:  No.  I'm looking at it now,
9    Joe.
10          MR. BERNSTEIN:  If we could have this marked
11   as Exhibit 1.
12          (Becnel Exhibit No. 1, Public Agenda, was
13   marked for identification.
14   BY MR. BERNSTEIN:
15     Q.  Actually, the first two pages look like a public
16   agenda.
17     A.  That's correct.
18     Q.  Is that something that's posted and put in the
19   newspaper or just how is that document published?
20     A.  It's posted in each school.  It is posted at the
21   location where the meeting is to be held.  And -- yeah,
22   that's generally where it's posted on.
23     Q.  Is it posted on the district's website?
24     A.  It is now posted on the district's website.  I'm

8

1    not sure when we began that.  We just upgraded the
2    website to be to handle that.  The state law doesn't
3    require that.  The state law requires it to be posted at
4    the location of the meeting.  We do that plus at all the
5    schools.
6      Q.  The first two pages of that document, D82, D83,
7    is that the only thing that would be posted?
8      A.  No, the entire agenda is posted.
9      Q.  Page D84, would that be posted?
10     A.  Yes.
11     Q.  And that would include the names of -- does it
12   stand for board information only?
13     A.  No.  The board information only is the location
14   of employment.
15     Q.  So the names are posted?
16     A.  The names and positions are posted.
17     Q.  So if I'm in a school and looking at the agenda,
18   I'm going to see everything on Page D84?
19     A.  Except the right-hand column that says the
20   location of the employment.  Like, in this case, that
21   particular Page D84 shows technology next to Merrill
22   Schwartz.  Technology is the location of employment.
23   That's not shown to the public.
24     Q.  But the name and the position are?

9

1      A.  Yes, that's right.
2      Q.  And the action that's proposed to be taken --
3      A.  Right.
4      Q.  -- are listed on a public agenda?
5      A.  Yeah.
6      Q.  Now, when it comes to the approval of personnel
7    decisions, is that something that's done in a public
8    meeting or in executive session?
9      A.  It's done in a public.
10     Q.  It's done in a public?
11     A.  Yes.
12     Q.  What about the discussions, what if somebody has
13   a question about a particular matter?
14     A.  Personnel issues aren't discussed in public.
15   They are discussed in executive session.
16     Q.  Well, when you get to the point in the agenda of
17   personnel reports, Section L and M on Page D83, does the
18   board go into executive session or do they stay in
19   public session?
20     A.  The discussions had occurred in the executive
21   session that preceded the public meeting.
22     Q.  I was confused about the timing.  Okay.  So when
23   the board holds a meeting on a particular evening, in
24   this case, on August 16th, the executive session would

Biliski v. Red Clay Consolidated School District Board of Education, et al.

Irwin J. Becnel, Jr.

**10**

1    take place before the public session?

2    A. Yes.

3    Q. Is that correct?

4    A. Yes.

5    Q. So if the meeting is scheduled for 7:30 p.m., by

6    7:30 p.m. or so, the executive session would have

7    already taken place?

8    A. Yes.

9    Q. Now, to your knowledge, when there is a

10    personnel decision such as a termination — and I would

11    like you to turn to Page D87. There is one termination

12    listed on that page. Do you see that?

13    A. Yes.

14    Q. And that's Ed Biliski. Would Mr. Biliski get an

15    individualized notice that his termination was going to

16    be taken up by the board on that particular day and that

17    particular meeting?

18    A. I don't know.

19    Q. Does the board typically notify employees about

20    personnel actions?

21    A. The board does not.

22    Q. Do you know whether the administration does?

23    A. I don't know.

24    Q. Do you have any specific recollection of the

**11**

1    meeting where Mr. Biliski's termination was taken up?

2    A. General recollection, yes.

3    Q. Tell me what your recollection is just sitting

4    here today.

5    A. He had called me before the meeting and said

6    that he had a letter that he wanted to give the board

7    members regarding personnel action.

8    Q. Let me interrupt you. Prior to receiving the

9    phone call from Mr. Biliski, had you ever met

10    Mr. Biliski or did you know him?

11    A. No.

12    Q. So this phone call kind of came out of the blue?

13    A. Yes.

14    Q. And can you recall the substance of your

15    conversation? You can pick it up where you left off.

16    A. He told me that he had a letter regarding

17    personnel action about him. He wanted the board members

18    to have it. I told him he should take copies of the

19    letter to Robbie Miller, who is the board secretary for

20    Red Clay, and that she would see to it that it was

21    distributed to board members.

22    Q. Do you know whether that was done?

23    A. Yes, it was.

24    Q. Did the letter that Mr. Biliski referred to show

**12**

1    up on the agenda? How did you get it?

2    A. It was delivered to us as — I don't recall the

3    exact mechanism. It was delivered to us before the

4    meeting. We generally use a Red Clay courier to deliver

5    paperwork to board members when it's necessary. I don't

6    recall what day that was. I know it was before the

7    board meeting.

8    Q. Do you recall receiving a copy of the letter —

9    A. Yes.

10    Q. — from Mr. Biliski?

11    A. Yes.

12    Q. Did you read it?

13    A. Yes.

14    Q. Did the subject of Mr. Biliski's letter come up

15    in the executive section of the board meeting?

16    A. Yes.

17    Q. Do you have any recollection of the discussion?

18    A. No, I don't recall the details of the

19    discussion.

20    Q. The executive session meetings that occur before

21    the public meeting, are they recorded in any way?

22    A. No, not the details.

23    Q. Does anybody take notes?

24    A. You know, I don't know. There is no official

**13**

1    note taker.

2    Q. Are minutes prepared of the executive session?

3    A. No. There is a general — that — I'm

4    stammering a little bit on that. There are minutes but

5    the minutes only say that personnel items were

6    discussed. There is no detail written.

7    Q. Do you know whether or not Mr. Biliski was

8    present at the August 16th meeting?

9    A. No.

10    Q. You don't know or he wasn't?

11    A. I don't know.

12    Q. Was Mr. Biliski ever asked to appear before the

13    board to get into the letter that he sent to the board?

14    A. No.

15    Q. Do you recall whether any questions were asked

16    of anyone in the administration concerning the letter

17    you got from Mr. Biliski?

18    MR. BOWSER: Object to the form of the

19    question. Will you say that one more time?

20    BY MR. BERNSTEIN:

21    Q. You received a letter from Mr. Biliski sometime

22    before the August 16th board meeting, correct?

23    A. Yes.

24    Q. And I assume, at least from your standpoint, you

4 (Pages 10 to 13)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 26 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Irwin J. Becnel, Jr.

14

1   read the letter?
2   A.  Yes.
3   Q.  I'm not asking whether anybody else did or not.
4   But you read the letter.  Did the letter prompt any
5   questions on your part to anybody in the administration
6   about Mr. Biliski's termination?
7   A.  I'm sure it did.  In fact, I know it did.  I
8   asked what this was all about.  Can you give us some
9   details?
10  Q.  Do you recall who it was that you asked?
11  A.  I asked in the executive session.
12  Q.  Do you recall who it was?
13  A.  No, I don't.
14  Q.  Is there typically someone from personnel
15  present at the executive sessions?
16  A.  Generally, the deputy superintendent who has
17  overall responsibility would be there.  And she was.  I
18  remember Diane Dunmon was there.
19  Q.  How about Debra Davenport?
20  A.  I don't recall is she was there.
21  Q.  Do you have any recollection, sitting here
22  today, as to what kind of a response you got from either
23  Diane Dunmon or anyone else about Mr. Biliski?
24  A.  I don't recall a detailed response, no.

15

1   Q.  You don't recall what the details were?
2   A.  No.  No.
3   Q.  You got some response but, sitting here today,
4   you don't remember what it was?
5   A.  I can't remember the exact words of the
6   response.
7   Q.  Can you remember the substance?
8   A.  The administration was recommending termination.
9   They gave reasons for the termination which were pretty
10  much the same that Mr. Biliski had in his letter.
11  Q.  Okay.  So, in your view, there wasn't much of a
12  factual dispute between what you heard from the
13  administration and what you received from Mr. Biliski?
14  A.  The administration listed, as I recall now,
15  listed the reasons for the recommendation of
16  termination.  As I remember Mr. Biliski's letter, I
17  don't recall him refuting any of those reasons.  And
18  that's what I recall about out of the meeting.
19  Q.  The next document I want you to look at is
20  document D170 through D243.  And I will give you a few
21  minutes to kind of familiarize yourself with that
22  document.  We don't need to mark that document as an
23  exhibit.  I just want you to look through it.  Take your
24  time.  Tell me when you can answer a question whether

16

1   you have ever seen this before.
2   A.  I can answer that question that, yes, I have
3   seen this document before.
4   Q.  Can you tell me what it is?
5   A.  It's the policy manual.
6   Q.  Is that part of a larger booklet or notebook or
7   document?
8   A.  I don't know that there is anything else that
9   goes in this or not.  These are the policies of the
10  district.  I don't recall what -- you know, this is the
11  personnel part of it.  I don't know what --
12  Q.  There might be other parts?
13  A.  Yeah, but I don't know what they are.
14  Q.  Let's talk about the personnel part.  Are those
15  policies something that is submitted to and approved by
16  the board or is that something that is a creation of the
17  administration without board approval?
18  A.  No, the board generally approves this.
19  Q.  So at some point in the past, this document or
20  the document piecemeal would have been submitted to and
21  approved by the board?
22  A.  Yes.
23  Q.  Whether as in its entirety or piece by piece?
24  A.  Right.

17

1   Q.  And I assume this is something that's updated
2   from time to time and changed --
3   A.  Yes.
4   Q.  -- as situations arise?
5   A.  It is supposed to be, yes.
6   Q.  So it's not a static document?
7   A.  Right.
8   Q.  And would changes be submitted to and approved
9   by the board from time to time?
10  A.  From time to time.
11  Q.  Now, I want you to turn your attention to page
12  D243, which is the last page.
13      MR. BOWSER:  Are we marking this, Joe?
14      MR. BERNSTEIN:  Yes.
15      (Becnel Exhibit No. 2, Suspension and
16  Dismissal of Classified Staff Members, was marked for
17  identification.)
18  BY MR. BERNSTEIN:
19  Q.  Have you had a chance to read through that?
20  A.  Yes.
21  Q.  Now, as I understand it, at least this document
22  says at the top, Suspension and Dismissal of Classified
23  Staff Members.  Do you know what the term "classified
24  staff members" refers to?

5   (Pages 14 to 17)

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Irwin J. Becnel, Jr.

18

1    A.  People who don't hold a certificate, a
2  certificate issued by the State of Delaware for
3  education.
4    Q.  What about individuals such as a superintendent
5  who has an individual employment contract, would it
6  apply to them?
7    A.  He is still certificate.
8    Q.  You mean certificate in terms of --
9        MR. BOWSER:  Is that the end of your
10  question, Joe?  I'll object to the form.
11  BY MR. BERNSTEIN:
12    Q.  Tell me what you mean by certificate again.
13        MR. BOWSER:  Is your question what is
14  certificated?
15  BY MR. BERNSTEIN:
16    Q.  Yeah.
17    A.  Certificated is the education or teaching
18  certificate issued by the State of Delaware.
19    Q.  So someone who holds a teaching certificate,
20  even if they are not a teacher, would not be considered
21  a classified staff member?
22    A.  As far as I know.
23    Q.  Okay.  And now what about people, employees who
24  are members of a union, are they classified staff

19

1  people?  They don't holding a teaching certificate.
2    A.  Yes.
3    Q.  What about employees who were not members of the
4  union who don't hold a teaching certificate?
5    A.  What is your question about?
6    Q.  Would they be considered, in your opinion,
7  classified staff members?
8    A.  Yes.
9        MR. BOWSER:  Would you read back the
10  question?
11        (The reporter read back as requested.)
12  BY MR. BERNSTEIN:
13    Q.  Is that still your answer?
14    A.  Yes.
15    Q.  And I assume that Page D243 was something that
16  would have been approved by the board?
17    A.  At some point, yes.
18    Q.  It indicates current practice codified, 1985,
19  adopted, date of manual adoption.
20    A.  Yes.
21    Q.  So this would have been approved whenever the
22  manual was adopted?
23    A.  Right.
24    Q.  And, to your knowledge, would that have, would

20

1  this document and the entire personnel manual have been
2  in place in August, July, August of 2006?  Codified
3  1985?
4        MR. BOWSER:  You are referring now to the --
5        MR. BERNSTEIN:  Page 243.
6        THE WITNESS:  To my knowledge, yes.
7        MR. BERNSTEIN:  Give me just a minute.  I
8  think we are done.  Let me review my notes here.  One
9  more question.
10  BY MR. BERNSTEIN:
11    Q.  Do you know whether, after August 16th when the
12  board approved Mr. Biliski's termination, Mr. Biliski
13  was offered any opportunity for any kind of a hearing to
14  explain his side of the issue?
15    A.  No, I don't.  I don't know.
16    Q.  You don't know?
17    A.  No.
18    Q.  You don't know whether he was or he wasn't?
19    A.  That's correct.
20    Q.  Would that typically be something that the board
21  would do or initiate?
22    A.  No.
23        MR. BERNSTEIN:  Okay.  That's all I have.
24        MR. BOWSER:  Joe, just give me one minute.

21

1        (Off the record.)
2        MR. BOWSER:  Joe, I have a couple questions.
3        EXAMINATION
4  BY MR. BOWSER:
5    Q.  Do you have an understanding of whether
6  Mr. Biliski was in a union?
7    A.  To my knowledge, he was not in a union.
8    Q.  Do you have an understanding as to the nature of
9  Mr. Biliski's employment with the district?
10    A.  What do you mean the nature?
11    Q.  With respect to termination.
12    A.  He operated and was hired as an at-will
13  employee.  We hired him to do a job.  And that job could
14  end the next day for that matter.  So it's an at-will
15  employment opportunity.
16    Q.  Does the policy which has been marked as Exhibit
17  Number 2 to be applied to at-will employees?
18    A.  No, it doesn't.  This policy, you see the date
19  on it.  And the references in the policy refer to union
20  agreements.  And these were -- this policy was
21  established along with the discussions with the
22  appropriate unions for the procedures that are laid out
23  in there.  It wasn't established -- back then, there
24  were no nonunion employees back when this was set up.

6  (Pages 18 to 21)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 28 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Irwin J. Becnel, Jr.

22

1   The use of at-will employees has been a fairly recent
2   occurrence, particularly in the technology area because
3   we have just now grown in technology in the last ten
4   years or less. So we have begun using technology
5   experts or technology related people that don't belong
6   to a union.
7       Q. To the best of your knowledge, this policy has
8   never been used in connection with the termination or
9   suspension or with respect to an at-will employee?
10      A. That is correct. To the best of my knowledge,
11  it has not.
12          MR. BOWSER: I don't have anything further.
13          MR. BERNSTEIN: I have a couple follow-up
14  questions.
15              EXAMINATION
16  BY MR. BERNSTEIN:
17      Q. First, Mr. Becnel, we took a short break just
18  before Mr. Bowser began asking you some questions,
19  correct?
20      A. That's right.
21      Q. Did you have any discussions with Mr. Bowser
22  during that break?
23      A. No, sir.
24      Q. Now --

23

1       A. Mr. Bowser was not in the room.
2       Q. Okay. In connection with your reference to an
3   employee being an at-will employee, is there any
4   document either in the personnel manual that is D170 to
5   D243 that contains the term at-will employee?
6           MR. BOWSER: If you know.
7           THE WITNESS: I'm not aware of any. I don't
8   know.
9   BY MR. BERNSTEIN:
10      Q. Do you know whether or not the board has adopted
11  any personnel policies with respect to so-called at-will
12  employees?
13      A. I don't know.
14      Q. If they had, do you think you would know about
15  it?
16      A. I would probably know about it. But there,
17  again, there are a lot of policies. There is a lot that
18  goes on. I can't tell you definitively.
19      Q. If there is such a written document concerning
20  at-will employees, would that be contained in Section G
21  somewhere of Page D170 to D243?
22      A. If it was a specific document, it should be.
23      Q. When individuals such as Mr. Biliski that you
24  termed an at-will employee are hired, is there anything

24

1   to memorialize the fact that they are considered an
2   at-will employee?
3           MR. BOWSER: Are you speaking -- object to
4   the form. Are you speaking with respect to Mr. Biliski
5   or just whether there is a standard policy?
6           MR. BERNSTEIN: Both.
7           MR. BOWSER: If you know.
8           THE WITNESS: I don't know.
9   BY MR. BERNSTEIN:
10      Q. That would be something that would be handled by
11  the administration --
12      A. It would be.
13      Q. -- as part of the hiring process?
14      A. It would be. Now, to my knowledge, there is no
15  document that tells someone like Mr. Biliski that he or
16  she would be hired for some certain period of time.
17      Q. Well, isn't that true with anyone other than
18  professional people who hold teaching certificates?
19      A. Generally, paraprofessional classified
20  employees, among others, are hired for at least a finite
21  period of time, at least a one-year period.
22      Q. Meaning they have contracts that are renewed
23  every year?
24      A. Yes.

25

1       Q. Cafeteria workers?
2       A. I'm not sure -- I can't answer that. I'm not
3   sure.
4           MR. BERNSTEIN: Okay. I think that's it.
5           MR. BOWSER: We want to take a look at it
6   and read it.
7           (Thereupon, the deposition concluded at
8   10:10 a.m.)
9
10          - - - - -
11          INDEX TO TESTIMONY
12
    IRWIN J. BECNEL, JR.              PAGE
13
    Examination by Mr. Bernstein      2, 22
14  Examination by Mr. Bowser         21
15          - - - - -
16          INDEX TO EXHIBITS
17  BECNEL DEPOSITION EXHIBIT NO.      PAGE
18
    Becnel Exhibit No. 1, Public Agenda     7
19  Becnel Exhibit No. 2, Suspension and    17
    Dismissal of Classified Staff Members
20
21
22
23
24

7 (Pages 22 to 25)

Case 1:06-cv-00740-GMS   Document 41   Filed 10/29/2007   Page 29 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

2

1   DEBRA DAVENPORT, the deponent herein,
2   having first been duly sworn on oath, was examined and
3   testified as follows:
4   BY MR. BERNSTEIN:
5   Q.  Mrs. Davenport, this is Joe Bernstein, we met
6   before and I have some questions to ask you concerning
7   a lawsuit that has been filed by Edward Biliski
8   against the Red Clay School District and you have been
9   identified as someone who may have some personal
10  knowledge about the allegations that Mr. Biliski has
11  made and we are here today so I can ask you some
12  questions about what you might know.  Okay?
13  A.  Okay.
14  Q.  And if at any time you don't understand a
15  question I'm asking you, please speak up.  I can't see
16  you, but I can hear you so speak up and I'll try and
17  clarify it.  Okay?
18  A.  Okay.
19  Q.  The first question is what is your current job?
20  A.  Manager of human resources.
21  Q.  And how long have you held that position?
22  A.  Nine years.
23  Q.  And before that were you employed by Red Clay
24  School District?

3

1   A.  Before this position?  No, I was not.
2   Q.  Where did you work before you went to work for
3   Red Clay?
4   A.  Philadelphia Mental Health Care Association.
5   Q.  And what kind of job did you do there?
6   A.  Director of human resources.
7   Q.  And how long were you in that position?
8   A.  Seven years.
9   Q.  Before that what was your employment?
10  A.  God, Franklin Glass Company, I believe.
11  Q.  And what was your position there?
12  A.  HR director.
13  Q.  How long were you in that position?
14  A.  Three years.
15  Q.  And before that?
16  A.  I don't remember.
17  Q.  Okay, that's fine.  So, now could you describe
18  generally your job as personnel administrator for Red
19  Clay.
20  A.  Yes.
21  Q.  Go ahead.  Who do you report to?
22  A.  I report to Diane Dunmon.
23  Q.  What is her position?
24  A.  She is deputy superintendent, assistant

4

1   superintendent.
2   Q.  She is the liaison with the board of
3   education --
4   A.  Yes.
5   Q.  -- so to speak?  Is that correct?
6   A.  Yes.
7   Q.  Now, under you do you have people who report to
8   you?
9   A.  Yes.
10  Q.  Can you describe that chain of command?
11  A.  There is a specialist and six secretaries.
12  Q.  What is the name of the specialist?
13  A.  Susan Carpenter.
14  Q.  What does she do generally?
15  A.  She does benefits.
16  Q.  And the secretaries, what do they do?  Are they
17  in administrative roles or just purely --
18  A.  They don't have any administrative roles.
19  Q.  Is there anybody else other than yourself who
20  is an administrative role in making personnel
21  decisions?
22  A.  In my department?  No.
23  Q.  You're it.
24  A.  Yes.

5

1   Q.  Now, do you have responsibility for
2   professional staff and by "professional staff" I mean
3   teachers?
4   A.  Yes.
5   Q.  Now, other than teachers are there any other
6   classifications that are used by Red Clay to classify
7   what I'm going to call non-professional employees,
8   that is, non-teachers?  How are they organized?
9   A.  There are paraprofessionals, there are
10  secretaries, there are bus drivers, there are at-will
11  employees.
12  Q.  Let's talk about paraprofessionals.
13  A.  Okay.
14  Q.  What kind of jobs would you include under the
15  paraprofessional category?
16  A.  Teacher aides.
17  Q.  Anybody else?
18  A.  No.
19  Q.  And the next category I think you said were
20  like school bus drivers?
21  A.  Yes.
22  Q.  Let's go back to the paraprofessionals, are
23  they covered by any union contract?
24  A.  Yes, they are.

2   (Pages 2 to 5)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 30 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

6

1    Q.  What union is that?
2    A.  It's --
3    Q.  If you know.
4    A.  Delaware Education Association.
5    Q.  And the teachers are they also covered by union
6    contract?
7    A.  Yes, they are.
8    Q.  Are all teachers covered by the union contract
9    or just teachers who belong to the union?
10   A.  All teachers are covered.
11   Q.  And teachers are also covered by various state
12   statutes depending on whether they are tenured or not?
13   A.  That's correct.
14   Q.  How about non-tenured teachers?
15   A.  Are they covered by the contract?
16   Q.  Yes.
17   A.  Yes.
18   Q.  And they may or may not be covered by state
19   statute?
20   A.  They are.
21   Q.  Putting aside the teacher and para-
22   professionals the next category of employees I think
23   you said was school bus drivers?
24   A.  Yes.

7

1    Q.  Are they covered by a union contract?
2    A.  No, they're not.
3    Q.  Are there any kind of written employment
4    policies that cover school bus drivers?
5    A.  We have board policies that cover all
6    employees.
7    Q.  When you say "board policies," are they written
8    down somewhere?
9    A.  Yes.
10   Q.  Now, I yesterday I received a set of documents
11   beginning with Bates stamp D170 --
12        MR. WILLOUGHBY:  Give me one second, Joe,
13   so I can pull those out.  170?
14        MR. ERHART:  Yes, and ending in 243.
15        MR. WILLOUGHBY:  I'm pulling them out now,
16   give me one second.
17        MR. BERNSTEIN:  Okay.
18   BY MR. BERNSTEIN:
19   Q.  On Page D170 at the top it says Section G
20   Personnel?
21   A.  Yes.
22   Q.  Do you see that?  Have you ever seen that
23   document before?
24        MR. WILLOUGHBY:  Before today?

8

1        MR. BERNSTEIN:  Yes.
2    A.  Yes.
3    Q.  And can you generally tell me what that
4    document is and how it came into being, if you know?
5    A.  I don't know how it came into being, but it's a
6    set of board policies that were written a long time
7    ago.
8    Q.  Is that something that you look to for guidance
9    with respect to your job?
10   A.  No.
11   Q.  And is there anything that you look to for
12   guidance as far as policies with respect to your job?
13   A.  Mostly all the collective bargaining contract
14   agreements.
15   Q.  Now, you say these are board policies?
16   A.  Yes.
17   Q.  Do you consider that those board policies cover
18   employees in Red Clay?
19        MR. WILLOUGHBY:  I'm going to object.  You
20   are asking for a legal conclusion.
21        MR. BERNSTEIN:  If she knows, just what her
22   practice is.
23        MR. WILLOUGHBY:  You are asking what her
24   practice is with respect to these board policies we

9

1    have just identified?
2        MR. BERNSTEIN:  Yes.
3    A.  I usually follow the union contracts.
4    Q.  Now, do you look to these board policies at
5    all?
6    A.  Not these particular ones because there is
7    other ones that have been updated since this one was
8    written.
9    Q.  Who has those updates?
10   A.  Everybody.
11   Q.  Do you have them?
12   A.  Yes.
13   Q.  Do you know whether whether or not the updates
14   have been included in the documents that were produced
15   to me?
16   A.  No, no, this personnel section has not been
17   re-written yet.
18   Q.  That personnel section do you want to leaf
19   through each page and --
20   A.  No, I don't need to, I know it hasn't been.
21   Q.  So, that's up-to-date then?
22   A.  This is the latest one that we have, yes.
23   Q.  And in considering a personnel matter you look
24   first to a union contract?

3  (Pages 6 to 9)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 31 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

10

1  A. Yes.
2  Q. Are all employees in the school district
3  covered by union contracts?
4  A. No.
5  Q. What about a situation where someone is not
6  covered by a union contract, what do you look to?
7  A. Federal and state guidelines.
8  Q. Do you look to Section G at all?
9  A. No.
10  Q. And could you tell me why not?
11  A. Because it's not applicable to at-will
12  employees. It basically covers things as far as
13  hiring and terminations are basically pertaining to
14  collective bargaining agreement employees.
15  Q. Okay, all right. Now, you said at-will
16  employees?
17  A. Yes.
18  Q. Do you know whether that term appears anywhere
19  in Section G?
20  A. No, I don't.
21  Q. Are you familiar with the term "probationary
22  employee"?
23  A. Sure.
24  Q. What is a probationary employee?

11

1  A. An employee who is hired and is looked at over
2  a short period of time to see if they're a match for
3  the position.
4  Q. When employees are hired as probationary
5  employees, is that hiring approved by the board?
6  A. Yes.
7  Q. Now, is there any particular length of time
8  that an employee is a probationary employee or does it
9  depend on the individual?
10  A. It's 60 to 90 days usually. It's all covered
11  under most of the employees in the collective
12  bargaining agreement, 60 to 90 days.
13  Q. How about employees who are not covered by
14  collective bargaining agreements?
15  A. We don't define it.
16  Q. Are all employees hired as probationary
17  employees initially?
18  A. When you say "all --"
19  Q. Yes. Well, let's exclude the teachers, okay?
20  Let's put the teachers aside. Aside from teachers are
21  all employees who are hired initially hired as
22  probationary employees?
23  A. Yes.
24  Q. What about employees who have a written

12

1  contract?
2  A. Yes.
3  Q. They also could be probationary employees
4  depending on what the contract says?
5  A. That's correct.
6  Q. Is there a procedure for moving a person off
7  probationary status and into some other status?
8  MR. WILLOUGHBY: You mean procedure like
9  you are talking about board approval or something?
10  MR. BERNSTEIN: If someone completes their
11  probationary period.
12  A. They don't go back to the board, no.
13  Q. You do not go back to the board?
14  A. No, we don't.
15  Q. Well, there is another term that I saw in
16  looking through Section G called "classified
17  employees."
18  A. Okay.
19  Q. Are you familiar with that term?
20  A. Yes.
21  Q. Can you tell me what that refers to?
22  A. Basically all non-administrators and teachers.
23  All other employees are considered classified.
24  Q. Administrators are not considered classified?

13

1  A. Correct.
2  Q. Teachers are not considered classified?
3  A. Correct.
4  Q. How about paraprofessionals?
5  A. Classified.
6  Q. They are classified?
7  A. Yes.
8  Q. How about cafeteria workers?
9  A. Classified.
10  Q. School bus drivers?
11  A. Classified.
12  Q. Persons like Mr. Biliski who is an IT tech?
13  A. He would fall under -- we don't have a term for
14  it because he is not in the collective bargaining
15  unit, but classified.
16  Q. Is he an at-will employee?
17  A. Yes, he is.
18  Q. Is he also a classified employee?
19  A. For lack of a category to put him into, yes.
20  Q. Now, Mr. Biliski in particular and the people
21  in his group are not under a collective bargaining
22  agreement as I understand it?
23  A. That's correct.
24  Q. Are there any other groups of employees other

4 (Pages 10 to 13)

Case 1:06-cv-00740-GMS    Document 41    Filed 10/29/2007    Page 32 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

22

1　particulars.
2　　Q.　The next document I would like you to look at
3　is document 62.
4　　A.　Okay.
5　　Q.　And this is dated August 7, 2006 and you were
6　copied on it and this is a memo from Ted Ammann to Mr.
7　Biliski about unaccounted for time and do you know
8　when the first time you saw this memo was? Would it
9　have been August 7th?
10　　A.　August 7th or August 8th.
11　　Q.　Did you have any discussions with Mr. Ammann
12　about Mr. Biliski on August 7th?
13　　A.　I don't remember if it was August 7th, no.
14　　Q.　Did you have any discussions with Mr. Biliski
15　on August 7th?
16　　A.　I can't recall if that was the date of the --
17　when we spoke to him when he received the memos and we
18　spoke to Ted Ammann and I spoke to him it was either
19　August 7th or August 8th.
20　　Q.　Did you have more than one meeting face-to-face
21　with Mr. Biliski about his employment situation?
22　　A.　No, I did not.
23　　Q.　Just one meeting?
24　　A.　Just one meeting.

23

1　　Q.　And it was either August 7th or August 8th?
2　　A.　That's correct.
3　　Q.　The next document I would like you to look at
4　is document D63 and that is also a memo dated August
5　7th from Ted Ammann to Ed Biliski and you are copied
6　on it and it's titled "Disregard for Instructions."
7　Do you have that in front of you?
8　　A.　Yes, I do.
9　　Q.　Would your answer be the same when you first
10　saw that memo, it was either August 7th or August 8th?
11　　A.　That's correct.
12　　Q.　The first time you saw this memo would that
13　have been when you met with Mr. Biliski or sometime
14　before that?
15　　A.　It would have been sometime before that because
16　I probably saw a draft of it before it was actually
17　given to him.
18　　Q.　And Mr. Ammann would have sent you a draft?
19　　A.　Yes.
20　　Q.　The next document I would like you to look at
21　is number 64.
22　　A.　I have it.
23　　Q.　And that is also dated August 7, 2006 from Ted
24　Ammann to Ed Biliski and it is titled "Refusal to

24

1　Carry Out Assigned Duties" and my first question is do
2　you recall seeing this memo at any time or a draft
3　before August 7th?
4　　A.　I may have. I don't know for sure, but I may
5　have seen a draft before I saw the actual memo.
6　　Q.　Again, with respect to this memo did you have
7　any meetings with Mr. Biliski other than the meeting
8　you had either on August 7th or August 8th?
9　　A.　No, I did not.
10　　Q.　Do you know whether Mr. Biliski ever tried to
11　contact you about this memo and independently of any
12　meeting you may have had with him?
13　　A.　No, I don't.
14　　Q.　The next document I would like you to look at
15　is number 65.
16　　A.　I have it.
17　　Q.　And that is a letter from you to Mr. Biliski
18　dated August 8th and it says, quote, "This letter is a
19　follow-up to the meeting held today with me and Mr.
20　Ammann." Does that refresh your memory about when the
21　meeting was, August 7th or August 8th?
22　　A.　It was August 8th.
23　　Q.　Does that refresh your memory?
24　　A.　Yes.

25

1　　Q.　And it also says, quote, "Due to poor work
2　performance your name will be submitted to the board
3　of education for termination. If approved your date
4　of termination will be effective August 11, 2006." Is
5　that accurate?
6　　A.　Yes.
7　　Q.　Now, what is the -- let me ask you this. When
8　the district proposes to terminate an employee, can
9　the district do that without board approval?
10　　A.　The recommendation goes to the board.
11　　Q.　When you say a "recommendation," what is
12　involved in that?
13　　A.　Basically it's a board authorization that --
14　board report that is presented to the board for
15　approval with actions that are required.
16　　Q.　In Mr. Biliski's case do you know what it was
17　that was submitted to the board?
18　　A.　No.
19　　Q.　Would that be something that would be your
20　responsibility to do or someone else's responsibility?
21　　A.　All the information was given to my immediate
22　supervisor.
23　　Q.　That would be Ms. Dunmon?
24　　A.　Yes.

7　(Pages 22 to 25)

Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

26

1   Q.  Do you know what was given to Ms. Dunmon?
2   A.  I can't remember.
3   Q.  Whatever was given to Ms. Dunmon would that
4   have been something that you prepared or that someone
5   else prepared?
6   A.  I would have prepared it.
7   Q.  Typically do you know -- do you have any
8   specific recollection in Mr. Biliski's case as to what
9   it was that you gave Ms. Dunmon?
10  A.  It might have been just the letter with the
11  recommendation.
12  Q.  Just the letter dated August 8th?
13  A.  Correct.
14  Q.  What about the reprimand letter that we
15  referred to --
16  A.  She would have copies of those.
17  Q.  -- earlier?  How would she have gotten copies
18  of those?
19  A.  Either from me or from Ted Ammann.
20  Q.  So, you don't know what it was that Ms. Dunmon
21  may have given to the board members?
22  A.  No, I don't.
23  Q.  So, once you transmit whatever documents you
24  transmitted to Ms. Dunmon you are out of the picture?

27

1   A.  That's correct.
2   Q.  Once this recommendation gets to the board do
3   you have any knowledge as to what happens from that
4   point on?
5   A.  No, I don't.
6   Q.  That would be something Ms. Dunmon would know?
7   A.  Yes.
8   Q.  As I understand it the issue of Mr. Biliski's
9   termination from employment was presented to the board
10  in its meeting on August 16th.  Do you know whether
11  you were present at that meeting or not?
12  A.  I was probably there.
13  Q.  And as I understand it when the board considers
14  personnel matters such as termination that is not done
15  in a public session, is that correct?
16  A.  That's correct.
17  Q.  That's done in an executive session?
18  A.  Yes.
19  Q.  Just as a practical matter can you tell me how
20  that works?  Do they adjourn the meeting and then go
21  into executive session?
22  A.  I believe it's done before the public session.
23  Q.  Do you know whether those proceedings, the
24  executive session proceedings, are recorded in any

28

1   way?
2   A.  I would assume assume they are.
3   Q.  Do you know or you don't know?
4   A.  I mean, there is minutes in the board meeting
5   in the public agenda with the executive session
6   meetings, yes.
7   Q.  But I'm talking about the discussions.
8   A.  Oh, I don't know.
9   Q.  Any discussions that are held in the executive
10  session?
11  A.  I don't know.
12  Q.  You don't know whether a tape recorder is used?
13  A.  No.
14  Q.  You have no idea?
15  A.  No.
16  Q.  Do you have any specific recollection as to
17  whether you were present when the issue of Mr.
18  Biliski's termination was presented to the board in
19  executive session?
20  A.  I was not.
21  Q.  Do you know whether Ms. Dunmon was present?
22  A.  I don't know.
23  Q.  Do you know whether Mr. Ammann was present?
24  A.  I don't know.

29

1       MR. BERNSTEIN:  Can you give me just a
2   minute?
3       MR. WILLOUGHBY:  Sure.
4       (Brief recess.)
5   BY MR. BERNSTEIN:
6   Q.  To your knowledge can an employee be terminated
7   without board approval?
8   A.  No.
9   Q.  Finally, I want you to look at document D243.
10      MR. WILLOUGHBY:  Okay, give me a second.
11      THE WITNESS:  I have it.
12  BY MR. BERNSTEIN:
13  Q.  Do you want to take a minute to read that over?
14  A.  Okay, (witness complies.)
15  Q.  Just let me know when you are done.
16  A.  Okay.
17  Q.  You have read that over?
18  A.  Yes.
19  Q.  In your opinion does page D243 apply to Mr.
20  Biliski?
21  A.  No, it does not.
22  Q.  Why in your opinion does it not?
23  A.  Because it refers to the collective bargaining
24  groups and you can see it has contract references and

8 (Pages 26 to 29)

A-31

Case 1:06-cv-00740-GMS   Document 41   Filed 10/29/2007   Page 34 of 76
Biliski v. Red Clay Consolidated School District Board of Education, et al.
Debra Davenport

30

1   it relates to teachers who really aren't classified
2   members and shouldn't be here, custodians, para-
3   professionals, food service workers and secretaries.
4   Q. So, when you made the decision to terminate Mr.
5   Biliski's employment, Page D243 played no role
6   whatsoever in your decision?
7        MR. WILLOUGHBY: She already testified the
8   board makes the decision. She made a recommendation.
9   BY MR. BERNSTEIN:
10  Q. Okay, your recommendation, when you made your
11  recommendation only. I'll amend the question. When
12  you made your recommendation, did Page D243 play any
13  role at all in your decision-making or recommending
14  process?
15  A. It did not.
16  Q. Finally, I want you to look at D-235. Just
17  read that over to yourself.
18       MR. WILLOUGHBY: Hold on one second,
19  (handed to the witness.)
20  A. Okay.
21  Q. In your opinion does Page 235 apply to Mr.
22  Biliski?
23  A. It does not.
24  Q. Why not?

31

1   A. Because at first this one specifically refers
2   to collective bargaining agreements.
3   Q. Now, after Mr. Biliski was terminated did you
4   have any contact with Mr. Biliski either in person or
5   any communication with Mr. Biliski concerning his
6   termination?
7   A. I did not.
8   Q. After Mr. Biliski's termination did you become
9   aware that Mr. Biliski had filed a claim for
10  unemployment compensation?
11  A. Yes.
12  Q. Did you receive notice that he had filed a
13  claim?
14  A. Yes.
15  Q. Did you receive notice that there was going to
16  be a hearing on his claim?
17  A. I didn't receive it personally, no, but I know
18  that it came through.
19  Q. You mean you saw it?
20  A. I saw it.
21  Q. Do you know whether or not any representatives
22  from Red Clay School District ever came to any
23  hearings before the unemployment compensation
24  department or employment referees or appeal board or

32

1   any other group relating to the unemployment
2   compensation?
3   A. We did not.
4   Q. Did you play a role in making the decision not
5   to attend those hearings?
6   A. No.
7   Q. Do you know who did?
8   A. No, because I didn't know until after the fact
9   that it had come through.
10  Q. You are saying you didn't know there was a
11  hearing until after the hearing was held?
12  A. Yes.
13  Q. Did you do anything to contact the department
14  of labor and basically say, Look, we didn't have a
15  chance to appear at this hearing, we would like to
16  re-open the case?
17  A. No, I did not.
18  Q. Did you make a decision not to do that or --
19       MR. WILLOUGHBY: You mean a conscious
20  decision?
21       MR. BERNSTEIN: Yes.
22  BY MR. BERNSTEIN:
23  Q. In other words, your testimony is you got a
24  notice after the hearing was actually held and did you

33

1   make any conscious decision, Hey, that's not fair, we
2   want to re-open this?
3   A. Yeah, just made the decision not to pursue it.
4   Q. You didn't take it any further?
5   A. No, I didn't.
6        MR. BERNSTEIN: Give me another minute and
7   let me review my notes here for a second and I think
8   we're done. (Brief pause.) Yes, okay, that's all I
9   have.
10       MR. WILLOUGHBY: I have no questions and we
11  will read and sign.
12       (Davenport Deposition Exhibit Numbers 1
13  through 11 were marked for identification.)
14       (The deposition was concluded at 10:52
15  a.m.)
16
17
18
19
20
21
22
23
24

9  (Pages 30 to 33)



**:D CLAY CONSOLIDATED**
**SCHOOL DISTRICT**

)bert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Human Resources**

(302) 683-6656
FAX (302) 636-8778

**Debra Davenport**
*Manager*

bra.Davenport@redclay.k12.de.us

August 8, 2006

Mr. Edward Biliski
106 Hunn Road
Manor Park
New Castle, DE 19730

Dear Mr. Biliski,

This letter is a follow-up to the meeting held today with me and Mr. Ammann. Due to poor work performance your name will be submitted to the Board of Education for termination. If approved your date of termination will be effective August 11, 2006.

Sincerely,

Debra Davenport
Manager, Human Resources

cc: Ted Ammann
Mary Norris
Diane Dunmon
HR/Payroll

D65

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

DEPOSITION
EXHIBIT
Biliski 10
8270

August 16, 2006

TO: The Board of Education for RCCSD
RE: Edward Biliski wrongful termination

I would like to thank each member of the Board for reviewing my wrongful termination situation.

To begin, I have had an exemplary work record, as documented in my file, for over five dedicated years that I have worked with the Technology Department at RCCSD.

I Edward Biliski have worked for the Technology Department at RCCSD for over five dedicated years and during that time I have completed more work orders than anyone else in our office. Over 4000 closed Track-it work orders in 5 years and I have worked through many of my lunches (over 75 in 5 years) to get teachers and administrators back up and running, I also stayed late to get the work done and never asked for any compensation. My job was rewarding to know that I was able to help in some small way. I have also received many appreciation letters for a job well done, more that anyone else in our office most of them were left on my computer and never had the chance to retrieve them.

I know how important it is to have and maintain a job in today's market and I have always protected it by being on time every day when the rest of the office arrives around 15 minutes late every day and nothing is said to them. I try doing more work that the average employee. I have had no complaints about my work in 5 years and 4 months and in the matter of 10 days my manager over reacted to a problem that should have been nothing more that a verbal reprimand. I had apologized to him 3 times but that was not good enough, I have even email him and still he was unwilling to be compassionate.

The problem was not completing a track-it work order that Ted Ammann has called "Missed Deadline" that was assigned to me to be completed by a certain date. He called me on my cell phone and asked me to sign a document that was going to go on my permanent record and said lets put this all behind us. The reason I did not want to sign it was I knew that I was not treated in the same manner as the rest of the staff and that he could whip up more documents at will for the smallest infraction and that is just what he did. I have put my response to the reason why it was not completed on time on the back of Ted Ammanns " Missed Deadline" document.

I did not want to sign the document because I believe that Ted Ammann was being unfair. Other employees had done things that were 10 times worse and were never written up for it. I will give you examples at the end of this letter of some of the other things that happened at our office and check and see if they were ever written up. It is Ted Ammann being paid extremely well for a Technology manager and failing to do his job time after time after time.

Right after I was written up for missing a deadline Ted Ammann had Cara Gaudino email other technicians to sit down and go over their over due work orders. I get fired for missing one Track-it work order and they get to sit down and discuss all theirs over due work orders with Cara Gaudino.

I received the document that Ted Ammann wanted me to sign and when I went to see his boss Mary Norris to complain about being treated unfair and he whipped up 3 more documents to

keep me from voicing my side of the story to anyone above him. He deliberately lied in the 3 of the documents and made statements that were just not true. And if terminated I will pursue legal action against Ted Ammann for all the damage that he may have caused by his actions. Where are the check offs to make sure Ted Ammann is acting in the best interest of Red Clay and not his own.

I was on light duty for 6 to 8 weeks because of going through minor heart surgery and had a defibulator implanted and Ted Ammann fires me due to poor work performance. I had told Ted Ammann I needed 6 to 8 weeks for light duty and I asked him if he needed a doctor's slip and he said no and take as much time as I needed. Then he turns around and documents me for not wanting to unload a small van. That was not true I am on light duty because I am not supposed to reach out or above my head with my left arm. I am not supposed to pick up any thing more that 15 pounds until everything heals. I was getting up to help and Barb Moore said with my condition I did not need to help so I sat back down. Jill who was sitting next to me heard Barb Moore make the comment.

I hope that you will look into the information that I have sent you and you will not elect to terminate me. Again I have done absolutely nothing wrong to be terminated from my job regardless of what Ted Ammann or Diane Dunmon say on and off the record. This is a deliberate act of harassment. I will add some of the other problems that other people in our office did and were not written up for and terminated.

Where did I have any chance to defend my self. There was never any training on how to handle these things. It was ok to leave my work to go sign his document but not ok to go see his boss to complain about being treated unfairly.

Ted Ammann has been to New York, San Diego and Rehoboth for conferences and then went on vacation to North Carolina and probably used comp time from the conferences instead of his vacation time. What a great life. Teachers are paying for supplies out of their own pocket while he is traveling all over the country. What would the tax payers think about that? I have been working in hot buildings with no air conditioning while recovering from a heart condition while he's traveling around the country and then comes back in a bad mood and I am fired.

I am available to return to work immediately and I am willing to put all of this behind me. If Ted cannot put it behind him perhaps you could arrange for my transfer.

It is my hope that we can settle this voluntarily as my health benefits and possibly my life are at stake.

I am willing to meet with anyone and request such a meeting in the event the Board votes against me.

Sincerely,


Edward Biliski
Attached: Ted's four write-ups and my rebuttals to the documents.



RED CLAY CONSOLIDATED
SCHOOL DISTRICT

Robert J. Andrzejewski, Ed.D.
Superintendent

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
Manager of Technology
Ted.Ammann@redclay.k12.de.us

Help Desk
2) 636-HELP

**Technology Office**

*MAIN COMPLAINT*

# Memo

**To:**      Ed Biliski

**From:**  Ted Ammann

**CC:**      Debra Davenport

**Date:**   July 31, 2006

**Re:**      Missed Deadline

On July 24th, I assigned work order #44522 to you. This work order involved work that needed to be done in the IDF of Conrad Middle School as a result of a construction project. The deadline assigned to this work order was July 28th. This deadline was assigned due to the dependencies upon this work involving not only outside contractors but after hours access to the building.

As of the deadline, this work had not been completed, nor had you raised any concerns with having the work completed. Because you were not at work on the deadline, the work had to be assigned to someone else. The expectation of technicians is that work orders are completed by the date assigned. Failure to complete work by assigned deadlines without mutually agreed upon revisions to the deadlines can not be tolerated. Future missed deadlines will result in disciplinary action up to and including termination.

I have received the above memo.

_____

Ed Biliski

D69

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is:    A-36

PROBLEM 1.  Missed Deadline –

     Not completing a work order assigned to me on the 24th and that needed to be done by the 28[th.] The work order consisted of disconnecting wires in a network closet so the rack could be moved by contractors out of the closet area.  It was completed on time by another technician in about ½ hr on the 28th with little interruption. This is why we have team meetings with team building games to be able to get things done in a minutes notice and in a fast pace environment.

     It turns out that the patch cable wires in the front did not need to be removed to get the rack out of the room. All they had to do is disconnect the 4 power cords and the one network cable supplying the t-1 connection. This could have been done in less than **"20 seconds"**. The network cables running to the back of rack were cut off by the contractors and they also removed the fiber optic connections at the same time. Ted Ammann did not know what he was talking about and had the technician create a bigger job because the wires were pulled out and thrown in a box and then someone had to untangle and separating each patch cable.

During the four days - Troy Yeager was off and I could not get it done first thing in the morning.

1. I covered for an admin staff meeting on Thursday and Wednesday I had to leave the Central school early to go back to the tech office and get a laptop and a projector for the meeting the next day.
2. I also have been working at Central School moving equipment around in many of the rooms per the principals request in very hot rooms again sweating from the heat.
3. Also had to install memory in all the newer computers per Cara Roken and upgrade to windows XP. Some of the equipment was not working properly and had to be setup and connected to the network.
4. Had to check on 2 problems in the community training lab per Cara Roken.
5. I had a hard drive taken off my desk in the past and I did not want to leave all the memory laying around the office so I went over to Central School and installed all the memory in as many computers as I could and by the end of the day my shirt that was soaking and I was feeling nauseated from the heat at the end of the shift.
6. All the computers had to be renamed at the Central \ Community school. I did this in rooms that had a reading near 100 with the heat index for 4 of the days around the 27th
7. I also had to go to mote to trouble shoot a network problem per Cara Roken because Cheryl Burns could not run an application - oms.
8. Also had to cover the help desk in the morning by my self from 7am to 8:15am because Troy Yeager was on vacation the 4 day's in question.
9. On the 27th I had to cover the Admin's meeting in the morning and I also had to leave to go to a doctor's appointment at 2 o'clock. This was the first follow up visit after 1- heart surgery and 2- having a defibulator installed in my chest to keep me alive. This was not only weighting on my mind on Thursday but for a couple of days leading up to it. I was going to get my results from all my tests.
10. On the 24th I had checked my track-it work orders first thing in the morning and their was no work order assigned to me at that time. I grabbed my work and left for the day not knowing it was even assigned to me.

PROBLEM 1. Missed Deadline –

Ted Ammann had called me in his office to discuss missing the deadline for the work order that was supposed to be done on the 28th. I told him that I did not intentionally avoid doing it and with everything going on I had over looked it. I apologized to him but that just was not good enough. I did everything to be as nice and non confrontational as I could to him and to get him to see my side but he was just really unreasonable. He seemed to be in a bad mood when I walked into his office and the feeling did not change when I left.

I left his office not feeling good about the whole situation so I email him to try and convey again how sorry I was but it did not seem to matter. Since I have started a RCCSD their probably have been over 5000 over due work orders and it looks like mine is the unacceptable one. Amazing that you can have an uncompleted work order one day and be out of a job the next day. I have over 4000 completed Track-it work orders and more than anyone else in our office but still once again this over-all performance is not good enough. I have in the past worked through my lunches to get the job done (over 75 lunches in 5 years) and also worked over time with out asking to be paid. I have had a lot of appreciation letters for the work that I have done. It just does not seem fair. Right after I had received the document that ted wanted me to sign Cara (Help Desk Manager) started emailing other techs about needing to talk to them about their over due work orders and none of them received letters that would go into their file. She would have never of done this if it wasn't for this current situation.

This is the main work order that started the whole problem.

There is no compassion with Ted Ammann. He knows I am on light duty for about 8 weeks after the surgery and he said he had no problem with that and take as long as I needed. He never stopped to ask if everything was ok and was having any problems with the lifting or if there was anything weighing on my mine that made me forget the work order. Did he ever stop to think I may have received bad news. He knows I have a heart condition and I just got out of surgery about a month ago. 1 -I had surgery on my heart and 2- I had a defibulator implanted in my chest to save my life if it gets out of rhythm. My heart rate was causing problems with my kidney and the side affects of that is feeling fatigued and nauseated he was aware of that. I have been working through this whole ordeal feeling fatigued and nauseated from my current problems and working in hot rooms has not made it any better. Through all this I was able to get all of my work orders done but this one and nobody else finisher all of theirs either.

I can not believe that in just 10 days I had nothing on my personal record and in a matter of 10 days there is a letter sent to the board of directors for approval to have me terminated with out any just cause. I was given no chance to defend my self against any allegations. There must be a code of conduct, ethics or a standard practice procedure to make sure a boss is not over stepping their boundary's and for dealing with these problems fairly.

To me this feels exactly like a hit and run accident or a drive by shooting with absolutely no reguards for me to be treaded honestly and fairly. This to me is just unethical.

An Example of favoritism

Ed Biliski

There was 4 days of tech training scheduled for the operation of apple computers.

The teacher from the company that was going to do the training emailed Keith Cox 2 times about what he needed before class and had received no reply. So on the last email he added "do not ignore this email" and Keith Cox never responded. Did Keith deliberately avoid this issue, I would say absolutely not. I would say he had a lot of work to do and missed it. And just like Richard Applegate jumped in and got my work done me so did cara jump in and help keith in the same manner.

The teacher who was not a regular teacher but a programmer agreed to fly out and train the 7 techs at red clay and about 5 techs from other schools.

He emailed Keith on how to setup the computers and have them ready so that he would be in very early to do a final setup of the programs that they were going to run for the 4 days.

He arrived and no computers were setup. Keith and Cara had to rush to get a network switch of 24 ports down to Conrad Library set it up, run all the network patch cables and then get all the laptops on the network. The teacher was very pissed off. He was hours behind and keep saying that he may not be able to get through everything in 4 days. He keep saying that this was it and he will never agree to do the training again. He also complained about the network being setup poorly and that he had never seen a network setup so bad. This teacher was one of the best teachers that we had ever seen.

Did Ted Ammann ever write up Keith Cox for his missed assignment and delay of a training class with 12 people and a programmer waiting around. Because Keith has a boat in the same marina as Ted should not be the deciding factor on weather you go beyond a verbal reprimand for one employee and a written document on some ones record with note of taking a disciplinary action up to and including termination.

I know there is a lot more instances of missed assignments where meetings were scheduled and know one was there to support the meeting or have software installed.

*1 of 3 That were added*

**:D CLAY CONSOLIDATED SCHOOL DISTRICT**

nbert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
/llmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

**Ted Ammann**
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

**Help Desk**
636-HELP

# Memo

**To:**     Ed Biliski

**From:**   Ted Ammann

**CC:**     Debra Davenport

**Date:**   August 7, 2006

**Re:**     Unaccounted for time

On August 1st, we met to discuss an issue regarding a deadline that you had missed. You were then asked to sign a memo that summarized our discussion. When you were given the memo, your behavior was inappropriate for a public office space. You were then unaccounted for during the rest of the day. The next morning, you again left and were unaccounted for until approximately 9AM.

You, as well as other full time techs, have been told to email Cara when you are going to be leaving the building. You have not been doing this.

It is even more important that you inform us if you are going to be leaving for non-tech. related issues so that we know you are not available. You are more than welcome to discuss any issues that you have with appropriate district personnel. However, it is incumbent upon you to notify Cara or myself when you are going to be away from your tech. responsibilities.

At this busy time of year, you were away from tech. responsibilities for over 2 hours with no evidence that you have met with any appropriate district personnel.

Cursing or disparaging remarks about supervisors in public places will not be tolerated and future instances will lead to discipline up to and including termination.

I have received, but do not necessarily agree with the content of this memo.

**D73**

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is:

A-40

Unaccounted for time

This was not a memo it was a document of termination. I left the building to go to his boss to complain about him and being treated unfairly and if I was treated fairly this complaint would not exist. There was nothing ever mentioned in our team meetings about resolving issues like this. This is my first time that I have ever gone through this and when I went over to talk to someone about how to handle this situation they offered to help. What should I have done asked for his permission to go to his boss and complain about him and should I have also asked if he would mind giving me a ride over to. Every group that works at red clay has union representation the sectaries, teachers, maintenance, custodians to help them through these things and to keep the RCCSD administrator staff honest but not the technology department. And Red Clay has never put anything in place to offer us the same treatment. The only recourse was to go to Ted's boss and complain and of course I did not want him to know. I was there because I was discriminated against and treated unfairly.

There are many different procedures and for different people.

**The building techs** - do not show up at the office they go right to the schools. They are not emailing Cara everyday when they get to their schools. These are the people that should be emailing Cara because they are not reporting to the office or signing the board with their location.
**The techs** – that do come to the office first started with having to sign a book in the help desk room, and sign a board at the entrance of the office. Then it went to emailing Cara, signing the book in the help desk room, and signing the board at the entrance. More than one person said that this was f@&king ridiculous and went to have it changed. Then the final change was when you leave to email Cara and sign the board at the entrance.
**The network engineers** – don't email cara when they leave the building. They are not signing out of a book when leaving or returning they only sign out on the board at the entrance and they don't put down any time when they leave just the location where they are going to be. Once they wipe the board clean at the entrance there is no way of ever knowing where they were. When they go out to the schools they do not sign in or out when they arrive, leave for lunch or when they are finished at that school. Why are they not emailing Cara before they leave the building. The question is why do we have to do both when the network engineers only have to sign the board at the entrance.
**Outside Visitors** – There is no book at our office to keep track of people that are coming and going that do not work in our department. When they are arriving or leaving they are not signing in and out of a book, they meet with people and then leave. After they leave there is no record of who they were, who they met with and how long they were in the building. **Example:** I have walked into the parts room and seen a dell technician sitting in the room fixing a computer on many occasions with no one else in the room. He is inches away from many laptops, switches, hard drives that could easily be put in his large tool bag that he brings with him. We just had 4 missing laptops and did anybody even consider the possibility dell technician may have taken them, the answer is no it was not even on the

radar screen. If you had everyone that comes in the office sign in and out of one book then when there is missing equipment you would know who to start asking questions and if the fire alarm sounds they could grab the book meet in one location and make sure everyone is accounted fore and not have to worry if someone may be trapped in the building.

If Cara needs to know where I am all she has to do is call my RCCSD cell phone. That is why I carry one. I have answered it every single time she has called, what is the big deal. The first thing Cara does when she is looking for someone is to call out to Debbie and asked if that person has signed out on the board and left the building and if so where they went to. Emailing Cara does not make any sense or everybody would be asked to do so. There are more people in our office that don't email Cara then there are that do. And all the ones that she has asked to email her have all stopped and she has never made a big deal about it. It is only a big deal now because it is now a tool to terminate me and that is all. The reason we have stopped is it's an easy thing to forget. What is the big deal, it is an unnecessary step and as soon as she gets the email it is deleted. If she wants to use the email as a step to get the techs out of the office then why not come in to the help desk area every morning and ask when we are leaving. Why was she moved out of the help desk area any whey. That made no sense except for her taking long lunches and leaving to go pick up Coffee with Barb Moore and not have the rest of us see all the time she was wasting. Your treating the Tech's that report to the office different then everyone else. Every one should follow the exact same procedure period, and it should be based around something that makes sense.

What behavior I felt like I was just sucker punched. What pray tell was my inappropriate behavior. Was it cussing, every body in the office at one time or another has used inappropriate language including you Ted Ammann and Cara Gaudino people in a management position that are truly representatives of the Red Clay School District. I have heard both of them say the same things my self and right after that they made a short apologetic remark because I was standing there and I happened to hear it. This also took place in an office area. When I get in the morning there is a group of 4 people in the lobby that spend at least ½ hr every single morning from 7:30 to after 8 am and as soon as Ted drives up is when the morning party breaks up. This has gone on ever since we moved to Conrad over 2 years ago. And when I went up to ask a question about work related issues I felt like I was intruding in their party. This kind of conduct should not be tolerated in an office but I cannot report it to Ted because he will make sure it got back to the person that I was the one that told him causing more trouble with employees. They were always talking about sex toys and having a sex toy party show at one of there homes. When I walked up to Cara's cubicle there were 3 people standing around and Rob Feby was talking about the women getting a Brazilian bikini wax and how much that must hurt, who knows how long that conversation went on. There was a group of employees that even left work to go shopping for sex related toys and by the time they drove to and came back their lunch was over. So the time spent at the sex store was on RCCSD time. One morning I walked over to ask a question and one employee was talking about using a vibrator with elephants printed on it. She has made this comment and similar ones on numerous occasions.

Ted Ammann has loaded up the office with woman and there is a little click that easy spend

a third of their working hours talking about nothing and this goes on every day. Their gossip has lead to at least one person being terminated no I am sorry now two. Barb Moore a low level tech has on many occasions bad mouth employee. She went on and on about how much she hated him until he was finally terminated. The employee that was terminated knew he was going to be fired because when he went to pay 5 dollars to our office fund barb moore said that's ok you do not need to contribute otherwise she would of never refused his money. How does a low level technician know that someone is going to be fired if Ted Ammann is not leaking the information.

You want to talk about being away from your responsibilities the first year I was the help desk coordinator the 3 engineers and 2 technicians were going down to the driving range and were away from their duties and not informed anyone that they would not be available. They spent about an hour and a half all during the summer and three times a week. Ted purchased new golf clubs just to go down to the driving range with them. By the time you drive to and from the driving range your lunch is over. Ted knew this and not only did he choose to ignore it but he joined them. I went to the golf course one day and when I seen how much time it was taking up I never went back. By not going back made the other people paranoid and they were worried that I was going to go to upper management and tell them what they were doing. Me the responsible one that did not want to waist rccsd,s valuable time or put my job in jeopardy. Again no one was written up and placed in their permanent record or even terminated from their job. I don't here management telling ted to do his job or your out. You are talking about 5 people X 1 and1/2 hours a day X 3 days a week. That is over 22 lost work hours a week and well over 100 lost work hours in 2 1/2 months. Imagine what the tax payers would say about that. Teachers are buying supplies for the children with their own money while the tax payers money is being wasted at the driving range. This is clearly an act for termination he knew this was going on all summer long but he deliberately ignored the problem as such he failed to do his job and he should be fired for it. Ted has brought up on many occasions that we only get ½ hour for lunch and you lunch starts when you leave the building and not when you have your food and you sit down to eat it. There is a group of people that have totally ignored this direct request and as such failed to do their job and they were never written up for it. This group has taking over an hour for lunch every single day but they are friends of Ted Ammann so this is ok. When they were done at the driving range they would stop and order lunch and then go back to the office and eat it at there desk.

The second biggest time that was wasted and this would be by far was when Cara was planning her wedding and she stayed logged out of her phone and let the other colleagues pick up all the work. For about 3 months you could not walk by her cubicle with out seeing 2 or 3 people constantly standing around talking about her wedding and other things that were not related to her job. They were there morning, noon and night. Someone would make a comment every day about the time she keeps wasting and ted knew this and he deliberately choose to ignore it and never made one negative comment about her wasting so much time.

When ted ammann was off Cara and Barb would leave on company time and go down and Get a pedicure.

Unaccounted for time

Chris Jerger was away from his job and unaccounted for when he was over at a dentist office working on their computer system trying to get it back up and running. Two people seen him running back and forth trying to fix their issues. The date was 9\25 but not sure of the year. I checked the tech calendar and there was no personal time listed that he would be away from his duties. Chris Jerger fixes computers on the side but does any manager watch to make sure he is working for Red Clay and not Chris Jerger on RCCSD time. Nobody knows how many other times he has done this. When he leaves the office all he does is sign a board by the entrance as to where he is going and no time is included of when he left. Once he returns and wipes the board clean there is no way of going back to see where he ever was. There is a book at each of the schools for the technology dept. to sign in and out when they arrive or leave the schools but Chris Yerger and the other Network Engineers has stopped signing it and Ted Ammann has never done any thing to them. Why don't they have to email Cara when they leave the office especially Chris Jerger who is known to be out of the office on quite a bit on personal business.

It was brought up in a conversation about some of the employees always coming in late and Chris Jerger made the comment that he comes in late every day and nothing has ever been done to him.

On 2 occasions Chris Jerger told teachers and sectaries that they were stupid and one of them broke down in tears. How does Chris get away with not being written up?

People are late every single day but are they ever written up,  the answer is no.

There is a group of people that arrive in the morning that do nothing but hang out by the front desk talking and having a good old time at the expense of RCCSD. This has gone on for over a year it starts at 7:30 and ends after 8am if and when Ted Ammann drives up. Some one made a comment that no one works when Ted is not there and a co worker made the joke that no one works when he is here either.

*2 of 3 That were Added*

ED CLAY CONSOLIDATED
SCHOOL DISTRICT

obert J. Andrzejewski, Ed.D.
Superintendent

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
Manager of Technology
Ted.Ammann@redclay.k12.de.us

Help Desk
636-HELP

# Memo

**To:**   Ed Biliski

**From:**  Ted Ammann

**CC:**   Debra Davenport

**Date:**  August 7, 2006

**Re:**   Refusal to carryout assigned duties

---

On August 1st, some technicians brought back a van of equipment that needed to be unloaded to our offices. The van was backed up to the door as to quickly empty the van, Barb asked everyone in the building to assist with the unloading. As she came to you, your response was, "No, I'm not doing it. I've been in the schools and it's hot."

Moving technology equipment is a job responsibility of Red Clay technicians and as such you were refusing to complete your responsibilities. It also meant more work for colleagues who were willing to complete the task assigned.

Failure to complete assigned tasks can not be tolerated and continued refusal will lead to disciplinary action up to and including termination.

I have received, but do not necessarily agree with the content of this memo.

1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in
its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is

Refusal to carryout assigned duties

This is a joke am I on candid camera.

First of all this was not an assigned duty this was a person that just walked into the room asking for help without any previous notification to unload a small van of computer equipment that usually takes 2 people at the most. I have loaded and unloaded the van many times without any colleagues help. The one that was requesting the help are they also incapable of doing their job if so why are they still doing it. There was never any mention that they had to hurry up and get the job done asap. I don't believe there was any urgency to hurry up and unload the van, that part was completely fabricated. We have our own driveway off of the entrance road to the parking lot and the van is in nobodies way. Yes I did say I'm not doing that and I was out at the schools and it was hot and I was tired but I said it as a joke while I was starting to stand up to go help. Barb Moore then said that you better not help with your condition. Jill who was sitting next to me heard the last part of Barb Moore's comment "its ok you better not help" so I sat back down. Yes I was tired from moving equipment but I did it on my own without any help from my colleagues. I hope they appreciate me not asking them for help. When I pick up equipment I have to do it with most of the weight on my right side until this heals completely. If I knew that I would be needed to unload a truck I would have paced myself moving equipment out at the school. Jill then asked about what condition barb was talking about and I told her that I had a Heart Condition and had to have a deliberator put in my chest.

I was still supposed to be on light duty and Ted Ammann knew that. I had told him in his office when I came back from surgery that I would need 6 to 8 weeks of light duty and I was not supposed to pick up anything more then 15 pounds with my left hand and he replied take as much time as you need.

Right where we were supposed to unload a van is where I almost had a heart attack. I had to be rushed to the hospital. When the ambulance came they were having trouble finding a pulse and to insert an IV line so they had to call a paramedic to do it. I was in the hospital for six days.

This documented grievance is clearly an act of pure harassment and I don't need to go any further then that.

Once again this feels to me like a hit and run accident or a drive by shooting.

Either way I feel like I was just run over by a RCCSD bus and Ted Ammann was driving.

D79



*3 of 3 that were Added*

**ED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

Help Desk
636-HELP

# Memo

**To:**    Ed Bliiski

**From:**   Ted Ammann

**CC:**    Debra Davenport

**Date:**   August 7, 2006

**Re:**    Disregard for Instructions

As you know, there has been extensive construction going on in the back parking lot of Conrad. In preparation for this week's construction, we were asked to park in the front of the building. At my request, Rhonda shared this with the team last week. On August 1st, I sent a follow up reminder letting people know that parking needed to be in the front of the building. On August 2nd, you parked in the fire lane behind the building.

In addition to being a safety hazard, parking here showed a disregard for instructions you had been given. This will not be tolerated. Future disregard for instructions or any other similar behavior will lead to disciplinary action up to and including termination.

I have received, but do not necessarily agree with the content of this memo

D80

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in

Disregard for instruction

I had missed the email the day it was sent out. I had checked my email in the morning and left the building to go out to one of the schools and never rechecked it that day. I had off on Friday and was not at work to check email so when I came in Monday their was a sign at the entrance that the parking lot was closed. I pulled up to the side of the driveway that leads to the parking lot the side that did not have the fire lane signs and Troy Yeager pulled in behind me. We both parked there and went into the building. Why wasn't Troy Yeager fired also along with all the other people that parked there that day.

All in all this is a ridiculous thing to write someone up for and fire them. I was unaware of Ted Ammann asking us not to park there, the gate was closed and a yellow caution ribbon running across the driveway entrance so no traffic would be driving in or out of the parking lot. If they needed us to move our cars all they have to do is knock on our door that is 30 feet away and ask us to move our cars like they have done many times in the past. Once again I told Ted Ammann in a meeting that I was unaware of his request to park else ware and I had apologized 2 times and started parking where he wanted but again this just was not good enough.

The Meeting of the Red Clay Consolidated School District Board of Education will be held on Wednesday, August 16, 2006.  This meeting will be held at **Highlands Elementary School, 2100 Gilpin Avenue, Wilmington.** The Board of Education contemplates discussion of the regular public agenda items to commence at approximately **7:30 p.m.**

# PUBLIC AGENDA

**Page(s)**

## PLEDGE OF ALLEGIANCE

### I. PRESENTATIONS

A.    AYP/School Accountability Ratings.................................................... --

### II. PUBLIC RECOGNITION

### III. APPROVAL OF MINUTES

A.    June 21, 2006 Regular Session – Revised/Resubmitted ..................1-4
B.    July 5, 2006 Executive Session ........................................................5
C.    July 5, 2006 Regular Session ......................................................6-10
D.    July 26, 2006 Special Executive Session.........................................11
E.    July 26, 2006 Special Regular Session......................................12-13

### IV. ACTION ITEMS

A.    Preliminary Budget  FY'07.............................................................14
B.    Charter Applications.....................................................................15
C.    School Calendar – 06/07 Revised ..............................................16-17

D82

## CONSENT CALENDAR

D.      Student Disciplinary Case 06-07 ..................................................18
E.      Student Disciplinary Case 06-35 ..................................................19
F.      Student Disciplinary Case 06-38 ..................................................20
G.      Financial Position Report............................................................21
H.      Sale of Bonds............................................................................22
I.      DMA Charter.............................................................................23
J.      Contractual Services ..................................................................24
K.      Vendor Contracts .......................................................................25
L.      Personnel Report – Certificated .............................................26-33
M.      Personnel Report – Classified ................................................34-37
N.      Bid Awards..............................................................................38-41
O.      Transportation Salaries ..............................................................42

## V.      ITEMS SUBMITTED BY THE BOARD

## VI.     INFORMATION ITEMS

A.      JEC Choice Policy Revisions* ................................................43-46
B.      Wellness Policy* .......................................................................  --
C.      Capital Improvement Bid Awards/Change
            Orders Approved by the Superintendent..............................47-98
D.      Choice Program – Good Cause Applications...................................99
E.      Choice Terminations .........................................................100-101

## VII.    ADJOURNMENT

---

### NEXT REGULARLY SCHEDULED BOARD OF EDUCATION MEETING
**Wednesday, September 20, 2006**
**Highlands Elementary School**

---

*Action Item – September 20, 2006

ram - 8/16/06

D83

# IV. ACTION ITEMS

M. Classified Personnel Report

It is recommended that the Classified Personnel Report be approved as submitted.

## CLASSIFIED PERSONNEL

BOARD OF EDUCATION APPROVAL IS RECOMMENDED FOR CLASSIFIED PERSONNEL AS LISTED:

I. APPOINTMENTS (pending criminal background checks)

A. New - Regular

 1. Schwartz, Merrill B.  F5 Technician   .Technology
            Effective 7-1-06

B. New - Temporary

 1. None

C. Recalled

 1. None

D. Rehire - Regular

 1. None

E. Rehire - Temporary

 1. None



F. Return from Leave

 1. None

II CHANGE IN ASSIGNMENT

A. Classification

 1. None

B. Job Title

 1. None

34

C.  Condition of Employment

    1.    Holmes, Robert           M2 Custodian           Cab Calloway
                                          Upgrade to
                                          Fireman/Custodian
                                        Effective 7-5-06

    2.    Palombo, Laura J.      F5 Clerk              District Office
                                          Promotion to Executive
                                          Secretary
                                        Effective 7-27-06

III  LEAVES

A.  Maternity

    1.    None

B.  Medical

    1.    None

C.  Personal

    1.    None

D.  Military

    1.    Wells, Brenda          F2 Transportation      Transportation
                                          Effective 8-27-06 to
                                          9-30-06

E.  Educational

    1.    None

F.  Sabbatical

    1.    None

G.  Disability

    1.    None

35.

H.　　Extension of Leave

　　　1.　　None

IV　SHORT-TERM DISABILITY

A.　　Stewart, Stephanie　　　　F2 Executive Secretary　　Instructional Services
　　　　　　　　　　　　　　　　　5-15-06 to 6-30-06

V　DISABILITY PENSIONS - PREPARATION TIME

A.　　None

VI　PENSIONS

A.　　Disability Pension

　　　1.　　None

B.　　Service Pension

　　　1.　　White, Betty J.　　　　F5 Senior Secretary　　　Linden Hill
　　　　　　　　　　　　　　　　　Effective 9-1-06

C.　　Vested Pension

　　　1.　　None

VII　RESIGNATIONS

A.　　Coates, Michael D.　　　　M2 Paraprofessional　　The Central School
　　　　　　　　　　　　　　　　　Effective 7-1-06

B.　　McGaha, Sandra　　　　　F5 Bus Driver　　　　　Transportation
　　　　　　　　　　　　　　　　　Effective 4-14-06

C.　　McVey, Gerald　　　　　　F5 General Worker　　　HB DuPont Middle
　　　　　　　　　　　　　　　　　Effective 6-30-06

D.　　O'Donnell, Mary　　　　　F5 General Worker　　　Wilmington Campus
　　　　　　　　　　　　　　　　　Effective 6-30-06

E.　　Serrano, Josefina　　　　　F4 Paraprofessional　　Meadowood
　　　　　　　　　　　　　　　　　Effective 7-1-06

36.

F.   Spears, Jewel                F5 General Worker          Baltz
                                  Effective 6-30-06

VIII   EXTENSION OF EMPLOYMENT

A.   None

IX   EXPIRATION OF EMPLOYMENT

A.   None

X   TERMINATION

A.   Bilinski, Ed                M5 Technician              Technology
                                 Effective 8-11-06

XI   RECISION OF TERMINATION

A.   None

XII   CORRECTIONS

A.   None

Classified Board.August 06

$\mathcal{Z}7.$

D87



**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
Linden Park
4550 New Linden Hill Road
Wilmington, Delaware 19808

**Human Resources**

Office (302) 552-3783
FAX  (302) 992-7822

**Debra Davenport**
*Manager*

Debra.Davenport@redclay.k12.de.us

**Benefits**

Office (302) 552-3782
FAX  (302) 992-7822

**Susan G. Carpenter**
*Specialist*

...n Carpenter@redclay.k12.de.us

August 17, 2006

Edward Biliski – 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
106 Hunn Road
Manor Park
New Castle, DE. 19720

Dear Mr. Biliski,

RE:  Board Action
     *Termination*
     Effective –   08/11/2006

The Board of Education took action to terminate your employment.

If your salary was subject to deduction for pension and you are not continuing employment with another state agency, you have two options for funds accumulated as a result of that deduction:

   *Request to withdraw these funds (Refer to Form No. WB-1)

   *Elect to leave these funds on deposit (Refer to Form No. CRN-1)

Please complete the upper portion of the form which indicates your preference and return it to this office. We will complete and forward it to the Office of Pensions.

Enclosed is a copy of the "Notice to All Employees and Spouses concerning Continuation coverage Under Group Health Plans". Please contact the Employee Benefits Office, 552-3782, for additional information.

If you have any question concerning this matter, please contact me.

Sincerely,

Debra Davenport
Manager
Human Resources

**D92**



DEPOSITION
EXHIBIT
Biliski 11
8-27-07 KO

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Debra Davenport, Human Resources Development, RCCSD, Linden Park, 4550 New Linden Hill Road, Wilmington, DE 19808 (302) 552-3783.

A-55

To: Diane Dunman - RCCSD

From: Edward Biliski

This is a written request for a meeting with personnel representative within 15 calendar days from the date of notice (12.4).

Employee Accountability

www.delawarepersonnel.com/search/mrules.asp

12.0 Employee Accountability – 12.0 to 12.9

12.1 - Just cause – imposing a penalty appropriate to the circumstances.
12.2 – Never received a verbal reprimand for this minor infraction.
12.3 –
12.4 – Employee shall receive written notice of their entitlement to a pre-decision meeting for just cause.
12.5 – Pre-decision meeting.
12.6 – Opportunity to respond to proposed action.

Once again – I have done nothing wrong to be treated like this. I had worked in rooms that had a heat index of 100 and over that made my feel a little sick but I keep working while still on light duty.

There are people at our office that have done things 10 times worse than I did but they were never written up and terminated.

Thank you very much.

Ed Biliski

*Ed Bilish*

RECEIVED
2006 AUG 21 P 1:47
DIANE L. DUNMON
DEPUTY SUPERINTENDENT
RCCSD

A-56



D CLAY CONSOLIDATED
SCHOOL DISTRICT

)bert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
/ilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

**Ted Ammann**
*Manager of Technology*
Ted.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

# Memo

**To:**    Ed Biliski

**From:**    Ted Ammann

**CC:**    Debra Davenport

**Date:**    August 7, 2006

**Re:**    Unaccounted for time

On August 1st, we met to discuss an issue regarding a deadline that you had missed. You were then asked to sign a memo that summarized our discussion. When you were given the memo, your behavior was inappropriate for a public office space. You were then unaccounted for during the rest of the day. The next morning, you again left and were unaccounted for until approximately 9AM.

You, as well as other full time techs, have been told to email Cara when you are going to be leaving the building. You have not been doing this.

It is even more important that you inform us if you are going to be leaving for non-tech. related issues so that we know you are not available. You are more than welcome to discuss any issues that you have with appropriate district personnel. However, it is incumbent upon you to notify Cara or myself when you are going to be away from your tech. responsibilities.

At this busy time of year, you were away from tech. responsibilities for over 2 hours with no evidence that you have met with any appropriate district personnel.

Cursing or disparaging remarks about supervisors in public places will not be tolerated and future instances will lead to discipline up to and including termination.

I have received, but do not necessarily agree with the content of this memo.



1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.



**D CLAY CONSOLIDATED
SCHOOL DISTRICT**

:bert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Department of
Information Technology**
Henry C. Conrad
Middle School
205 Jackson Avenue
'ilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
*Manager of Technology*
'ed.Ammann@redclay.k12.de.us

*Help Desk*
(302) 636-HELP

# Memo

**To:**  Ed Biliski

**From:**  Ted Ammann

**CC:**  Debra Davenport

**Date:**  August 7, 2006

**Re:**  Disregard for instructions

_____

As you know, there has been extensive construction going on in the back parking lot of Conrad. In preparation for this week's construction, we were asked to park in the front of the building. At my request, Rhonda shared this with the team last week. On August 1st, I sent a follow up reminder letting people know that parking needed to be in the front of the building. On August 2nd, you parked in the fire lane behind the building.

In addition to being a safety hazard, parking here showed a disregard for instructions you had been given. This will not be tolerated. Future disregard for instructions or any other similar behavior will lead to disciplinary action up to and including termination.

I have received, but do not necessarily agree with the content of this memo

( People had not beed told with out
Emails )



1

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

RED CLAY CONSOLIDATED
SCHOOL DISTRICT

Robert J. Andrzejewski, Ed.D.
Superintendent

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808


Department of
Information Technology
Henry C. Conrad
Middle School
205 Jackson Avenue
Wilmington, Delaware, 19804

(302) 892-4721
FAX (302) 892-2247

Ted Ammann
Manager of Technology
Ted.Ammann@redclay.k12.de.us


Help Desk
(302) 636-HELP

# Memo

**To:**    Ed Biliski

**From:**   Ted Ammann

**CC:**    Debra Davenport

**Date:**   August 7, 2006

**Re:**    Refusal to carryout assigned duties

---

On August 1ˢᵗ, some technicians brought back a van of equipment that needed to be unloaded to our offices. The van was backed up to the door as to quickly empty the van, Barb asked everyone in the building to assist with the unloading. As she came to you, your response was, "No, I'm not doing it. I've been in the schools and it's hot."

Moving technology equipment is a job responsibility of Red Clay technicians and as such you were refusing to complete your responsibilities. It also meant more work for colleagues who were willing to complete the task assigned.

Failure to complete assigned tasks can not be tolerated and continued refusal will lead to disciplinary action up to and including termination.


I have received, but do not necessarily agree with the content of this memo.



DEPOSITION
EXHIBIT
Biliski

1
The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

## SECTION G:    PERSONNEL

Section G of the EPS/NSBA policy classification system provides a repository for personnel policies. This section has three main subdivisions: section GB presents policy topics that pertain to all employees; subsection GC is for policies that pertain to professional personnel, including administrators, who must hold educational certification by the state to serve in their positions; subsection GD is for policies pertaining to all other personnel.

| | |
|---|---|
| GA | Personnel Policies Goals |
| GB | General Personnel Policies |
| GBA | Non-discrimination In Employment |
| GBA-R | Equal Employment Opportunity |
| GBC-E | Staff Ethics |
| GBCB | Staff Conduct |
| GBCBA (Also GBEB) | Drug-Free Workplace Policy (staff conduct) |
| GBE | Staff Health and Safety |
| GBEA | Staff Protection |
| GBEB (Also GBCBA) | Drug-Free Workplace Policy (assistance/protection) |
| GBEC | Staff and Students Who Are HIV-Positive (Also JHCCA) |
| GBEC-R | Guidelines for a Model HIV/AIDS Infection School District Policy For Students and Employees (Also JHCCA-R) |
| GBI | Staff Gifts and Solicitations |
| GBL | Personnel Records |
| GBM | Staff Complaints and Grievances (Affirmative Action) |
| | |
| GCA | Professional Staff Positions |
| GCB | Professional Staff Contracts and Compensation Plans |
| GCBA | Professional Staff Salary Schedules (Teachers) |
| GCBD | Professional Staff Leaves and Absences |
| GCD | Professional Staff Hiring |
| GCE | Part-Time and Substitute Professional Staff Employment |
| GCEA | Long-Term Substitute Policy |
| GCI | Professional Staff Assignments and Transfers |
| GCJ | Professional Staff Time Schedules |
| GCN-1 | Evaluation of Professional Staff (Teachers) (Also AFC-1) |
| GCN-2 | Evaluation of Professional Staff (Administrators) (Also AFC-2) |
| GCN-2-R | Evaluation of Professional Staff (Adm.) (Also AFC-2-R) |

**SECTION G:**   **PERSONNEL**
(Continued)

GCP                  Professional Staff Termination of Employment
GCPA                     Reduction in Professional Staff Work Force
GCPB                     Resignation of Professional Staff Members
GCPC                     Retirement of Professional Staff Members
GCPD                     Suspension and Dismissal of Professional Staff Members
GCQAA            Professional Staff Consulting Activities
GCQD             Professional Organizations

GDA              Classified Staff Positions

GDB/GDBA         Classified Staff Contracts and Compensation Plans/Salary Schedules
GDBB             Classified Staff Supplementary Pay Plans
GDBC             Classified Staff Fringe Benefits
GDBD             Classified Staff Leaves and Absences
GDBE             Classified Staff Vacations and Holidays

GDC/GDCA         Classified Staff Recruiting/Posting of Classified Staff Vacancies

GDD              Classified Staff Hiring

GDG              Classified Staff Probation and Tenure

GDH              Classified Staff Seniority

GDI              Classified Staff Assignments and Transfers

GDJ              Classified Staff Time Schedules

GDN              Evaluation of Classified Staff  (Also AFD)

GDO              Classified Staff Promotions

GDPA             Reduction in Classified Staff Work Force

GDPB             Resignation of Classified Staff Members

GDPD             Suspension and Dismissal of Support Staff Members

*Section G – 2nd of 2 pages*

D171

## SECTION G: Personnel
(Continued)

| | |
|---|---|
| GDP | Support Staff Termination of Employment |
| GDPA | Reduction in Support Staff Work Force |
| GDPB | Resignation of Support Staff Members |
| GDPC | Retirement of Support Staff Members |
| GDPD | Suspension and Dismissal of Support Staff Members |
| GDPD-A | Transportation Policy – Suspension |
| GDQ | Miscellaneous Support Staff Policies |
| GDQA | Nonschool Employment by Support Staff Members |

A-62

Current practice codified 1985                    File: GDG
Adopted:  date of manual adoption


## CLASSIFIED STAFF PROBATION AND TENURE


All new classified staff employees will serve a probationary period in
accordance with collective bargaining agreements or regulations adopted by the
Board.

This will also apply to former employees who are re-employed, and to employees
who are promoted to new positions in accordance with collective bargaining
agreements or Board adopted regulations.


CONTRACT REFS.:  RCFS Agreement, Article.7,  secs. 2 and 4
                 AFSCME-C Agreement, Article 7, sec. 5
                 RCPA  Agreement, Article 8, sec. 4
                 RCSA Agreement, Article 8, sec. 4


Red Clay Consolidated School District, Wilmington, Delaware

File: GDPD

## SUSPENSION AND DISMISSAL OF CLASSIFIED STAFF MEMBERS

It will be the policy of the Board to strive to assist personnel in every possible way to adjust to their positions and to perform their duties satisfactorily. Every reasonable effort will be made to avoid dismissing personnel at any level.

No employees will be dismissed except for just and reasonable cause, and only after an investigation has been conducted and written and signed charges have been filed with the Board. The Board, if it decides to proceed on the charges, will notify the employee in writing of the charges and will provide an opportunity for a hearing.

The Board, upon recommendation by the superintendent or designee, has the right to suspend an employee against whom formal charges have been filed, until such time as a decision has been rendered.

Current practice codified 1985
Adopted:  date of manual adoption

LEGAL REFS.:  DCA, 14:1005; 14:1094

CONTRACT REFS.:    RCEA Agreement, Article 6, sec. 10
                 AFSCME Agreement, Article 6, sec. 13
                  RCPA Agreement, Article 5, sec. 14, and Article 6, sec. 4

                 RCFS Agreement, Article 6
                 RCSA Agreement, Article 6

Red Clay Consolidated School District, Wilmington, Delaware

| State of Delaware | DELAWARE DEPARTMENT OF | | Notice of |
|---|---|---|---|
| Department of Labor | | | Determination |
| Division of Unemployment Insurance | **LABOR** | | UC-409 |

| Claimant | EDWARD A BILISKI | SS Number: 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 | Delivered by Mail |
|---|---|---|---|
| Address | 106 HUNN RD | Local Office: 1 | Redet: No |
| | MANOR PARK | Fund Code: 10 | Count: Yes |
| | NEW CASTLE, DE 19720-0000 | Claim Date: 08/13/2006 | |
| | | Date of AC:   /  / | |
| | | Case Number: 164586 | |

**Findings of Fact:**

The claimant last worked on August 8, 2006 when he was terminated from his employment for poor job performance. The claimant was being issued a corrective action form for not completing work. During this meeting the claimant became argumentative and belligerent. He also threw two objects and cursed his supervisor. The claimant did not respond to an attempt to obtain additional information.

In a discharge situation, the burden of proof is on the employer to show just cause. Just cause can be defined as willful and wanton misconduct. Just cause for the discharge of an employee requires a showing that one was conscious of one's conduct and recklessly indifferent of its consequences. The claimant's actions doe rise to the level of misconduct. Therefore, the claimant disqualified from the receipt of benefits.

**Title 19 of Delaware Code 3314(2)**

An individual shall be disqualified for benefits: For the week in which he was discharged from his work for just cause in connection with his work and for each week thereafter until he has been employed in each of 4 subsequent weeks (whether or not consecutive) and has earned wages in covered employment equal to not less than 4 times the weekly benefit amount.

**Determination:**

You are disqualified for receipt of benefits, effective with or for week ending 08/19/2006.   $330.00 x 4 = $1320.00

**Local Office Manager Signature:** _____   **Date:** 08/31/2006

If you disagree with this determination, you should ask the Claims Deputy for an explanation. If you are not satisfied with the explanation, you may file an appeal.

**Claimant and Employer Appeal Rights**

This determination becomes final on   09/10/2006   unless a written appeal is filed. Your appeal must be received or postmarked on or before the date indicated. If the last date to file an appeal falls on a Saturday, Sunday or Legal Holiday, the appeal will be acceptable the next business day.

If you file an appeal and are still unemployed, you must continue to file weekly claim pay authorization forms with the local office, as instructed, until you receive a final decision.

| **Employer Name and Address** | RED CLAY CONSOLIDATE SCHOOL<br><br>2916 DUNCAN RD<br>WILMINGTON, DE 19808-0000 | No charge will be made against your reimbursable employer account at this time, but may be subject to a charge if the claimant becomes subsequently eligible on a subsequent separation from employment. |
|---|---|---|

Biliski 265



**DELAWARE
DEPARTMENT OF
LABOR**

Lower Authority
4425 N. Market St.
PO Box 9950
Wilmington, DE 19809

ate of Delaware
ppeals Department of Labor
vision of Unemployment Insurance

**NOTICE OF HEARING**

Appeal Docket #  **164586**

| | |
|---|---|
| Claimant Name | **EDWARD A BILISKI** |
| Address | **106 HUNN ROAD** |
| | **MANOR OPARK** |
| | **NEW CASTLE, DE 19720-** |

Social Security #  **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**

| | |
|---|---|
| Employer Name | **RED CLAY CONSOLIDATED SCHOOL** |
| Address | **ATTN:  DEBORAH FORD, HR SPEC** |
| | **2916 DUNCAN ROAD** |
| | **WILMINGTON, DE 19808-** |

*old address*

---

**IMPORTANT**

This hearing will be conducted in person . All parties are to appear at the location listed below.  Please read the Statement of Issues below for further information.

---

If either party wishes to participate by telephone, in lieu of an in-person hearing, they should contact the Appeals Unit, prior to the date of the hearing,  at (302) 761-8418.

This hearing will be held at the following date and location, concerning an appeal to a decision given by a Claims Deputy.

| Deputy Decision Date: | Hearing Location: | Date and Time: |
|---|---|---|
| 08/31/2006 | **Fox Valley Shopping Ctr.** | **10/16/2006** |
| | **4425 N. Market Street** | **3:00 PM** |
| | **Wilmington** | |

This appeal has been filed by the **Claimant**
on  **09/01/2006**

Statement of Issues:
**The claimant was discharged from work for just cause in connection with the work and is disqualified from the receipt of unemployment benefits.**

Date of Mailing:  **09/29/2006**

By: Stephanie L. Fitzgerald
Appeals Referee
Division of Unemployment Insurance

To Claimant: You must continue to file for benefits as instructed as long as you are unemployed.

Notices to:      Claimant
Employer
Local Office
JOSEPH BERNSTEIN, ESQUIRE

UC 301
Document 60-06/96/02/02

**\*\*SEE OTHER SIDE FOR INSTRUCTIONS\*\***



**DELAWARE
DEPARTMENT OF**
**LABOR**

te of Delaware
peals Department of Labor
vision of Unemployment Insurance

**NOTICE OF HEARING**

Lower Authority
4425 N. Market St.
PO Box 9950
Wilmington, DE 19809

| | | |
|---|---|---|
| Claimant Name<br>Address | **EDWARD A BILISKI<br>106 HUNN ROAD<br>MANOR OPARK<br>NEW CASTLE, DE 19720-** | Appeal Docket #  **164586**<br><br>Social Security #  **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** |
| Employer Name<br>Address | **RED CLAY CONSOLIDATE SCHOOL<br>ATTN:  DEBORAH FORD, HR SPEC<br>2916 DUNCAN ROAD<br>WILMINGTON, DE 19808-** | |

---

**IMPORTANT**

This hearing will be conducted in person . All parties are to appear at the location listed below.  Please
read the Statement of Issues below for further information.

---

If either party wishes to participate by telephone, in lieu of an in-person hearing, they should contact the
Appeals Unit, prior to the date of the hearing,  at (302) 761-8418.

This hearing will be held at the following date and location, concerning an appeal to a decision given by a Claims Deputy.

Deputy Decision Date:        Hearing Location:                Date and Time:

08/31/2006                **Fox Valley Shopping Ctr.**        **09/27/2006**
                         **4425 N. Market Street**
                         **Wilmington, DE**                **11:30am**

This appeal has been filed by the **Claimant**
                         on  **09/01/2006**

Statement of Issues:

The claimant was discharged from work for just cause in connection with the work and is disqualified
from the receipt of unemployment benefits.

Date of Mailing:    **09/07/2006**

By: Stephanie L. Fitzgerald
    Appeals Referee
    Division of Unemployment Insurance

To Claimant: You must continue to file for benefits as instructed as long as you are unemployed.

Notices to:        Claimant
                Employer
                Local Office

**\*\*SEE OTHER SIDE FOR INSTRUCTIONS\*\***

UC 301
Document 60-06/96/02/02

**DELAWARE**
**DEPARTMENT OF**
## LABOR
KEEPING
DELAWARE FIRST

*Winner, Delaware Quality Award of Merit*

Division of Unemployment Insurance
Appeals
P. O. Box 9950
Wilmington, DE 19809

DOCKET NO: 164586
DATE: 09/26/06

SS#: 222 36 0790

THIS SERVES TO INFORM YOU THAT THE HEARING SCHEDULED FOR _09/27/2006
AT 11:30 A M INVOLVING THE BELOW CLAIMANT AND EMPLOYER HAS BEEN
POSTPONED. A NOTICE WILL FOLLOW INFORMING OF THE NEW HEARING DATE.

### CLAIMANT

NAME:      EDWARD A BILISKI
ADDRESS:   106 Hunn Road
           Manor Park
           New Castle DE 19720

### EMPLOYER

NAME:      RED CLAY CONSOLIDATED SCHOOL
ADDRESS:   ATTN: Deborah Ford HR SPEC
           2916 Duncan Road
           Wilmington DE 19808

RUDOLPH J ANTONINI JR
CHIEF APPEALS REFEREE
(302) 761 8418

NOTICES TO:   CLAIMANT
              EMPLOYER
              CLAIMS DEPUTY
              OTHER:



**DELAWARE
DEPARTMENT OF
LABOR**

**NOTICE OF HEARING**

Lower Authority
4425 N. Market St.
PO Box 9950
Wilmington, DE 19809

ate of Delaware
peals Department of Labor
vision of Unemployment Insurance

| | |
|---|---|
| Claimant Name<br>Address | **EDWARD A BILISKI**<br>**106 HUNN ROAD**<br>**MANOR PARK**<br>**NEW CASTLE, DE 19720-** |

Appeal Docket #  **164586**

Social Security #  **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**

| | |
|---|---|
| Employer Name<br>Address | **RED CLAY CONSOLIDATED SCHOOL**<br>**ATTN:  DEBORAH FORD, HR SPEC**<br>**4550 NEW LINDEN HILL RD-STE#117**<br>**WILMINGTON, DE 19808-** |

---

**IMPORTANT**

This hearing will be conducted in person . All parties are to appear at the location listed below.  Please read the Statement of Issues below for further information.

---

If either party wishes to participate by telephone, in lieu of an in-person hearing, they should contact the Appeals Unit, prior to the date of the hearing,  at (302) 761-8418.

This hearing will be held at the following date and location, concerning an appeal to a decision given by a Claims Deputy.

Deputy Decision Date:

08/31/2006

Hearing Location:

**Fox Valley Shopping Ctr.**
**4425 N. Market Street**
**Wilmington**

Date and Time:

10/16/2006

3:00 PM

This appeal has been filed by the **Claimant**
on  **09/01/2006**

Statement of Issues:
The claimant was discharged from work for just cause in connection with the work and is disqualified from the receipt of unemployment benefits.

Date of Mailing:   **10/04/2006**

By: Stephanie L. Fitzgerald
Appeals Referee
Division of Unemployment Insurance

To Claimant: You must continue to file for benefits as instructed as long as you are unemployed.

Notices to:         Claimant
Employer
Local Office
JOSEPH BERNSTEIN, ESQUIRE

**\*\*SEE OTHER SIDE FOR INSTRUCTIONS\*\***

UC 301
Document 60-06/96/02/02

Biliski-32
A-69

DELAWARE
DEPARTMENT OF
LABOR

## DIVISION OF UNEMPLOYMENT INSURANCE
### APPEALS
4425 N. MARKET STREET
PO BOX 9950
WILMINGTON, DE 19809

## REFEREE'S DECISION

**CLAIMANT**

EDWARD A BILISKI
106 HUNN ROAD
MANOR PARK
NEW CASTLE, DE 19720

**EMPLOYER**

RED CLAY CONSOLIDATED SCHOOL
ATTN: DEBORAH FORD, HR SPEC
4550 NEW LINDEN HILL RD-STE#117
WILMINGTON, DE 19808

Appeal Docket Number: 164586

Social Security No: 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

Date of Claim: 08/13/2006

Date of Appeal: 09/01/2006

Date of Hearing: 10/16/2006

Place of Hearing: WILMINGTON

Date Decision Mailed: 10/19/2006

Last Day to File Appeal: 10/29/2006

### RIGHT OF FURTHER APPEAL

Section 3318, Title 19, Delaware Code, provides that any interested party involved, the claimant, the employer, or the Claims Deputy has a right of appeal from the decision of the Referee to the Unemployment Insurance appeal Board, and further provides the opinion of the Referee "shall be deemed to be the final decision of the Department of Labor unless within 10 days after the date of notification or mailing of such decision further appeal is initiated ..." You are, therefore, hereby notified that if an appeal is not made within the ten-day period specified by law, all further right to appeal is lost and the case cannot be reopened. The appeal may be made at the local office or directed to Department of Labor, Division of Unemployment Insurance, 4425 N. Market St, PO Box 9950, Wilmington, DE 19809.

Appearances:

Stephanie Fitzgerald, Appeals Referee; Edward Biliski, Claimant; Joseph Bernstein, Claimant's Attorney

Claims Deputy's Determination:

The claimant was discharged from work for just cause in connection with the work and is disqualified from the receipt of unemployment benefits.

Statutory Provision Involved: Title 19, Delaware Code, Section   3314(2)

## SUMMARY OF EVIDENCE

The claimant was employed as a computer technician for Red Clay from March 20, 2001 until August 8, 2006 when he was separated from employment. The claimant worked full-time and earned $40000 per year.

The employer failed to appear for the hearing despite proper notice.

The claimant testified that there were some staff members out of work and the claimant had to cover for those people. The claimant stated that each technician is giving work orders and they go in and do the work orders. The employer would only prioritize the work orders by urgency. The claimant would print the work orders out of the computer each day. The claimant stated that he was giving a warning that he had not completed a work order that was assigned on July 24 by the deadline on July 28. The claimant concerned the memo as a warning. The witness stated that the claimant missed the deadline but anther employee stepped in and finished the job by the deadline. The claimant stated that he was not able to complete the job because he had other responsibilities that prevented him from completing the job. The claimant stated that he had responsibilities to the help desk and the employer that normally assisted him was out. The claimant stated that the particular assignment in question slipped through the cracks due to the high volume of work that he had to complete. The claimant testified that prior to July 31 he had never received any disciplinary warnings. The claimant stated that on August 8, 2006 he was working at Pace School. The claimant stated that he was in the middle of trying to complete a project. The claimant was trying to get computers up and working and connected to the network. The claimant received a call from one of his supervisors to meet him at the human resources office. The claimant stated that he met over there and started reading off a series of grievances. The claimant stated that the only one that he was aware of was the one in the warning on July 31. The claimant stated that the first time that he saw any of the memos of August 7 were at the meeting on August 8. The claimant stated that he was accused of parking his car in a fire lane. The claimant did not park his car in a fire lane and the charge was inaccurate. The claimant was not given any opportunity on August 8 to present his side of the story. The claimant stated that he did talk to his boss about parking in the location because he had sent an email to park on the other side. The claimant stated that he apologized and offered to move the car to the other side of the building. The claimant stated that he did not think he was parking in a fire lane. The claimant's second memo was about unaccounted for time. The claimant was accused of expressing behavior that was inappropriate in a public office space and that the claimant's time was unaccounted for the rest of the work day. The claimant was given no opportunity to explain nor was he told that his conduct was inappropriate. The final warning was failure to carry out assigned duties because he was asked to assist in unloading a van and the claimant declined to help unloading the van. The claimant stated that he was willing to unload the van and joked around that he wasn't going to do it. The claimant stated that as he got up to do it another worker told him due to his recent heart condition it was better he not do it. The claimant stated that he did tell his supervisor that he needed to be on light duty for six to eight weeks. The claimant

DOCKET # 164586

stated that he made it clear that he could not reach above his head. The claimant stated that he had been doing some lifting with his left hand. The claimant stated that another worker that was on the help desk did not help unload the van either. The claimant stated that he asked his supervisor if he needed something from the doctor the supervisor indicated he did not. The claimant provided a copy of the doctor's note at the hearing.

## FINDINGS OF FACT

The claimant was employed as a computer technician for Red Clay from March 20, 2001 until August 8, 2006 when he was separated from employment. The claimant worked full-time and earned $40000 per year.

The claimant was responsible for a large number of daily tasks including covering for co-workers that were out of work. The claimant was sent a work order that had a deadline and the claimant overlooked the work order because a high volume of other work he was in the process of completing. Another employee completed that work order by the deadline. The claimant was given a written warning as a result of the incident. The claimant then was called to the human resources department on August 8 and presented with three memos stating that he had parked his car in a fire lane and that he had failed to help unload cargo from a van. One of the memos also referred to the prior written warning and accused the claimant of acting unprofessionally and leaving and being unaccounted for through the remainder of his shift. The claimant was not given the opportunity to defend himself against any of the allegations. The employer discharged the claimant.

## CONCLUSIONS OF LAW

TITLE 19, SECTION 3314(2), DELAWARE CODE, PROVIDES AS FOLLOWS:

AN INDIVIDUAL SHALL BE DISQUALIFIED FOR BENEFITS:

FOR THE WEEK IN WHICH THE INDIVIDUAL WAS DISCHARGED FROM THE INDIVIDUAL'S WORK FOR JUST CAUSE IN CONNECTION WITH THE INDIVIDUAL'S WORK AND FOR EACH WEEK THEREAFTER UNTIL THE INDIVIDUAL HAS BEEN EMPLOYED IN EACH OF 4 SUBSEQUENT WEEKS WHETHER OR NOT CONSECUTIVE AND HAS EARNED WAGES IN COVERED EMPLOYMENT EQUAL TO NOT LESS THAN 4 TIMES THE WEEKLY BENEFITS AMOUNT.

The issue in this case is whether the employer discharged the claimant without just cause. In a discharge case, the employer must show by a preponderance of the evidence that the claimant was discharged for just cause in connection with the work. Just cause exists where the claimant commits a willful or wanton act or engages in a willful or wanton pattern of conduct in violation of the employer's interest, duty to the employer, or expected standard of conduct. Ordinarily for there to be a finding of willful or wanton misconduct, a prior unequivocal warning is required, putting the employee on clear notice

4

DOCKET # 164586

that a repetition or continuation of certain behavior may lead to dismissal. The function of the warning is twofold. First, it provides the employee with the information needed to conform their conduct to what is required to keep the job. Second, it permits an inference of willful or wanton misconduct if the offending behavior is subsequently repeated.

The claimant was doing his job to the best of his ability. The employer had the administrative right to terminate the claimant, a right not questioned by this tribunal. However, in order to cause a denial of unemployment benefits the employer must demonstrate that the claimant's conduct rose to the level of willful or wanton misconduct. The employer has not met the burden here. The claimant is not disqualified from the receipt of unemployment benefits.

## DECISION

The decision of the claims deputy is **REVERSED**. The claimant was discharged by his employer without just cause in connection with his work. Therefore, the claimant is **NOT DISQUALIFIED** from receiving unemployment insurance benefits pursuant to Section 3314(2), Title 19, Delaware Code and will be eligible to receive benefits for each week of unemployment insurance benefits claimed for which the division determines she meets the eligibility requirements of Section 3315, Title 19, Delaware Code. The division shall issue a determination for any week(s) of unemployment insurance benefits claimed for which the claimant is subsequently deemed ineligible to receive benefits.

*Stephanie Fl*

**STEPHANIE FITZGERALD**
**APPEALS REFEREE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDWARD A. BILISKI,                        :
                                          :
    Plaintiff                     :
                                          :     Civil Action No.: 06-740-GMS
    v.                            :
                                          :
RED CLAY CONSOLIDATED SCHOOL   :
DISTRICT BOARD OF EDUCATION, et al.,:
    Defendant.                    :

## CERTIFICATE OF SERVICE

    I, Joseph M. Bernstein, hereby certify that on this 29 day of October, 2007, I caused a

copy of the attached Appendix to Plaintiff's Brief in Support of Plaintiff's Motion for Summary

Judgment to be delivered to the below listed parties by means indicated:

**ELECTRONIC SERVICE VIA-CM/ECF**

Barry M. Willoughby
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391

                                     */s/ Joseph M. Bernstein*
                                     Joseph M. Bernstein (ID #780)
                                     800 N. King Street – Suite 302
                                     Wilmington, DE 19801
                                     302-656-9850
                                     302-656-9836 (Fax)
                                     E-mail: jmbernstein@embarqmail.com
                                     Attorney for Plaintiff